**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

_____

SABRINA BRIONY DUNCAN          :
                                    :
        Plaintiff,            :
                                      :
        v.                   :
                                      :
JACK HENRY & ASSOCIATES, INC.; THE   :
JACK HENRY & ASSOCIATES, INC. GROUP  :   Case No. 6:21-cv-03280-RK
HEALTH BENEFIT PLAN; UMR, INC.; and  :
QUANTUM HEALTH, INC.,             :
                                      :
        Defendants.        :
_____

# AMENDED COMPLAINT

Plaintiff Sabrina Briony Duncan complains as follows against Defendants Jack Henry & Associates, Inc., The Jack Henry & Associates, Inc. Group Health Benefit Plan, UMR, Inc., and Quantum Health, Inc.

## INTRODUCTION

1.    Plaintiff is a transgender woman who has been diagnosed with gender dysphoria. Gender dysphoria is a mental health condition characterized by psychological distress arising from an incongruence between one's sex assigned at birth and one's gender identity. The former is determined by one's physical sex characteristics and the latter is intrinsic. As part of Plaintiff's treatment for gender dysphoria, Plaintiff's doctors recommended facial feminization surgery ("FFS").

2.    FFS is a classification for medical procedures that surgically modify masculine facial characteristics to make them more typically feminine. FFS is recognized as medically necessary treatment for some individuals with gender dysphoria, based on an evaluation by their

healthcare providers.

3.      Plaintiff's doctors and psychologist have determined that FFS is medically necessary to treat Plaintiff's gender dysphoria. Plaintiff sought precertification of coverage for this treatment under her employer-sponsored health benefit plan. Defendants denied Plaintiff's request for coverage for her prescribed FFS treatment. In so doing, Defendants misinterpreted the Plan, ignored prevailing medical standards, and relied on an internal UnitedHealthcare clinical policy (the "Gender Dysphoria Policy") that, contrary to Plaintiff's Plan, arbitrarily defines all FFS procedures as "cosmetic and not medically necessary, when performed as part of surgical treatment for Gender Dysphoria." Through these acts, Defendants violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*., and the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"), codified at 29 U.S.C. § 1185a, which is incorporated into and enforceable through ERISA.

4.      Plaintiff seeks to enforce her rights under ERISA and the Parity Act, and to remedy the injuries Defendants have caused her to suffer, and which she continues to suffer, because of Defendants' illegal and discriminatory denial of coverage for her FFS treatment.

5.      In the alternative, Plaintiff seeks to enforce her rights and to remedy the injuries Defendant Jack Henry & Associates, Inc. has caused her to suffer, and which she continues to suffer, because of its illegal and discriminatory denial of coverage for her FFS treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, as amended by the Civil Rights Act of 1991, at 42 U.S.C. § 1981(a) ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, *et seq.* ("MHRA").

6.      Plaintiff also seeks statutory penalties under the Parity Act, as amended by the

Consolidated Appropriations Act of 2021, against Defendant Jack Henry & Associates, Inc. for its failure to provide her with statutorily required information about the limitations the Plan imposes on mental health benefits, including coverage for gender dysphoria treatment, as compared to the limitations on medical/surgical benefits.

## JURISDICTION AND VENUE

7.      Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this case arises under ERISA, 29 U.S.C. § 1132(e), Title VII, 42 U.S.C. § 2000(e), *et seq.*, and the ADA, 42 U.S.C. § 12101, *et seq.* The Court has supplemental jurisdiction over the MHRA claim, Mo. Rev. Stat. § 213.010, *et seq.*, pursuant to 28 U.S.C. § 1367.

8.      Venue is appropriate in this District under ERISA, 29 U.S.C. § 1132(e)(2), because this District is where the Plan is administered, and because Defendant Jack Henry & Associates, Inc. has its principal place of business and may be found in this District.

9.      Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Greene County, Missouri.

10.     Venue is appropriate in the Southern Division pursuant to Local Rule 3.2(a)(3)(A).

## THE PARTIES

11.     At all times relevant to this Complaint, Plaintiff Sabrina Briony Duncan has been an employee of Jack Henry & Associates, Inc., and a participant in the Jack Henry & Associates, Inc. Group Health Benefit Plan. Ms. Duncan resides in Springfield, Missouri.

12.     Jack Henry & Associates, Inc. ("JHA") is a corporation organized under Missouri law with its principal place of business located in Monett, Missouri. JHA is an employer subject to the requirements of Title VII, the ADA, and the MHRA.

13.     The Jack Henry & Associates, Inc. Group Health Benefit Plan (the "Plan") is a self-

funded, non-grandfathered health and welfare benefit plan sponsored by JHA, which offers the Plan as an employment benefit to its employees. The Plan is governed by ERISA.

14.     Defendant UMR, Inc. ("UMR") is a corporation organized under Wisconsin law with its principal place of business located in Wausau, Wisconsin. UMR is a subsidiary of UnitedHealth Group (together with UMR, "United") that administers health benefit plans nationwide, including Plaintiff's Plan.

15.     Defendant Quantum Health, Inc. ("Quantum") is a corporation organized under Ohio law with its principal place of business located in Columbus, Ohio. Under the Plan's terms, Quantum is responsible for the "Care Coordination" process, and therefore for precertification requests, under the Plan.

## THE PLAN

16.     The Plan covers both medical/surgical benefits and mental health/substance use disorder benefits, including coverage for gender dysphoria and gender transition surgery.

17.     JHA is the named Plan Administrator and the Named Fiduciary for the Plan. As such, JHA is a fiduciary under ERISA.

18.     UMR is the named "Third Party Administrator" and "claims administrator" for medical claims (including behavioral health claims) under the Plan, with the delegated fiduciary responsibility to make all final and binding coverage determinations under the Plan. The Plan states that "all clinical reviews that are done to determine Plan coverage are conducted by the clinical staff of UMR Care Management department."

19.     United issues internal clinical coverage policies from time to time, which are intended to assist its personnel in interpreting the terms of "standard" United benefit plans when conducting clinical reviews. The UMR Care Management department follows United's clinical policies when administering benefits under the JHA Plan.

4

20.     The Plan also sets forth a "Care Coordination Process," which Plan participants are instructed to use when seeking precertification of coverage, among other things. Although UMR conducts "all clinical reviews," UMR delegated some of the administrative responsibilities of the Care Coordination Process to Quantum. Among other things, Quantum utilizes its own administrative system to process requests for precertification of coverage.

21.     Based on the responsibilities JHA delegated to Defendants UMR and Quantum with respect to the management and administration of the Plan, including with respect to clinical benefit determinations under the Plan, UMR and Quantum are both fiduciaries under ERISA.

22.     All Defendants, therefore, must discharge their duties under the Plan solely in the interests of Plan participants and beneficiaries, with care, skill, diligence, and prudence, while ensuring that the Plan complies with ERISA and its parity requirements.

## THE PARITY ACT

23.     Congress enacted the Parity Act on October 3, 2008 as an amendment to ERISA. *See* 29 U.S.C. § 1185a. The purpose of the law was to end discrimination in the provision of insurance coverage for mental health treatment, as compared to medical and surgical services. While the Parity Act does not require health care plans to cover mental health services, if a plan chooses to cover mental health services, such coverage must be provided "at parity" with medical/surgical benefits.

24.     Plaintiff's Plan covers mental health services. Therefore, under the Parity Act, the Plan must be administered to ensure that:

> the treatment limitations applicable to such mental health or substance use disorder benefits are ***no more restrictive*** than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are ***no separate treatment limitations*** that are applicable only with respect to mental health or substance use disorder benefits.

*Id*. (emphasis added). The regulations implementing the Parity Act specify that these requirements

apply to both quantitative treatment limitations ("QTLs") and non-quantitative treatment limitations ("NQTLs").

25.     The treatment limitations at issue in this case—the Plan's Cosmetic Treatment exclusion and its Medical Necessity requirement—are NQTLs.

26.     The Parity Act's implementing regulations define six classifications into which all benefits covered under a plan must be categorized: (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs. The FFS prescribed to treat Plaintiff's gender dysphoria falls into the second classification, for "inpatient, out-of-network" services.

27.     The implementing regulations prohibit the Plan from imposing an NQTL on mental health benefits in any classification unless, under the terms of the Plan as written ***and*** in operation, any processes, strategies, evidentiary standards, or other factors used in applying the NQTL to mental health benefits in a classification are comparable to, and are applied no more stringently than, those used in applying the limitation with respect to medical/surgical benefits in the same classification.

28.     In addition, any separate NQTL that applies to only the mental health benefits within any particular classification violates the Parity Act.

29.     Congress amended the Parity Act when it passed the Consolidated Appropriations Act of 2021 to require plans to perform and document comparative analyses of the design and application of all NQTLs plans impose on mental health and substance use disorder benefits. 29 U.S.C. § 1185a(8)(A). The amended statute further required the comparative analyses to be completed and available to the Department of Labor, upon request, by February 10, 2021.

30.     As a participant in the JHA Plan, Plaintiff is entitled to receive a copy of the

required comparative analyses within 30 days of requesting them.

## FACTUAL ALLEGATIONS

31.     ERISA requires Defendants to administer the Plan according to its terms, except that the statute also requires Defendants to refrain from enforcing Plan terms that violate ERISA or the Parity Act. In addition, ERISA imposes other fiduciary duties on Defendants, including the duty to administer the Plan solely in the interest of the Plan participants and beneficiaries and for the "exclusive purpose" of "providing benefits to participants and their beneficiaries" while defraying reasonable expenses of administering the plan. By incorrectly interpreting the Plan as excluding all coverage for FFS for gender dysphoria, and by applying the Gender Dysphoria Policy in violation of the Parity Act and its regulations, Defendants breached their fiduciary duties to Plaintiff and violated ERISA.

### *Background on Transgender Healthcare and FFS*

32.     A transgender person is someone whose sex assigned at birth, as determined by the appearance of physical sex characteristics, does not match the person's gender identity—their intrinsic sense of being male, female, or a different category.

33.     There are two categories of sex characteristics: primary and secondary. Primary sex characteristics are the sex organs used for reproduction. Secondary sex characteristics are features that appear during puberty in humans and that are not directly part of the reproductive system. They include, among other things, facial hair, cranial shape, Adam's apples, and breasts.

34.     Transgender individuals often suffer from gender dysphoria—a recognized mental health diagnosis that refers to the psychological distress that results from an incongruence between one's sex assigned at birth and one's gender identity. The *Diagnostic and Statistical Manual of Mental Disorders* (5th ed.) ("DSM-V") recognizes gender dysphoria as a mental disorder. Treatment for gender dysphoria includes, but is not limited to, psychotherapy, hormone therapy,

and surgery.

35.     The World Professional Association for Transgender Health ("WPATH") is the leading international and interdisciplinary organization devoted to transgender health.

36.     WPATH publishes the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th ed. 2011) ("*Standards of Care*"), which are recommended clinical protocols and standards of care based on the best available science and expert professional consensus on the topic.

37.     WPATH's *Standards of Care*, originally published in 1979, are internationally accepted and considered the gold standard for professionals working with transsexual, transgender, and gender nonconforming individuals. Major medical and mental health organizations, including the American Psychiatric Association, endorse the *Standards of Care* as the authoritative standards of care for the provision of transgender healthcare.

38.     The *Standards of Care* include a well-established, evidence-based treatment protocol for gender dysphoria, which provides for a process of medically supported gender transition to allow transgender patients to live consistently with their core gender identity. Where appropriate for the individual, the treatment protocol provides for patients to undergo medical treatments to alter their physical characteristics to align with their gender identity. Above all, WPATH's *Standards of Care* emphasize the importance of individualized assessment and treatment for individuals with gender dysphoria, as each case and each person's treatment needs are different.

39.     The American Medical Association's policy on the medical necessity of treatment for gender dysphoria similarly recognizes that the medical necessity of medical and surgical treatments for gender dysphoria are dependent on "shared decision making between the patient

and physician."

40. One of the recognized treatment options for gender dysphoria in the *Standards of Care* is surgery to change primary and/or secondary sex characteristics. Within this category is surgery to modify certain facial features that are secondary sex characteristics. This is known as facial gender confirmation surgery. For transgender women, the procedure is called facial feminization surgery ("FFS"). FFS significantly assists transgender women in social integration by modifying masculine facial characteristics to appear feminine. Just as genitals and breasts are physical markers of incongruent biological identity for some individuals with gender dysphoria, so too are facial characteristics. And unlike genitals and breasts, an individual's facial characteristics are the physical markers of biological identity that are most easily and often observed. Whether FFS is medically necessary is dependent on the patient's individualized medical needs as assessed by their healthcare provider.

41. Peer-reviewed literature and research in the relevant medical field concludes that FFS should be considered a medically necessary gender-confirming surgery when indicated for a given patient.

### *Plaintiff's Plan Covers Medically Necessary Treatment for Mental Health Conditions, Including Gender Dysphoria*

42. The Plan provides coverage for medical services that are authorized by a Physician or other Qualified Provider and "are necessary for the treatment of an Illness or Injury," subject to exclusions and limitations enumerated in the Plan. The Plan also covers "services authorized by a Physician and deemed to be Medically Necessary for the treatment of a Mental Health Disorder," subject to other exclusions and limitations enumerated in the Plan.

43. Under the Plan, a "Mental Health Disorder" is "a disorder that is a clinically significant psychological syndrome associated with distress, dysfunction, or Illness," and "[t]he

9

syndrome must represent a dysfunctional response to a situation or event that exposes the Covered Person to an increased risk of pain, suffering, conflict, Illness, or death."

44. The Plan defines "Gender Dysphoria" by incorporating the diagnostic criteria in the DSM-V. According to the Plan, the diagnostic criteria provide that "[a] marked incongruence exists between one's experienced/expressed gender and one's assigned gender, of at least six months' duration, as manifested by at least two of the following," listing, in relevant part:

[1] A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics . . .;

[2] A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender . . .;

[3] A strong desire for the primary and/or secondary sex characteristics of the other gender;

[4] A strong desire to be of the other gender . . .;

[5] A strong desire to be treated as the other gender . . .; and

[6] A strong conviction that one has the typical feelings and reactions of the other gender. . . .

45. The Plan further specifies that "[t]he condition must be associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning."

46. The Plan defines "Medically Necessary" services in relevant part as those that are "provided for the purpose of . . . treating. . . [a] mental illness. . . or its symptoms," which must also be "[i]n accordance with Generally Accepted Standards of Medical Practice," among other requirements. According to the Plan, "Generally Accepted Standards of Medical Practice" are "standards that are based on credible scientific evidence," "observational studies," or "standards that are based on Physician specialty society recommendations or professional standards of care."

### Plaintiff's Plan Covers Gender Transition Treatment, Including Surgery

47. The Plan explicitly covers "Gender Transition," including "[t]reatment, drugs,

medicines, services and supplies for, or leading to, gender transition surgery." The Plan does not define "Gender Transition." The American Psychological Association defines the term as "the process of shifting toward a gender role different from that assigned at birth, which can include social transition, such as new names, pronouns and clothing, and medical transition, such as hormone therapy or surgery."

48.     FFS, the facial gender confirmation surgery prescribed to treat Ms. Duncan's gender dysphoria, is gender transition surgery.

49.     The Plan excludes from coverage "Cosmetic Treatment" and "Cosmetic Surgery" "unless the procedure is otherwise listed as a covered benefit." Because Gender Transition and treatment for Gender Dysphoria are otherwise listed in the Plan as covered benefits, the plain terms of the Cosmetic Treatment exclusion do not apply to Ms. Duncan's request for coverage of her FFS.

***Plaintiff's Plan Purports to Exclude Coverage for Surgeries That Alter Appearance, But Only When They Are Prescribed for Psychological or Emotional Reasons***

50.     The Plan defines "Cosmetic Treatment" as "medical or surgical procedures that are primarily used to improve, alter, or enhance appearance, whether or not for psychological or emotional reasons." The Plan, however, makes clear that such procedures are *not* considered "cosmetic" when they are performed for physical reasons, rather than psychological ones.

51.     Specifically, the Plan defines "Reconstructive Surgery" as "surgical procedures performed on abnormal structures of the body caused by congenital Illness or anomaly, Accident, or Illness." The definition of Reconstructive Surgery emphasizes that "[t]he fact that physical appearance may change or improve as a result of Reconstructive Surgery does not classify surgery as Cosmetic Treatment when a physical impairment exists and the surgery restores or improves function."

52.     Thus, under the plain terms of the Plan, surgical procedures that "improve, alter or enhance appearance" are categorically deemed Cosmetic and excluded when they are for "psychological or emotional reasons," but are ***not*** categorically deemed Cosmetic and may be covered "when a physical impairment exists and the surgery restores or improves function."

53.     The plain terms of the Plan, therefore, impose a treatment limitation on mental health conditions that is separate and more restrictive than the limitations imposed on medical conditions, in violation of the Parity Act.

54.     Thus, even if the Cosmetic Treatment exclusion applied to Plaintiff's request for coverage for FFS (which, as alleged above, it did not), Defendants would be precluded from enforcing it because the Plan's definition of Cosmetic Treatment violates the Parity Act.

### *The United Gender Dysphoria Policy*

55.     United recognizes gender dysphoria as a mental health condition and has developed an internal clinical policy, entitled "Gender Dysphoria Treatment," that sets forth United's clinical coverage criteria for services to treat this condition (the "Gender Dysphoria Policy"). The policy states that it "provides assistance in interpreting UnitedHealthcare standard benefit plans."

56.     Defendants applied United's Gender Dysphoria Policy to determine that Ms. Duncan's FFS was excluded as "Cosmetic Treatment" despite the contrary terms of her Plan. While the Gender Dysphoria Policy categorically deems certain treatments as cosmetic "when performed as part of surgical treatment for Gender Dysphoria," the Plan explicitly provides that Gender Transition surgeries and Gender Dysphoria treatments are covered and states that the exclusion for Cosmetic Treatment and Cosmetic Surgeries does not apply to services that are otherwise covered under the Plan. Moreover, while the policy categorically provides that the services it deems "cosmetic" are never medically necessary, Plaintiff's Plan defines medical necessity, in relevant part, as services that are consistent with generally accepted standards of care,

which, in the context of treating Gender Dysphoria, recognize that FFS may be appropriate based on an individualized assessment of medical need.

57.     Defendants' reliance on the Gender Dysphoria Policy to interpret the terms of Plaintiff's Plan was unreasonable for two additional, independent reasons.

58.     First, although the Plan calls for medical necessity determinations to assess whether services are consistent with generally accepted standards of medical practice, the Gender Dysphoria Policy's categorical exclusion of FFS procedures is directly contrary to prevailing national criteria, standards of care, and peer-reviewed literature in the relevant medical field— including the WPATH *Standards of Care*, which United even cites as part of its evidence base for the Gender Dysphoria Policy.

59.     The Gender Dysphoria Policy allows for coverage of breast reduction surgery and genital surgery as gender transition treatments for gender dysphoria. These are surgeries to modify secondary sex characteristics and primary sex characteristics, respectively. United covers these procedures on a case-by-case basis and requires certain criteria to be met before authorizing the coverage. For example, the Gender Dysphoria Policy covers genital confirmation surgery if the patient meets certain criteria, including: the patient's persistent, well-documented gender dysphoria, age of majority, capacity, and 12 months of successful and continuous full-time real-life experience in the desired gender. Thus, for this particular gender transition treatment for gender dysphoria, United applies an individualized approach to assessing medical necessity/clinical appropriateness.

60.     But with respect to FFS, the Gender Dysphoria Policy leaves no room for individualized assessment. The policy states, "[c]ertain ancillary procedures. . . are considered cosmetic and not medically necessary, when performed as part of surgical treatment for Gender

Dysphoria," listing a number of procedures, including "[f]acial bone remodeling for facial feminization," "[r]hinoplasty," and "trachea shave (removal or reduction of the Adam's apple)," despite the fact that the Gender Dysphoria Policy actually cites to WPATH's *Standards of Care* and other clinical evidence that supports FFS as medically necessary in appropriate cases, based upon individualized assessment.

61. The Gender Dysphoria Policy is therefore inconsistent with WPATH's *Standards of Care* and prevailing medical standards, which direct "an individualized approach to best meet a patient's health care needs" with "documentation of persistent gender dysphoria by a qualified mental health professional."

62. The *Standards of Care* explain that "in the field of plastic and reconstructive surgery . . . , there is no clear distinction between what is purely reconstructive and what is purely cosmetic. Most plastic surgery procedures actually are a mixture of both reconstructive and cosmetic components." For example, WPATH concludes that an FFS rhinoplasty procedure "can have a radical and permanent effect on [a gender dysphoria patient's] quality of life, and therefore is much more medically necessary than for somebody without gender dysphoria." Nevertheless, United's Gender Dysphoria Policy excludes FFS procedures without exception "when performed as part of surgical treatment for Gender Dysphoria." United considers these procedures to be "cosmetic" 100 percent of the time without any individualized assessment.

63. Second, because the United Gender Dysphoria Policy categorically excludes coverage for FFS regardless of individual need, the Defendants' application of the policy to Plaintiff's request for coverage also violated the Parity Act. In contrast to the Gender Dysphoria Policy's across-the-board exclusion of coverage for FFS to treat gender dysphoria, United's other clinical policies call for individualized assessments to determine the medical necessity of facial

surgeries when they treat medical and surgical conditions. For example, United's medical policy on Rhinoplasty and Other Nasal Surgeries reflects that the Rhinoplasty-Tip surgery that United deems inherently cosmetic and excluded treatment for Ms. Duncan's mental health condition is considered "reconstructive" and "medically necessary" for medical/surgical patients who meet certain requirements. The requirements include prolonged, persistent obstructed nasal breathing; anatomic mechanical nasal airway obstruction; photo documentation; rhinoplasty designed to correct and relieve the obstruction; and significant symptoms that persist for at least 4 weeks. In stark contrast to this individualized approach for medical/surgical patients, Defendants deemed exactly the same procedure to be purely cosmetic for Ms. Duncan, solely because it would treat a mental health condition rather than a medical one.

64.     The disparate position on facial surgical procedures reflected in United's internal clinical policies—i.e., excluding them if treating a mental health condition but offering coverage when medically necessary to treat medical and surgical conditions—thus imposes a separate, more restrictive treatment limitation applicable only to mental health benefits. No blanket exclusion applies to facial surgeries for individuals with medical/surgical conditions. In fact, United draws a clear line between mental health and medical conditions when it comes to gender-biological incongruence. The Policy states that "individuals with ambiguous genitalia or disorders of sexual development" (medical conditions), are exempt from the entirety of the policy on gender dysphoria (a mental health condition).

65.     The Gender Dysphoria Policy therefore violates the Parity Act and is void and unenforceable. By relying on the illegal policy to interpret Plaintiff's Plan, Defendants breached their fiduciary duties under ERISA.

### Ms. Duncan's Request for Coverage and Defendants' Denials

66.     Plaintiff Sabrina Duncan is a 46-year-old transgender woman. Although she was

assigned male at birth based on external physical sex characteristics, Ms. Duncan is female. Ms. Duncan desires to live and be accepted as female.

67.     Ms. Duncan's gender dysphoria meets the Plan's definition of the diagnosis, set forth above. She has experienced clinically significant distress and impairment for years, manifesting in all six of the conditions listed in the DSM-V diagnostic criteria incorporated into the Plan.

68.     Although Ms. Duncan has struggled with gender dysphoria since adolescence, she first sought treatment to address her psychological distress relating to her gender identity as an adult. In March 2016, Dr. Rachel Hankins, Ms. Duncan's primary care provider, diagnosed Ms. Duncan with gender dysphoria. Dr. Jamie Durfey, M.D., took over Ms. Duncan's primary care in September 2017. Ms. Duncan continues to receive hormone therapy from Dr. Durfey.

69.     In October 2015, Ms. Duncan began seeing Krystle Robinson Eckhart, Psy.D., a licensed clinical psychologist and credentialed health service psychologist with expertise in lesbian, gay, bisexual, and transgender individuals. Dr. Robinson Eckhart confirmed the gender dysphoria diagnosis based on her assessment of Ms. Duncan's clinical presentation in individual therapy sessions. Since 2015, Ms. Duncan has consistently received individual psychotherapy from Dr. Robinson Eckhart as part of the treatment protocol for her gender dysphoria.

70.     Ms. Duncan made a full social transition in 2018, meaning that she now lives full-time in her authentic gender identity in all areas of her personal and professional life.

71.     Despite receiving treatment and support for years, Ms. Duncan continues to experience severe distress relating to her remaining male sex characteristics. One of these is the secondary sex characteristic of her facial and skull features. To the outside world, these are the most obvious indicators of the incongruence between her gender identity and the sex she was

assigned at birth.

72.     Ms. Duncan experiences significant anxiety and depression as a result of the incongruence between her masculine facial features and her female gender identity. For example, Ms. Duncan struggles with looking at herself in the mirror without experiencing what she explains as "utter disgust." She experiences severe distress around being photographed or recorded on video. This has become particularly acute due to the necessity of remote working during the pandemic. Ms. Duncan is crippled with anxiety during videoconference meetings, which prevents her from turning her video on and actively participating with her colleagues. This is in addition to the many work opportunities Ms. Duncan has turned down out of fear that she may advance at work and be placed on a new team with colleagues who may not accept her authentic female gender.

73.     The distress of Ms. Duncan's gender dysphoria keeps her from a number of social and professional experiences that are part of an otherwise normal life. For these reasons, Dr. Robinson Eckhart and Dr. Durfey have both concluded that FFS is medically necessary treatment for Ms. Duncan's gender dysphoria.

74.     On May 27, 2020, Bounmany Kyle Keojampa, M.D., a surgeon with extensive expertise in FFS, evaluated Ms. Duncan for facial gender confirmation surgery. Dr. Keojampa conducted a detailed assessment of Ms. Duncan's clinical presentation and concluded that Ms. Duncan was an "appropriate candidate for facial gender confirmation surgery" because FFS "is a critical part of" the male-to-female transition process and Ms. Duncan met the WPATH guidelines for surgical treatment for gender dysphoria.

75.     Dr. Keojampa ordered an FFS treatment plan for Ms. Duncan's gender dysphoria. Some of the procedures he prescribed include forehead cranioplasty, bone removal around the

orbit, midface reconstruction, rhinoplasty, jaw surgery, genioplasty, and tracheal shave.

76.     Dr. Keojampa, on Ms. Duncan's behalf, promptly requested precertification of coverage for these FFS procedures under the Plan through Quantum, following the Plan's Care Coordination process.

77.     On information and belief, the clinical staff of UMR's Care Management department conducted a clinical review of Ms. Duncan's request for precertification, as her Plan provides.

78.     On May 28, 2020, Defendants denied precertification of coverage for the prescribed FFS procedures on the ground that "this surgery is for cosmetic purposes," citing the Plan's exclusion of coverage for Cosmetic Treatment.

79.     Defendants' denial of Plaintiff's coverage request pursuant to the Cosmetic Treatment exclusion violated the Plan's plain terms, which, as alleged above, state that the exclusion does not apply if "the procedure is otherwise listed as a covered benefit," which gender transition surgeries are.

80.     Moreover, the primary *purpose* for Ms. Duncan's FFS procedures is not to improve, alter, or enhance her appearance. The primary purpose is to treat her gender dysphoria and the clinically significant distress it causes her, by removing existing male secondary sex characteristics and adding female sex characteristics so that she may reach congruence with her gender identity.

81.     Further demonstrating their failure to conduct any individualized assessment of Ms. Duncan's precertification request, Defendants also deemed "cosmetic" and therefore denied coverage for a procedure to treat Ms. Duncan's temporomandibular joint ("TMJ") syndrome—that is, a medical procedure to treat a medical condition—merely because that procedure was submitted for precertification along with the FFS procedures.

82. Ms. Duncan appealed Defendants' initial denial of precertification. On August 13, 2020, Defendants upheld the denial. This time, the written notification of denial stated that "the requested facial feminization surgery was determined not to be medically necessary per the Plan's language." The rationale offered in the denial letter further stated that the FFS was "not medically necessary because national criteria considers [it] a cosmetic procedure" and "cosmetic treatment, cosmetic surgery, or any portion thereof is excluded" by the Plan. The letter cited the Plan, but did not explain what the "national criteria" were on which Defendants were basing the denial.

83. Defendants did not dispute the medical necessity of Plaintiff's prescribed treatment for any reason other than their incorrect conclusion that FFS surgery is always "cosmetic."

84. Ms. Duncan's second level appeal, which Defendants denied on October 5, 2020, exhausted the Plan's internal appeal process. The written notification of denial for the second level appeal asserted that the requested FFS procedures "would be considered cosmetic based on the Plan's definition of cosmetic treatment." The letter further stated that this conclusion was based on "clinical practice standards and peer-reviewed literature established by the relevant medical community." The letter, again, did not provide any information as to what criteria, standards, or literature Defendants consulted in making this determination.

85. Throughout the appeal process, Ms. Duncan asked Quantum to provide her with all documents relied upon in denying her precertification request. Among other things, Quantum sent Ms. Duncan a copy of the Gender Dysphoria Policy. Quantum did not cite to the Gender Dysphoria Policy in any of its three denial letters, but Quantum represented that it relied on the Gender Dysphoria Policy when it mailed Ms. Duncan a copy of it.

86. On information and belief, therefore, the appeal denial letters' references to "national criteria" and "clinical practice standards" refer to the Gender Dysphoria Policy.

87.     As Defendants' written notifications of denial reflect, the only reason Defendants denied coverage for Plaintiff's FFS was their determination, based on the Gender Dysphoria Policy, that the prescribed surgery was cosmetic. If not for that faulty determination, Defendants would have approved coverage for Plaintiff's surgery.

88.     Defendants' wrongful denial of Ms. Duncan's request for pre-authorization for her FFS procedures has left Ms. Duncan with two grim choices: either pay well over $100,000 dollars out of pocket for her surgeries, which would impose a severe financial burden she cannot reasonably afford in order to receive medically necessary treatment that should be covered under her Plan, or continue to suffer from the psychological distress and functional impairment from her untreated gender dysphoria. Neither option is tenable.

### *Plaintiff's Request for the Plan's Comparative Analysis of NQTLs*

89.     As alleged above, the Parity Act, as amended by the Consolidated Appropriations Act of 2021, required JHA to perform and document comparative analyses of the design and application of all NQTLs the Plan imposes on mental health benefits. 29 U.S.C. § 1185a(8)(A).

90.     The statute and implementing regulations further required JHA to produce the mandated comparative analyses to a Plan participant within 30 days following the participant's request for them. 29 U.S.C. § 1185a(8)(A); 29 U.S.C. § 1024(b)(4) (requiring administrator to furnish, upon written request of a participant, any "instruments under which the plan is established or operated"); 29 C.F.R. § 2590.712(d)(3) ("Instruments under which the plan is established or operated include documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.").

91.     On May 1, 2021, Plaintiff submitted a written request for JHA's comparative analyses of the Plan's non-quantitative treatment limitations. Using a template provided by the Department of Labor for this purpose, Plaintiff requested (1) information concerning the Plan's NQTLs related to coverage for mental health and substance use disorder benefits, generally; (2) information concerning the Plan's NQTLs related to coverage for gender dysphoria, specifically; and (3) information relating to the particular NQTLs on which JHA based its denial of Plaintiff's request for coverage.

92.     Plaintiff's request—again, using the DOL template—expressly asked JHA for the following information regarding each of these three categories of NQTLs:

1. Provide the specific plan language regarding the limitation(s) and identify the medical/surgical and mental health or substance use disorder benefits to which it applies in the relevant benefit classification described in the regulations under the Mental Health Parity and Addiction Equity Act;

2. Identify the factors used in the development of the limitation(s) (examples of factors include, but are not limited to, excessive utilization, recent medical cost escalation, high variability in cost for each episode of care, and safety and effectiveness of treatment);

3. Identify the sources (including any processes, strategies, or evidentiary standards) used to evaluate the factors identified above. Examples of evidentiary standards include, but are not limited to, the following:

• Excessive utilization as defined by two standard deviations above average utilization per episode of care;

• Recent medical cost escalation as defined by medical costs for certain services increasing 10% or more per year for 2 years;

• High variability in cost per episode of care as defined by episodes of outpatient care being 2 standard deviations higher in total costs than the average cost per episode 20% or more of the time in a 12-month period; and

• Safety and efficacy of treatment modality as defined by 2 random clinical trials required to establish that a treatment is not experimental or investigative;

4. Identify the methods and analysis used in the development of the limitation(s); and

5. Provide any evidence and documentation to establish that the limitation(s) is applied no more stringently, as written and in operation, to mental health and substance use disorder benefits than to medical and surgical benefits.

93.    On May 28, 2021, JHA sent Plaintiff a three-page response that failed entirely to meet the requirements of the Parity Act disclosure requirement. JHA's response with respect to the first two categories of treatment limitations (those related to coverage for mental health and substance use disorder benefits, generally, and those related to coverage for gender dysphoria, specifically) consisted of a single paragraph of generalized statements like the following: "[T]he Plan has certain limitations in place for in-network and out-of-network services and for prescription drugs benefits, but these limitations apply the same whether they are incurred in connection with a medical/surgical or a mental health expense." JHA completely failed to provide the specific information Plaintiff enumerated in her request, which mirrored the information JHA is required by law to disclose.

94.    Even with respect to the NQTLs JHA imposed to deny coverage to Plaintiff, JHA failed to provide the disclosure required under the Parity Act. JHA admitted that it used two NQTLs to deny coverage to Plaintiff: (1) the cosmetic treatment exclusion; (2) the medical-necessity requirement. With respect to those NQTLs, JHA identified the relevant Plan terms, but otherwise failed to provide any of the other information Plaintiff requested, which JHA is required by law to disclose.

95.    The response failed entirely to describe "all mental health . . . and medical or surgical benefits to which each such term applies in each respective benefits classification."

96.    JHA admitted that its agent Quantum's application of the two NQTLs was "based on" United's Gender Dysphoria Policy, but otherwise failed to identify or define any of the "factors

used to determine that the NQTL will apply to mental health . . . and medical or surgical benefits" or to disclose "the evidentiary standards used" for those factors.

97.     Rather than disclosing "any other source or evidence relied upon to design and apply the NQTLs to mental health or substance use disorder benefits and medical or surgical benefits," JHA merely asserted that United "relied on multiple clinical studies . . . including one . . . regarding the effectiveness of facial feminization surgery for the treatment patients with gender dysphoria." JHA asserted that "many" of those studies were "cited in the Policy," but listed only "a 2016 study by Morrison, et. al" in its disclosure.

98.     The entirety of JHA's response to Plaintiff's request for evidence to establish that the NQTLs applied to her claim are applied no more stringently, as written and in operation, to mental health benefits than to medical/surgical benefits, was as follows:

> Medical necessity under the Plan was based on the Policy. When deciding the medical necessity of a requested treatment, the Plan relies on medical consensus as determined from the Policy and similar studies. It makes no difference in this regard whether the benefit sought is medical/surgical or mental health or substance abuse disorder benefits. Moreover, both categories of benefits are subject to the opinion of an Independent Medical Reviewer.

99.     JHA's response contained ***no*** comparative analysis whatsoever, let alone an analysis capable of "demonstrating that the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to mental health or substance use disorder benefits, as written and in operation, are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to medical or surgical benefits in the benefits classification."

100.    JHA's response also contained no specific findings or conclusions reached by JHA with respect to any comparative analysis or whether JHA is in compliance with the Parity Act.

101.    Besides failing to provide the statutorily required information with respect to the

NQTLs it did address, JHA's paltry one-paragraph response managed to introduce yet **another** NQTL, also not analyzed elsewhere in the disclosure: "the opinion of an Independent Medical Reviewer."

### *Defendant JHA Discriminated Against Plaintiff Based on Her Sex and Disability*

102.    As administered by Defendants, Defendant JHA's employer-provided health insurance plan—the Plan—categorically excludes coverage for certain facial surgeries only when they are prescribed for transgender individuals. JHA offers employees an insurance plan that singled out Plaintiff's request for coverage and subjected it to different clinical standards based solely on her transgender status.

103.    This employer-provided insurance plan refused to provide full and equal coverage for gender dysphoria—a health condition specific to transgender status—and related treatment, including gender affirmation surgery.

104.    Plaintiff dual filed a timely charge of discrimination with the Equal Employment Opportunity Commission and the Missouri Human Rights Commission on July 19, 2021, alleging discrimination based on sex and disability.

105.    Plaintiff received Notice of Right to Sue from the EEOC on July 28, 2021, indicating that while "[l]ess than 180 days have passed since the filing of this charge, . . . I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge."

106.    The Notice of Right to Sue from the EEOC also indicated that "[t]he EEOC is terminating its processing of this charge."

107.    On September 22, 2021, Plaintiff requested a Right to Sue letter from the MCHR.

108.    On September 22, 2021, Plaintiff was informed by the MCHR that it cannot issue a Right to Sue letter until a case has been on file for 180 days, which is counted from the date the

dual charge was received by the EEOC—July 19, 2021.

109.    Thus, MCHR will not issue Plaintiff's Right to Sue Letter until January 17, 2022 (180 days from July 19, 2021 is January 15, 2022, a Saturday).

**COUNT ONE**
**Claim to Enforce Plan Terms and Clarify Right to Benefits**
**Against All Defendants**

110.    Plaintiff realleges and incorporates paragraphs 1–88, above, as though they were fully stated herein.

111.    Plaintiff brings Count One under 29 U.S.C. § 1132(a)(1)(B), which authorizes a participant in an ERISA plan to bring a civil action to, among other things, enforce her rights under the terms of the plan and to clarify her rights to future benefits under the terms of the plan.

112.    Defendants violated the terms of Plaintiff's Plan by arbitrarily denying her request for precertification of coverage for her prescribed facial feminization surgery to treat her diagnosed gender dysphoria, even though Plaintiff satisfied all prerequisites for coverage under the Plan and the Plan explicitly covers treatment for gender dysphoria, including gender transition surgery.

113.    The only Plan term Defendants initially cited in denying Plaintiff's request for coverage was the Plan's exclusion of coverage for "Cosmetic Treatment." That exclusion, however, did not apply to Plaintiff's request because gender transition surgery is "otherwise listed as a covered benefit" under the Plan.

114.    In denying Plaintiff's administrative appeal of their wrongful denial, Defendants asserted that her prescribed FFS was not "medically necessary" solely because Defendants deemed the treatment "cosmetic" pursuant to the United Gender Dysphoria Policy. Defendants applied the United policy to deny Plaintiff's request for coverage even though the policy contradicted the terms of Plaintiff's Plan, including the definition of "medically necessary" services, as alleged above.

115.    Defendants' denial of Plaintiff's request for precertification of coverage also breached the fiduciary duties Defendants owed Plaintiff under ERISA.

116.    As the named Plan Administrator and the Named Fiduciary for the Plan, JHA is an ERISA fiduciary that owes Plaintiff the fiduciary duties identified in 29 U.S.C. § 1104(a).

117.    As the entities responsible for making benefit determinations under Plaintiff's Plan, including as to requests for precertification, and as entities that exercised discretion with respect to the administration of Plaintiff's Plan, Defendants UMR and Quantum are also ERISA fiduciaries who owe Plaintiff the fiduciary duties identified in 29 U.S.C. § 1104(a).

118.    Among other things, Defendants are required to discharge their duties with respect to the Plan: solely in the interests of the Plan participants, including Plaintiff; carefully, diligently, and prudently; and in accordance with the terms of her Plan, insofar as the Plan complies with ERISA. Defendants breached those fiduciary duties to Plaintiff by carelessly misinterpreting the terms of Plaintiff's Plan and by applying the United Gender Dysphoria Policy to deny Plaintiff's request for coverage even though that internal United policy was not created solely in the interests of any ERISA plan participants; contradicted the terms of the JHA Plan; and flouted the generally accepted standards of care for the treatment of gender dysphoria.

119.    Moreover, as co-fiduciaries, Defendants knowingly participated in each other's breaches of fiduciary duty, as set forth above, and each failed to make reasonable efforts to remedy the others' breaches, giving rise to co-fiduciary liability pursuant to 29 U.S.C. § 1105(a).

120.    Plaintiff continues to suffer from severe gender dysphoria and continues to need the facial feminization surgery her physicians prescribed, but having been denied precertification of coverage, Plaintiff cannot seek benefits under her Plan for that treatment.

121.    In order to remedy Defendants' Plan term violations and fiduciary breaches, which

have caused Defendants wrongfully to deny Plaintiff's request for precertification of coverage, Plaintiff seeks the relief below to enforce her rights under the Plan and to clarify her rights to future benefits under the Plan.

**COUNT TWO**
**Alternative Claim for Injunctive Relief**
**Against All Defendants**

122.    Plaintiff realleges and incorporates paragraphs 1–88 and 112–120, above, as though they were fully stated herein.

123.    Plaintiff brings Count Two under 29 U.S.C. § 1132(a)(3)(A) as an alternative to Count One, which is brought under 29 U.S.C. § 1132(a)(1)(B). Plaintiff seeks relief under Count Two only to the extent the Court finds that the relief available to Plaintiff under Count One is not adequate to fully remedy her injuries alleged therein.

124.    ERISA, 29 U.S.C. § 1132(a)(3)(A), authorizes a plan participant to bring a civil action to enjoin any act or practice that violates any provision of ERISA or the terms of an ERISA plan.

125.    As alleged above, Defendants violated Plaintiff's Plan by denying Plaintiff's request for coverage pursuant to the Plan's Cosmetic Treatment exclusion, which does not apply to gender transition surgery to treat gender dysphoria because such surgery is otherwise covered under the Plan. Defendants further violated Plaintiff's Plan by applying the United Gender Dysphoria Policy to deny her request for precertification of coverage because the United policy contradicts the Plan's plain terms, including the definition of "medically necessary" services and the Cosmetic Treatment exclusion.

126.    Plaintiff continues to suffer, daily, from her gender dysphoria, and continues to need the FFS her doctors have prescribed. Defendants' consistent refusal to approve coverage for those prescribed services makes clear that if Plaintiff requests coverage for this treatment in the

future, Defendants will deny coverage again for the same illegal reasons. Plaintiff, accordingly, has been harmed and is likely to be harmed in the future by Defendants' violations of her Plan, ERISA, and the Parity Act as alleged above.

127.     In order to prevent Defendants from continuing to misinterpret her Plan and wrongfully deny her requests for coverage, and to prevent those violations from causing further harm, Plaintiff is entitled to enjoin Defendants' misinterpretation of the Cosmetic Exclusion and their application of the Plan-violating Gender Dysphoria Policy.

**COUNT THREE**
**Alternative Claim for Appropriate Equitable Relief**
**Against All Defendants**

128.     Plaintiff realleges and incorporates paragraphs 1–88 and 112–120, above, as though they were fully stated herein.

129.     Plaintiff brings Count Three under 29 U.S.C. § 1132(a)(3)(B) as an alternative to Count One, which is brought under 29 U.S.C. § 1132(a)(1)(B). Plaintiff seeks relief under Count Three only to the extent the Court finds that the relief available to Plaintiff under Count One is not adequate to fully remedy her injuries alleged therein.

130.     ERISA, 29 U.S.C. § 1132(a)(3)(B), authorizes a participant or beneficiary to bring a civil action to obtain appropriate equitable relief to redress any act or practice which violates any provision of ERISA or the terms of an ERISA plan, or to enforce any provision of ERISA.

131.     As ERISA fiduciaries, Defendants were required to discharge their duties with respect to the Plan: solely in the interests of the Plan participants, including Plaintiff; carefully, diligently, and prudently; and in accordance with the terms of her Plan, insofar as the Plan complies with ERISA.

132.     As alleged above, Defendants breached those fiduciary duties and harmed Plaintiff by denying her request for precertification of coverage for her prescribed FFS based on a

misreading of the Plan's plain terms and application of clinical coverage criteria that were incompatible with the applicable Plan terms.

133. Plaintiff has been harmed by Defendants' breaches of fiduciary duty and violations of her Plan, as alleged above, because she was wrongfully denied precertification of coverage for treatment that should have been covered under her Plan. Plaintiff seeks appropriate equitable relief to redress Defendants' fiduciary breaches and Plan violations and the harm Defendants' wrongful denials have caused.

<u>**COUNT FOUR**</u>
**Claim to Remedy Parity Act Violation**
**Against All Defendants**

134. Plaintiff realleges and incorporates paragraphs 1–101, above, as though they were fully stated herein.

135. Plaintiff brings Count Four under 29 U.S.C. § 1132(a)(3).

136. The Parity Act, incorporated into ERISA at 29 U.S.C. § 1185a, prohibits Plans that cover both medical/surgical services and mental health services from imposing separate treatment limitations that apply only to mental health benefits and from imposing treatment limitations that are more restrictive than the predominant treatment limitations that apply to substantially all medical/surgical benefits under the plan.

137. The Plan's Cosmetic Treatment exclusion and Medical Necessity requirement are both non-quantitative treatment limitations ("NQTLs") under the Parity Act.

138. On its face, the Plan's definition of "Cosmetic Treatment" applies to "medical or surgical procedures that are primarily used to improve, alter, or enhance appearance," including for "psychological or emotional reasons," *except* "when a physical impairment exists and the surgery restores or improves function." The Plan's "Cosmetic Treatment" exclusion, therefore, applies to such surgeries only when they are prescribed solely for psychological reasons, rather

than physical ones. As such, the exclusion, on its face, violates the Parity Act.

139.    Defendants therefore breached their fiduciary duties under 29 U.S.C. § 1104(a) by denying Plaintiff's request for coverage pursuant to the Cosmetic Treatment exclusion because that provision violates the Parity Act, which is incorporated into ERISA. As fiduciaries, Defendants are obligated to ignore Plan terms that violate ERISA.

140.    Moreover, the Plan's Cosmetic Treatment exclusion and Medical Necessity requirement, as applied by Defendants, are also more restrictive with respect to mental health benefits than to medical/surgical benefits. When applying those NQTLs to mental health benefits for inpatient, out-of-network treatment—specifically, surgical treatment for gender dysphoria— Defendants rely upon the United Gender Dysphoria Policy, which is not only more stringent as written *and* in operation than are medical policies used in applying those NQTLs to medical benefits in the same classification, but it also imposes a separate exclusion on facial surgeries to treat gender dysphoria that does not apply to facial surgeries for medical reasons.

141.    Whereas the Gender Dysphoria Policy arbitrarily deems all facial surgeries prescribed to treat gender dysphoria as "cosmetic" and *never* medically necessary—contrary to the generally accepted standards of care for the treatment of gender dysphoria—Defendants' medical policies applicable to facial surgeries for medical or physical reasons contain no such restriction.

142.    Defendants, accordingly, violated the Parity Act by denying Plaintiff's request for coverage by applying the Gender Dysphoria Policy to deny coverage for Plaintiff's prescribed FFS because it deemed those services to be cosmetic and not medically necessary.

143.    Plaintiff was harmed by Defendants' breaches of fiduciary duty and violations of the Parity Act because Defendants denied her request for precertification of coverage pursuant to non-quantitative treatment limitations that, on their face and as applied, were more restrictive than

the limitations on coverage for medical/surgical conditions in the same classification.

144.     Plaintiff seeks the injunctive and equitable relief identified below to remedy this claim.

**COUNT FIVE**
**Claim for Statutory Penalties**
**Against Defendant Jack Henry & Associates, Inc.**

145.     Plaintiff realleges and incorporates paragraphs 1–30 and 89–101, above, as though they were fully stated herein.

146.     Plaintiff brings Count Five under 29 U.S.C. § 1132(c)(1)(B).

147.     The Parity Act, as amended by the Consolidated Appropriations Act of 2021, requires JHA to perform and document comparative analyses of the design and application of all non-quantitative treatment limitations the Plan imposes on mental health benefits. 29 U.S.C. § 1185a(8)(A).

148.     JHA was further required to produce, within 30 days of a request from a participant, its statutorily required comparative analysis, along with five categories of additional information enumerated in the statute. 29 U.S.C. § 1185a(8)(A); 29 U.S.C. § 1024(b)(4) (requiring administrator to furnish, upon written request of a participant, any "instruments under which the plan is established or operated"); 29 C.F.R. § 2590.712(d)(3) ("Instruments under which the plan is established or operated include documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.").

149.     Under 29 U.S.C. § 1132(c)(1)(B), a plan administrator "who fails or refuses to comply with a request for any information which such administrator is required by this subchapter

31

to furnish to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."

150.   Plaintiff submitted her request for JHA's comparative analyses on May 1, 2021. JHA failed to comply with Plaintiff's request for the information the Parity Act required JHA to "prepare and document," and which ERISA requires JHA to furnish to Plaintiff. JHA's response to Plaintiff's request was entirely inadequate under the statute and its implementing regulations, and to date, JHA still has never provided the required information.

151.   Either JHA never performed the comparative analyses required under the statute, or JHA simply refused to provide those analyses to Plaintiff. Either way, JHA should be liable for the statutory penalty in the amount of $100 per day running from May 31, 2021, the date on which JHA should have furnished the information to Plaintiff.

## COUNT SIX
### Violation of Title VII of the Civil Rights Act of 1964
### Against Defendant Jack Henry & Associates, Inc.

152.   Plaintiff realleges and incorporates paragraphs 1–88 and 102–109, above, as though they were fully stated herein.

153.   Plaintiff brings Count Six under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, as amended by the Civil Rights Act of 1991, at 42 U.S.C. § 1981(a), and in compliance with 29 C.F.R. § 1601.28.

154.   Plaintiff brings Count Six as an alternative to Counts One through Four.

155.   Plaintiff received Notice of Right to Sue from the EEOC on July 28, 2021.

156.   Claims under Title VII must be filed within 90 days of the receipt of the Notice of Right to Sue from EEOC. This lawsuit was filed on October 26, 2021 and was therefore timely under Title VII.

157.     Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "[C]ompensation, terms, conditions, or privileges of employment" include health insurance and other fringe benefits.

158.     Plaintiff is insured through her employer-provided health insurance plan.

159.     JHA is an employer subject to the requirements of Title VII. 42 U.S.C. § 2000e(b).

160.     Discrimination based on transgender status is a form of sex discrimination. Therefore, Title VII requires an employer-sponsored group health plan to extend equally comprehensive coverage to both cisgender and transgender employees.

161.     JHA's administration of the employer-provided Plan constitutes an adverse employment action and unlawful discrimination under Title VII because it excludes coverage for certain facial surgeries only when they are requested by transgender individuals and because the employer-provided Plan singled out Plaintiff's request for coverage and subjected it to different clinical standards based solely on her transgender status. Refusing to provide full and equal coverage for health conditions specific to transgender status, such as gender dysphoria treatment and gender affirmation surgeries, violates Title VII's antidiscrimination mandate.

162.     Plaintiff was harmed because JHA discriminated against Plaintiff with respect to her compensation and privileges of employment based on her transgender status and sex. JHA therefore violated Title VII of the Civil Rights Act of 1964.

163.     Plaintiff seeks the relief identified below to remedy this claim.

## COUNT SEVEN
### Violation of the Americans with Disabilities Act
### Against Defendant Jack Henry & Associates, Inc.

164.     Plaintiff realleges and incorporates paragraphs 1–88 and 102–109, above, as though

they were fully stated herein.

165.    Plaintiff brings Count Seven under the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. and by the procedures outlined in 29 C.F.R. § 1601.28.

166.    Plaintiff brings Count Seven as an alternative to Counts One through Four.

167.    Plaintiff received Notice of Right to Sue from the EEOC on July 28, 2021.

168.    Claims under the ADA must be filed within 90 days of the receipt of the Notice of Right to Sue from EEOC. This lawsuit was filed on October 26, 2021 and was therefore timely under the ADA.

169.    The ADA prohibits discrimination by employers against qualified individuals because of their disability in regard to employment, which includes the denial of "other terms, conditions, and privileges of employment." See 42 U.S.C. § 12112(a)-(b). "[O]ther terms, conditions, and privilege of employment," include health insurance and other fringe benefits.

170.    Plaintiff is insured through her employer-provided health insurance plan.

171.    Gender dysphoria is a "mental impairment" that "substantially limits one or more major life activities" including social, occupational, neurological, or brain functions, and thus constitutes a disability within the meaning of the ADA. See 42 U.S.C. § 12102(1)–(2).

172.    The employer-provided Plan discriminates against Plaintiff on the basis of her actual and/or perceived disabilities and/or record of impairment, and fails to provide reasonable accommodation for her disability. As such, the administration of Plaintiff's employer-provided Plan constitutes a violation of the ADA.

173.    As a direct result of JHA's unlawful discriminatory practices in violation of the ADA, alleged above, Plaintiff sustained permanent and irreparable harm, resulting in a loss of the value of certain employment benefits.

174. As a direct result of JHA's unlawful discriminatory practices in violation of the ADA, alleged above, Plaintiff has suffered and continues to suffer severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

175. Plaintiff seeks the relief identified below to remedy this claim.

## COUNT EIGHT
### Violation of the Missouri Human Rights Act (MHRA)
### Against Defendant Jack Henry & Associates, Inc.

176. Plaintiff realleges and incorporates paragraphs 1–88 and 102–109, above, as though they were fully stated herein.

177. Plaintiff brings Count Eight under the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, *et seq.* and by the procedures outlined in §§ 213.075 and 213.111.

178. Plaintiff brings Count Eight as an alternative to Counts One through Four.

179. JHA is an employer within the meaning of the MHRA. Mo. Rev. Stat. § 213.010(8).

180. Plaintiff dual filed a timely charge of discrimination with the Equal Employment Opportunity Commission and the Missouri Human Rights Commission ("MHRC") on July 19, 2021, alleging discrimination based on sex . . . or disability. The MHRC will not issue a right to sue letter until January 17, 2022.

181. Obtaining a Right to Sue letter from the MHRC before filing this MHRA claim is not a jurisdictional prerequisite. Plaintiff can and will cure the lack of a Right to Sue letter from the MHRA when she receives the letter in January 2022.

182. It is unlawful under the MHRA for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . or disability." Mo. Rev. Stat. § 213.055(1)(a). "[C]ompensation, terms, conditions, or privileges of employment" include health insurance and other fringe benefits.

183. Plaintiff is insured through her employer-provided health insurance plan.

184. Discrimination based on transgender status is a form of sex and disability discrimination. Therefore, the MHRA requires an employer-sponsored group health plan to extend equally comprehensive coverage to cisgender and transgender employees.

185. Gender dysphoria is a "mental impairment" that "substantially limits one or more of a person's major life activities" including social, occupational, neurological, or brain functions, and thus constitutes a disability within the meaning of the MHRA. Mo. Rev. Stat. § 213.010(5).

186. The administration of the employer-provided Plan constitutes an adverse employment action and discrimination under the MHRA by excluding Plaintiff's medical condition from coverage and by singling out her medical condition for different treatment based on her transgender status. Refusing to cover medical conditions specific to transgender status such as gender dysphoria treatment and gender affirmation surgeries violates the MHRA's antidiscrimination mandate.

187. Plaintiff was harmed because JHA discriminated against Plaintiff with respect to her compensation and privileges of employment based on her transgender status, sex, and disability. JHA therefore violated the MHRA.

188. Plaintiff seeks the relief identified below to remedy this claim.

## JURY DEMAND

Counts One through Five above are brought under ERISA, for which Plaintiff submits her claims to the Court for final adjudication in a Bench Trial. For Counts Six through Eight, Plaintiff hereby demands a Jury Trial for determination of Defendants' liability and appropriate remedies.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in her favor against Defendants and requests that this Court:

A. Declare that Defendants violated their legal obligations in the manner described herein.

B. Declare that the Cosmetic Treatment exclusion in Plaintiff's Plan does not apply to Gender Transition surgery, including Facial Feminization Surgery.

C. Declare that the United Gender Dysphoria Policy violates the terms of Plaintiff's Plan.

D. Declare that the definition of Cosmetic Treatment in Plaintiff's Plan violates the Parity Act, and is void and unenforceable as a matter of law, insofar as it purports to exclude coverage for surgeries that alter appearance when they are treatments for mental health conditions, but not when they are treatments for medical conditions.

E. Declare that, under the enforceable provisions of Plaintiff's Plan, Facial Feminization Surgery to treat Gender Dysphoria is not Cosmetic Treatment.

F. Declare that the United Gender Dysphoria Policy violates the Parity Act insofar as it categorically deems certain treatments as "cosmetic" and thus never medically necessary, "when performed as part of surgical treatment for Gender Dysphoria," because that limitation is separate and more restrictive than the limitations other United clinical policies impose on medical/surgical benefits in the same classification.

G. Declare that the refusal to authorize coverage for Plaintiff's Facial Feminization Surgery treatment violates her rights under Title VII.

H. Declare that the refusal to authorize coverage for Plaintiff's Facial Feminization Surgery treatment violates her rights under the ADA.

I. Declare that the refusal to authorize coverage for Plaintiff's Facial Feminization Surgery treatment violates her rights under the MHRA.

J. Enjoin Defendants from denying coverage for Plaintiff's Facial Feminization Surgery treatment based on the Plan's Cosmetic Treatment exclusion.

K. Enjoin Defendants from denying coverage for Plaintiff's Facial Feminization Surgery treatment based on the Plan's definition of Cosmetic Treatment.

L. Enjoin Defendants from denying coverage for Plaintiff's Facial Feminization Surgery treatment based on the United Gender Dysphoria Policy.

M. Order Defendants, when administering Plaintiff's Plan going forward, to make determinations of medical necessity for gender dysphoria treatments, including surgery, in accordance with the most recent version of the WPATH *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (currently the 7th ed. 2011).

N. Award Plaintiff $100 per day in statutory penalties running from May 31, 2021 under 29 U.S.C. § 1132(c)(1)(B).

O. Award Plaintiff attorneys' fees and costs under 29 U.S.C. § 1132(g); 42 U.S.C. § 2000e–5(k); 42 U.S.C. § 12205; and Mo. Rev. Stat. § 213.111.2.

P. Award such other relief as is just and proper.

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony E. Rothert, #44827
Jessie Steffan, #64861
Molly E. Carney, #70570
Emily Lazaroff, #73811
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Tel.: (314) 652-3114
Fax: (314) 652-3112
arothert@aclu-mo.org
jsteffan@aclu-mo.org
mcarney@aclu-mo.org
elazaroff@aclu-mo.org

Gillian R. Wilcox, #61278
ACLU of Missouri Foundation
406 W. 34th Street, Suite 420
Kansas City, Missouri 64111
Tel.: (816) 470-9938
gwilcox@aclu-mo.org


ZUCKERMAN SPAEDER LLP

By: /s/ Caroline E. Reynolds
Caroline E. Reynolds (*pro hac vice*)
Zuckerman Spaeder LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: 202.778.1800
Fax: 202.822.8106
creynolds@zuckerman.com

Leila Bijan (*pro hac vice*)
Zuckerman Spaeder LLP
485 Madison Avenue, 10th Floor
New York, NY 10022
Tel: 212.704.9600
Fax: 212.704.4256
lbijan@zuckerman.com

*Attorneys for Plaintiff Sabrina Briony Duncan*

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

### AMENDED <u>CIVIL COVER SHEET</u>

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Western District of Missouri.

**The completed cover sheet must be saved as a pdf document and filed as an attachment to the Complaint or Notice of Removal.**

## Plaintiff(s):

First Listed Plaintiff:
Sabrina Briony Duncan ;
**County of Residence:** Greene County

## Defendant(s):

First Listed Defendant:
Jack Henry & Associates, Inc. ;
**County of Residence:** Barry County

Additional Defendants(s):
The Jack Henry & Associates, Inc. Group Health Benefit Plan ;
UMR, Inc. ;
Quantum Health, Inc. ;

## County Where Claim For Relief Arose: Greene County

## Plaintiff's Attorney(s):

Caroline E. Reynolds (Sabrina Duncan )
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
**Phone:** 202.778.1800
**Fax:** 202.822.8106
**Email:** creynolds@zuckerman.com

Leila Bijan (Sabrina Duncan )
Zuckerman Spaeder LLP
485 Madison Avenue, 10th Floor
New York, New York 10022
**Phone:** 212.704.9600
**Fax:** 212.704.4256
**Email:** lbijan@zuckerman.com

Anthony E. Rothert (Sabrina Duncan )
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
**Phone:** (314) 652-3114
**Fax:** (314) 652-3112
**Email:** arothert@aclu-mo.org

Gillian R. Wilcox (Sabrina Duncan )
ACLU of Missouri Foundation
406 W. 34th Street, Suite 420
Kansas City, Missouri 64111

## Defendant's Attorney(s):

Amy L. Blaisdell ( Jack Henry & Associates, Inc.; The Jack Henry & Associates, Inc. Group Health Benefit Plan)
Greensfelder, Hemker & Gale, P.C.
10 S. Broadway, Suite 2000
St. Louis, Missouri 63102
**Phone:** 314-241-9090
**Fax:** 314-241-8624
**Email:** apb@greensfelder.com

Lauren A. Daming ( Jack Henry & Associates, Inc.; The Jack Henry & Associates, Inc. Group Health Benefit Plan)
Greensfelder, Hemker & Gale, P.C.
10 S. Broadway, Suite 2000
St. Louis, Missouri 63102
**Phone:** 314-241-9090
**Fax:** 314-241-8624
**Email:** ldaming@greensfelder.com

Heather M. Mehta (Jack Henry & Associates, Inc.; The Jack Henry & Associates, Inc. Group Health Benefit Plan)
Greensfelder, Hemker & Gale, P.C.
10 S. Broadway, Suite 2000
St. Louis, Missouri 63102
**Phone:** 314-241-9090
**Fax:** 314-241-8624
**Email:** hmm@greensfelder.com

Ann E. Buckley ( UMR, Inc. )
Buckley & Buckley, L.L.C.
800 Market Street, Suite 2900
St. Louis, Missouri 63101

**Phone:** (816) 470-9938
**Fax:**
**Email:** gwilcox@aclu-mo.org

Jessie Steffan (Sabrina Duncan )
ACLU of Missouri Foundation
906 Olive St., Suite 1130
St. Louis, Missouri 63101
**Phone:** (314) 652-3114
**Fax:**
**Email:** jsteffan@aclu-mo.org

Molly Carney (Sabrina Duncan )
ACLU of Missouri Foundation
906 Olive St., Suite 1130
St. Louis, Missouri 63101
**Phone:** (314) 652-3114
**Fax:**
**Email:** mcarney@aclu-mo.org

**Phone:** (314) 621-3434
**Fax:** (314) 621-3485
**Email:** abuckley@buckleylawllc.com

Andrew G. Jubinsky ( UMR, Inc. )
Figari + Davenport, LLP
901 Main Street, Suite 3400
Dallas, Texas 75202
**Phone:** (214) 939-2000
**Fax:**
**Email:** andy.jubinsky@figdav.com

Amber D. Reece ( UMR, Inc. )
Figari + Davenport, LLP
901 Main Street, Suite 3400
Dallas, Texas 75202
**Phone:** (214) 939-2000
**Fax:**
**Email:** Amber.reece@figdav.com

Danne W. Webb ( Quantum Health, Inc.)
Horn Aylward & Bandy, LLC
2600 Grand Blvd., Suite 1100
Kansas City, Missouri 64108
**Phone:** 816-421-0700
**Fax:** 816-421-0899
**Email:** dwebb@hab-law.com

Andrea S. McMurtry ( Quantum Health, Inc.)
Horn Aylward & Bandy, LLC
2600 Grand Blvd., Suite 1100
Kansas City, Missouri 64108
**Phone:** 816-421-0700
**Fax:** 816-421-0899
**Email:** amcmurtry@hab-law.com

David J. Butler ( Quantum Health, Inc.)
Taft Stettinius & Hollister LLP
65 E. State Street, Suite 1000
Columbus, Ohio 43215
**Phone:** 614-334-6167
**Fax:**
**Email:** dbutler@taftlaw.com

Rachel A. Smoot ( Quantum Health, Inc.)
Taft Stettinius & Hollister LLP
65 E. State Street, Suite 1000
Columbus, Ohio 43215
**Phone:** 614-221-2838
**Fax:**
**Email:** rsmoot@taftlaw.com

**Basis of Jurisdiction:** 3. Federal Question (U.S. not a party)

**Citizenship of Principal Parties** (Diversity Cases Only)

   **Plaintiff:** N/A

   **Defendant:** N/A

**Origin:** 1. Original Proceeding

**Nature of Suit:** 791 ERISA

**Cause of Action:** Enforce plan terms, clarify right to benefits, violation of plan terms, breach of fiduciary duty, injunctive relief, equitable relief (ERISA, 29 U.S.C. § 1132); Parity Act violation (29 U.S.C. § 1132 and 29 U.S.C. § 1185a); Statutory penalties under the Parity Act (29 U.S.C. § 1132 and 29 U.S.C. § 1185a); Sex discrimination (Title VII of the Civil Rights Act of 1964 and Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, et seq.); Discrimination based on disability (Americans with Disabilities Act and Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, et seq.); Discrimination based on transgender status (Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, et seq.)

**Requested in Complaint**

    **Class Action:** Not filed as a Class Action

    **Monetary Demand (in Thousands):**

    **Jury Demand:** Yes

    **Related Cases:** Is NOT a refiling of a previously dismissed action

---

**Signature:** Caroline E. Reynolds

**Date:** 12/28/2021

If any of this information is incorrect, please close this window and go back to the Civil Cover Sheet Input form to make the correction and generate the updated JS44. Once corrected, print this form, sign and date it, and submit it with your new civil action.