**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| SABRINA BRIONY DUNCAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 6:21-cv-03280-RK |
| | : | |
| JACK HENRY & ASSOCIATES, INC.; THE | : | |
| JACK HENRY & ASSOCIATES, INC. GROUP | : | |
| HEALTH BENEFIT PLAN; UMR, INC.; and | : | |
| QUANTUM HEALTH, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S CONSOLIDATED SUGGESTIONS
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................................................................. iv

Introduction ........................................................................................................................... 1

Legal Standard ....................................................................................................................... 2

Background ............................................................................................................................. 2

I.   Selected Facts Alleged in the Complaint ........................................................................ 2

II.  Plaintiff's Claims ........................................................................................................... 4

    A.   Counts One Through Three: Plan Violations and Breach of Fiduciary Duty ................... 5

    B.   Count Four: Parity Violation ......................................................................................... 7

    C.   Count Five: Statutory Penalties for Failure to Disclose Plan Information ..................... 8

    D.   Counts Six Through Eight: Employment Discrimination ................................................. 8

Argument ................................................................................................................................ 9

I.   The Complaint Plausibly Alleges That Defendants' Denial of Coverage Violated the Terms of Plaintiff's Plan. ......................................................................................................... 9

    A.   The Plan Unambiguously Covers All Types of Gender Transition Surgeries, Including Facial Surgeries. ............................................................................................... 11

    B.   Defendants' Interpretation of the Plan's Medical Necessity Requirement is Unreasonable ..................................................................................................................... 14

    C.   UnitedHealthcare's Clinical Policy is Not a Term of the Plan ........................................ 16

    D.   In Counts One Through Three, Plaintiff Seeks To Enforce Her Plan, Not To Reform It. ........................................................................................................................... 18

    E.   In Counts One through Three, Plaintiff Seeks Equitable Relief Only, Not an Award of Benefits ............................................................................................................... 20

II.   The Complaint Plausibly Alleges that Defendants Breached their Fiduciary and Co-Fiduciary Duties. .................................................................................................................... 21

    A.   Plaintiff's Breach of Fiduciary Duty Claims Are Cognizable Under Either Section (a)(1)(B) or (a)(3). ............................................................................................................. 21

i

B.    The Complaint Plausibly Alleges that Defendants Breached Their Fiduciary and Co-
Fiduciary Duties ................................................................................................................ 23

    1.    Quantum ................................................................................................................. 23

    2.    UMR ...................................................................................................................... 25

    3.    JHA ....................................................................................................................... 26

    4.    Defendants Breached Their Fiduciary Duties ....................................................... 26

    5.    Defendants Are Also Liable as Co-Fiduciaries ..................................................... 27

III.    ERISA Allows for Pleading in the Alternative ................................................................. 27

IV.    Count Four of the Complaint Plausibly Alleges that Defendants Violated the
Parity Act ................................................................................................................................... 30

  A.    The Complaint Plausibly Alleges an As-Applied Violation of the Parity Act,
Which Defendants Do Not Challenge ................................................................................ 33

  B.    The Complaint Plausibly Alleges a Facial Violation of the Parity Act. ........................ 35

V.    Count Five Must Stand Because Plan Participants Are Entitled To The Information
JHA Refuses To Provide ............................................................................................................ 39

  A.    Statutory and Regulatory Chronology .......................................................................... 39

    1.    ERISA ................................................................................................................... 39

    2.    The 2008 Parity Act and the Departments' Subsequent Regulations ..................... 39

    3.    The 2021 Amendment to the Parity Act and the Departments' Consistent
Guidance ........................................................................................................................ 41

  B.    The 2013 Regulations Receive *Chevron* Deference and JHA Must Provide
Plaintiff with the Documents ............................................................................................ 43

    1.    The 2021 Amendment Further Clarified the "Processes, Strategies, Evidentiary
Standards, and Other Factors," Which FAQ 45 Confirms .................................................. 46

  C.    Even if *Auer* Deference Were Applicable, Count Five Would Stand ............................. 47

VI.    Count Seven Should Not Be Dismissed Because Gender Dysphoria Is Not Excluded
From ADA Protection. ............................................................................................................... 48

  A.    Gender Dysphoria is Not Excluded from ADA Protection. ........................................... 49

B.    Plaintiff Exhausted Administrative Remedies for Her Discriminatory Disparate Treatment ADA Claim and Is Not Raising a Separate Failure to Accommodate Claim.......... 55

VII.   Plaintiff's MHRA Claims Are Not Preempted By ERISA, But Even If They Were, Any Alleged Preemption Is Irrelevant At This Stage In The Case Because All Of The Discrimination Claims Are Brought In The Alternative To The ERISA Claims. ....................... 56

A.    Plaintiff's MHRA Claims Are Not Preempted by ERISA. ............................................ 56

B.    Plaintiff's MHRA Claims Should Not Be Dismissed at This Stage Because They Are Brought in the Alternative to Her ERISA Claims. .................................................................. 58

Conclusion .......................................................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.Z. ex rel. E.Z. v. Regence Blueshield*,
  333 F. Supp. 3d 1069 (W.D. Wash. 2018) ......................................................................... 35, 38

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................... 2

*Auer v. Robbins*,
  519 U.S. 452 (1997) ............................................................................................................. 47

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ 2, 27

*Bennett v. Hallmark Cards Inc.*,
  1993 WL 327842 (W.D. Mo. Aug. 17, 1993) ................................................................ 57, 58

*BJC Health Sys. v. Columbia Cas. Co.*,
  348 F.3d 685 (8th Cir. 2003) ............................................................................................... 51

*Blatt v. Cabela's Retail, Inc.*,
  2017 WL 2178123 (E.D. Pa. May 18, 2017)............................................................ 53, 54, 55

*Brown v. Am. Life Holdings, Inc.*,
  190 F.3d 856 (8th Cir. 1999) ........................................................................... 44, 45, 46, 47

*Bushell v. UnitedHealth Grp. Inc.*,
  2018 WL 1578167 (S.D.N.Y. Mar. 27, 2018)................................................................. 32, 35

*C.M. v. Fletcher Allen Health Care, Inc.*,
  2013 WL 4453754 (D. Vt. Apr. 30, 2013) .......................................................................... 32

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................................. 43, 44, 45

*Christoff v. Unum Life Ins. Co. of Am.*,
  2018 WL 4110963 (D. Minn. Aug. 29, 2018)..................................................................... 29

*CIGNA Corp. v. Amara*,
  563 U.S. 421 (2011) ............................................................................................................. 29

*Coleman v. Standard Life Ins. Co.*,
  288 F. Supp. 2d 1116 (E.D. Cal. 2003) .............................................................................. 59

*Collins v. Aetna Life Ins. Co.*,
  2012 WL 5377797 (E.D. Wash. Nov. 1, 2012) ................................................................... 59

Case 6:21-cv-03280-RK   Document 65   Filed 03/02/22   Page 5 of 71

*Daniel v. Eaton Corp.*,
    839 F.2d 263 (6th Cir. 1988) ................................................................. 20

*David P. v. United Healthcare Ins. Co.*,
    2020 WL 607620 (D. Utah Feb. 7, 2020) ........................................ 33, 38

*Delcastillo v. Odyssey Res. Mgmt., Inc.*,
    431 F.3d 1124 (8th Cir. 2005) ............................................................. 19

*Delker v. MasterCard Int'l, Inc.*,
    21 F.4th 1019 (8th Cir. 2022) ...................................................... *passim*

*Doe Run Res. Corp. v. Lexington Ins. Co.*,
    719 F.3d 868 (8th Cir. 2013) ............................................................... 11

*Doe v. Mass. Dep't of Corr.*,
    2018 WL 2994403 (D. Mass. June 14, 2018) ...................................... 50

*Doe v. Northrop Grumman Sys. Corp.*,
    418 F. Supp. 3d 921 (N.D. Ala. 2019) ......................................... *passim*

*Doe v. Pa. Dep't of Corr.*,
    2021 WL 1583556 (W.D. Pa. Feb. 19, 2021) ...................................... 53

*Doe v. Triangle Doughnuts, LLC*,
    472 F. Supp. 3d 115 (E.D. Pa. 2020) .................................................. 52

*Fenney v. Dakota, Minn. & E. R.R. Co.*,
    327 F.3d 707 (8th Cir. 2003) ............................................................... 56

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101 (1989) ............................................................................. 22

*Gallagher v. Empire HealthChoice Assurance, Inc.*,
    339 F. Supp. 3d 248 (S.D.N.Y. 2018) ................................................ 31

*Gardea v. JBS USA, LLC*,
    915 F.3d 537 (8th Cir. 2019) ............................................................... 53

*Garren v. John Hancock Mut. Life Ins. Co.*,
    114 F.3d 186 (11th Cir. 1997) ............................................................. 20

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ............................................................... 52

*Grissom v. Arnott*,
    2012 WL 1309266 (W.D. Mo. Apr. 16, 2012) .................................... 59

v

*Guthrie v. Dow Chem. Co.*,
    445 F. Supp. 311 (S.D. Tex. 1978) ........................................................ 19

*H.H. v. Aetna Ins. Co.*,
    342 F. Supp. 3d 1311 (S.D. Fla. 2018) ............................................ 33, 35

*Halbach v. Great-W. Life & Annuity Ins. Co.*,
    561 F.3d 872 (8th Cir. 2009) ....................................................... 17, 18

*Hankins v. Standard Ins. Co.*,
    677 F.3d 830 (8th Cir. 2012) .............................................................. 10

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
    530 U.S. 238 (2000) .......................................................................... 20

*Holland v. Bordelon*, No. 4:20-CV-00344-KGB,
    2021 WL 966422 (E.D. Ark. Mar. 15, 2021) .................................... 59

*Iglesias v. True*,
    403 F. Supp. 3d 680 (S.D. Ill. 2019) ................................................. 52

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
    312 F. Supp. 2d 1165 (D. Minn. 2004) ............................................. 23

*Janssen v. Minneapolis Auto Dealers Ben. Fund*,
    447 F.3d 1109 (8th Cir. 2006) ............................................ 10, 11, 14

*Jones v. Aetna Life Ins. Co.*,
    943 F.3d 1167 (8th Cir. 2019) ........................................................... 29

*Jones v. Aetna Life Insurance Co.*,
    856 F.3d 541 (8th Cir. 2017) ...................................... 9, 22, 23, 28, 30

*Kaprielian v. Stringer*,
    2016 WL 1586488 (E.D. Mo. Apr. 20, 2016) .................................. 55

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ....................................................................... 47

*Knowlton v. Anheuser-Busch Cos. Pension Plan*,
    849 F.3d 422 (8th Cir. 2017) ............................................................... 9

*Kutten v. Sun Life Assur. Co. of Canada*,
    759 F.3d 942 (8th Cir. 2014) ............................................................. 12

*L.P. ex rel. J.P. v. BCBSM, Inc.*,
    2020 WL 981186 (D. Minn. Jan. 17, 2020) ............................ 32, 33, 35

*LaSalle v. Mercantile Bancorporation Inc. Long Term Disability Plan*,
  498 F.3d 805 (8th Cir. 2007) ................................................................... 22

*Layes v. Mead Corp.*,
  132 F.3d 1246 (8th Cir. 1998) ................................................................. 20

*Lickteig v. Bus. Men's Assur. Co. of Am.*,
  61 F.3d 579 (8th Cir. 1995) ..................................................................... 11

*McCalden v. Cal. Library Ass'n*,
  955 F.2d 1214 (9th Cir. 1990) ................................................................. 59

*Michael W. v. United Behavioral Health*,
  420 F. Supp. 3d 1207 (D. Utah 2019) ..................................................... 31

*Michaels v. Akal Security, Inc.*,
  2010 WL 2573988 (D. Colo. June 24, 2010) ........................................... 55

*Moore v. Apple Cent., LLC*,
  893 F.3d 573 (8th Cir. 2018) ....................................................... 19, 22, 23

*Moore v. Lafayette Life Ins. Co.*,
  458 F.3d 416 (6th Cir. 2006) ................................................................... 23

*Mueller v. SPX Corp.*,
  2013 WL 656619 (D. Minn. Feb. 22, 2013) ............................................. 45

*Munnelly v. Fordham Univ. Faculty*,
  316 F. Supp. 3d 714 (S.D.N.Y. 2018) ..................................................... 30

*N.R. ex rel. S.R. v. Raytheon Co.*,
  24 F.4th 740 (1st Cir. 2022) .............................................................. 32, 48

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ................................................................................ 47

*Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ................................................................................ 45

*O'Brien v. Sperry Univac*,
  458 F. Supp. 1179 (D.D.C. 1978) ........................................................... 19

*Pilot Life Ins. Co. v. Dedeaux*,
  481 U.S. 41 (1987) .................................................................................. 22

*Portell v. AmeriCold Logistics, LLC*,
  571 F.3d 822 (8th Cir. 2009) ................................................................... 16

Case 6:21-cv-03280-RK    Document 65    Filed 03/02/22    Page 8 of 71

*Ross v. Rail Car Am. Grp. Disability Income Plan*,
  285 F.3d 735 (8th Cir. 2002) ................................................................ 19

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) ..................................................................... 57, 58

*Shelton v. ContiGroup Cos., Inc.*,
  285 F.3d 640 (8th Cir. 2002) ................................................................ 22

*Silva v. Metro. Life Ins. Co.*,
  762 F.3d 711 (8th Cir. 2014) ............................................... 10, 28, 29, 59

*Spizman v. BCBSM, Inc.*,
  2015 WL 4569249 (D. Minn. July 27, 2015) ......................................... 45

*Strand v. Charles Mix Cty.*,
  2017 WL 1854695 (D.S.D. May 5, 2017) ............................................... 53

*Tay v. Dennison*,
  2020 WL 2100761 (S.D. Ill. May 1, 2020) ............................................ 51

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994) ............................................................................. 47

*Torres v. UNUM Life Ins. Co. of Am.*,
  405 F.3d 670 (8th Cir. 2005) .......................................................... 10, 16

*Torti v. Hoag*,
  868 F.3d 666 (8th Cir. 2017) .......................................................... 51, 52

*U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*,
  756 F.3d 1075 (8th Cir. 2014) ................................................................ 4

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996) ............................................................................. 22

*Venson v. Gregson*,
  2021 WL 673371 (S.D. Ill. Feb. 22, 2021) ............................................ 51

*Vorpahl v. Harvard Pilgrim Health Ins. Co.*,
  2018 WL 3518511 (D. Mass. July 20, 2018) ......................................... 35

*Waldoch v. Medtronic, Inc.*,
  757 F.3d 822 (8th Cir. 2014) ................................................................ 10

*Williams v. Kincaid*,
  2021 WL 2324162 (E.D. Va. June 7, 2021) ........................................... 55

Case 6:21-cv-03280-RK   Document 65   Filed 03/02/22   Page 9 of 71

**Statutes**

29 U.S.C. § 1001(b) .................................................................... 21

29 U.S.C. § 1002(21)(A) ............................................................ 23

29 U.S.C. § 1024(b)(4) ......................................................... *passim*

29 U.S.C. § 1102(a)(2) ........................................................ 25, 26

29 U.S.C. § 1104(a) ...................................................................... 6

29 U.S.C. § 1104(a)(1)(A) .......................................................... 26

29 U.S.C. § 1104(a)(1)(B) .......................................................... 26

29 U.S.C. § 1104(a)(1)(D) .......................................................... 26

29 U.S.C. § 1105(a) ................................................................. 6, 27

29 U.S.C. § 1132(a) ............................................................... 22, 28

29 U.S.C. § 1132(a)(1)(B) ................................................... *passim*

29 U.S.C. § 1132(a)(3) ........................................................ *passim*

29 U.S.C. § 1132(a)(3)(A) ............................................................ 7

29 U.S.C. § 1132(a)(3)(B) ............................................................ 7

29 U.S.C. § 1132(c)(1)(B) ...................................................... 8, 10

29 U.S.C. § 1133 .................................................................... 39, 43

29 U.S.C. § 1144(a) .................................................................... 57

29 U.S.C. § 1144(d) .............................................................. 57, 58

29 U.S.C. § 1185a ............................................................... *passim*

42 U.S.C. § 2000(e) ...................................................................... 9

42 U.S.C. § 12101 ........................................................................ 9

42 U.S.C. § 12102(4) .................................................................. 53

42 U.S.C. § 12112 ...................................................................... 49

42 U.S.C. § 12211(b)(1) ............................................................. 49

42 U.S.C. § 12102 .................................................................................................................... 49

42 U.S.C. § 12111 .................................................................................................................... 49

Mo. Rev. Stat. § 213.010 .......................................................................................................... 9

**Rules**

Fed. R. Civ. P. 8 ................................................................................................................ 31, 59

Fed. R. Civ. P. 8(d)(2) ....................................................................................................... 28, 58

Fed. R. Civ. P. 8(d)(3) ............................................................................................................. 58

Fed. R. Civ. P. 15(a) ............................................................................................................... 23

**Regulations**

28 C.F.R. § 36.105(b)(1)(ii) .................................................................................................... 49

29 C.F.R. § 2590.712 ....................................................................................................... *passim*

45 C.F.R. § 146.136(a) ............................................................................................................ 30

45 C.F.R. § 146.136(c)(4) ........................................................................................................ 31

Plaintiff Sabrina Briony Duncan, through counsel, submits the following Consolidated Suggestions in Opposition to the motions filed by Defendants Jack Henry & Associates, Inc. ("JHA") ("JHA SIS," Dkt. 55), The Jack Henry & Associates, Inc. Group Health Benefit Plan ("JHA Plan" or "Plan") (*id.*), UMR, Inc. ("UMR") ("UMR SIS," Dkt. 53), and Quantum Health, Inc. ("Quantum") ("Quantum SIS," Dkt. 58) to dismiss Plaintiff's Amended Complaint ("AC," Dkt. 46).

## INTRODUCTION

This case began with a simple request for preauthorization of coverage for medically necessary mental treatment covered by an employer-sponsored health plan. Ms. Duncan, a transgender woman with gender dysphoria, sought coverage for medically necessary gender transition surgery. Even though the Plan explicitly covers gender transition surgery, Defendants denied Ms. Duncan's request, concluding that this mental health treatment was not covered because it was "cosmetic" and therefore not medically necessary, contrary to the opinions of Ms. Duncan's doctors and the accepted standards of care in the relevant medical community.

Defendants now move to dismiss most—but not all—of Plaintiff's well-pleaded Amended Complaint ("Complaint") based on mischaracterizations of fact, law, and the claims Plaintiff asserts. Defendants' raft of misplaced arguments appears designed to create confusion and distract from the simple reality of this case: when presented with Plaintiff's request for coverage for a surgery that is expressly covered under her employer-sponsored health plan, Defendants refused to approve coverage, and in so doing, violated a host of federal and state laws that exist to prevent exactly the kind of behavior alleged here. Defendants' attack on Plaintiff's Complaint asks the Court to adopt a heightened, hyper-technical pleading standard; sustain a tortured reading of the terms of Plaintiff's health plan that cannot be squared with the plan's plain language; override plan terms in favor of an external, contrary clinical policy; and to find facts and draw inferences in

Defendants' favor. But the Court's task in reviewing the Defendants' motions to dismiss is much more straightforward: the Court need only determine whether Plaintiff has plausibly stated a claim for relief. And she has—for every count of the Complaint.

As explained below, Plaintiff has plausibly alleged that the Defendants misinterpreted the plain language of her health plan and denied coverage under an inapplicable exclusion; that at least one defendant breached its fiduciary duties to her; that other defendants failed as co-fiduciaries to prevent or remedy those breaches; that Defendants violated multiple federal and state laws designed to prevent discrimination against individuals with mental health conditions or disabilities and transgender individuals; and that she is entitled to a panoply of injunctive and equitable relief as a result. The motions must be denied.

## LEGAL STANDARD

In ruling on a 12(b)(6) motion, the Court must "assume the truth of all factual allegations in the complaint and make all reasonable inferences in favor of the nonmoving party." *Delker v. MasterCard Int'l, Inc.*, 21 F.4th 1019, 1024 (8th Cir. 2022). A complaint need not contain detailed factual allegations, merely "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Delker*, 21 F.4th at 1024 ("[A] plaintiff need only allege sufficient facts to provide 'fair notice' of the claim and its basis."). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## BACKGROUND

## I.     SELECTED FACTS ALLEGED IN THE COMPLAINT

Plaintiff Sabrina Duncan is a transgender woman who has been diagnosed with gender dysphoria, a mental health condition characterized by psychological distress arising from an

incongruence between one's sex assigned at birth and one's intrinsic gender identity. AC ¶ 1. Gender dysphoria—which afflicts many, but not all, transgender people, *id.* ¶ 34—causes "clinically significant distress or impairment in social, occupational, or other important areas of functioning," *id.* ¶ 45, and can be associated with strong feelings relating to a person's primary or secondary sex characteristics (or both),[1] *id.* ¶ 44.

Although Ms. Duncan has struggled with gender dysphoria since adolescence, she first sought treatment to address her psychological distress relating to her gender identity as an adult. *Id.* ¶ 68. Since she was first diagnosed with gender dysphoria in 2015, Ms. Duncan has received consistent treatment, including psychotherapy and hormone therapy, and she has made a full social transition to her authentic gender identity. *Id.* ¶¶ 69–70. Despite years of treatment, however, Ms. Duncan continues to experience severe distress relating to her remaining male sex characteristics, including the secondary sex characteristic of her facial and skull features. *Id.* ¶ 71. Her gender dysphoria has caused her to suffer significant anxiety and depression on an ongoing basis, which has hampered her work and personal life. *Id.* ¶¶ 72–73.

Based on their individualized assessments of Ms. Duncan's clinical needs, the physicians treating her for gender dysphoria have recommended, and a surgeon has prescribed, "facial gender confirmation surgery," which is often called "facial feminization surgery" ("FFS") in the case of a male-to-female gender transition, like Ms. Duncan's. *Id.* ¶ 74. Ms. Duncan's surgeon prescribed a number of surgical procedures designed to remove or reshape certain male characteristics, including forehead cranioplasty, bone removal around the orbit, midface reconstruction, rhinoplasty, jaw surgery, genioplasty, and tracheal shave. *Id.* ¶ 75.

---

[1] Primary sex characteristics are the sex organs used for reproduction; secondary sex characteristics are features that appear during puberty in humans and that are not directly part of the reproductive system. AC ¶ 33. They include, among other things, facial hair, cranial shape, Adam's apples, and breasts. *Id.*

3

Ms. Duncan, who has worked for Defendant JHA for nearly 15 years, is a participant in the Jack Henry & Associates, Inc. Group Health Benefit Plan (the "Plan"). *Id.* ¶ 11; *see also* Ex. 1 (Jack Henry & Assoc., Inc. Health Benefit Summary Plan Description, effective Jan. 1, 2020 ("SPD")).[2] The Plan provides health coverage for both medical/surgical conditions and mental health conditions, including Gender Dysphoria. AC ¶ 16; Ex. 1 (SPD) at 50 (Plan provides coverage for treatment of "Illness or Injury"); *id.* at 125 ("Illness" defined to include "mental sickness"). The Plan expressly lists "Gender Transition" as a Covered Benefit, including "gender transition surgery." AC ¶ 47; Ex. 1 (SPD) at 53. Yet when Ms. Duncan's surgeon sought precertification of coverage under the Plan for the procedures he prescribed, Defendants denied the request, asserting that the "surgery is for cosmetic purposes" and therefore subject to the Plan's exclusion of coverage for "Cosmetic Treatment." AC ¶¶ 76, 78; *see also* Ex. 2 (May 28, 2020 Letter). Ms. Duncan appealed the denial, twice, but Defendants continued to refuse coverage, in each instance, ultimately, based on Defendants' assertion that the surgery was excluded because it was "cosmetic." AC ¶¶ 82–84; *see also* Ex. 3 (Aug. 13, 2020 Letter); Ex. 4 (Oct. 5, 2020 Letter). After exhausting her administrative appeals, Plaintiff filed this lawsuit.

## II.    **PLAINTIFF'S CLAIMS**

Defendants repeatedly mischaracterize Plaintiff's claims, ignoring the distinctions between the disparate legal theories and statutory bases on which Plaintiff relies, often in the alternative. For that reason, Plaintiff sets out her various claims here.

---

[2] As Defendants concede, the Court may consider the Summary Plan Description because it is incorporated into Plaintiff's Complaint. *U.S. ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d 1075 (8th Cir. 2014). This is also true as to other key documents quoted in the Complaint, including Defendants' written notifications of their denials of Plaintiff's request for benefits, Exs. 2-4, and the UnitedHealthcare Gender Dysphoria Policy on which Defendants based their determinations, Ex. 5.

### A. Counts One Through Three: Plan Violations and Breach of Fiduciary Duty

To start, Plaintiff asserts a cause of action under 29 U.S.C. § 1132(a)(1)(B) ("Section (a)(1)(B)") to "enforce [her] rights under the terms of the plan" and to "clarify [her] rights to future benefits under the terms of the plan." AC ¶ 111.[3] In short, Plaintiff alleges that Defendants wrongfully denied her request for coverage by misinterpreting and overriding the Plan terms. Plaintiff's claim embraces at least three distinct legal theories.

*First*, Plaintiff alleges that Defendants violated the express terms of her Plan by applying the Cosmetic Treatment exclusion to her request for coverage for a type of gender transition treatment (i.e., FFS). AC ¶¶ 48, 112–13. The Plan's Cosmetic Treatment exclusion bars coverage for "Cosmetic Surgery . . . unless the procedure is otherwise listed as a covered benefit." *Id.* ¶ 49; *see also* Ex. 1 (SPD) at 94. Because the Plan "otherwise listed" gender transition surgery "as a covered benefit," AC ¶¶ 47–49; Ex. 1 (SPD) at 53, the Cosmetic Treatment exclusion did not apply and the denial of coverage violated the Plan. AC ¶ 113.

*Second*, Plaintiff alleges that Defendants violated her Plan by relying on UnitedHealthcare's "Gender Dysphoria Policy" to deem her prescribed surgery "cosmetic" and therefore not "medically necessary." *Id.* ¶ 56. The Gender Dysphoria Policy contradicts the terms of Plaintiff's Plan in two ways: (a) it flouts the express Plan terms that provide for coverage of *all* gender transition surgeries and exempt those treatments from the Cosmetic Treatment exclusion, *see id.*; Ex. 1 (SPD) at 53, and (b) it overrides the Plan's definition of "medical necessity" by deeming all facial gender transition surgeries "cosmetic" and therefore "not medically necessary,"

---

[3] Plaintiff does not seek an award of monetary damages pursuant to § 1132(a)(1)(B). *See* AC ¶¶ 111, 121; *id.* ¶¶ 36–38 (Prayer for Relief). Monetary benefits are not currently "due" to Plaintiff because Defendants denied her request for coverage on a **pre-service** basis—that is, before the services were rendered. *Id.* ¶¶ 76–78. As a result, Plaintiff has not yet incurred expenses for FFS for which she could be reimbursed. Instead, she has been forced to delay her treatment because she cannot afford to pay for it without insurance coverage. *Id.* ¶ 88.

while the Plan measures medical necessity according to "Generally Accepted Standards of Medical Practice." AC ¶ 58–62; Ex. 1 (SPD) at 126. Generally accepted standards of medical practice call for individualized assessments of medical need, and recognize that facial surgeries are medically indicated to treat some individuals with gender dysphoria. AC ¶¶ 35–38.

*Third*, Plaintiff alleges that Defendants breached their fiduciary duties, and continue to do so, by misinterpreting and/or ignoring the Plan and the "generally accepted standards of care" the Plan required Defendants to apply.[4] *Id.* ¶¶ 115–18. An ERISA fiduciary must carry out its duties with respect to a Plan solely in the interest of the plan participants; with care, prudence, diligence, skill, and loyalty; and "in accordance with the documents and instruments governing the plan . . . ." 29 U.S.C. § 1104(a). Defendants either negligently or purposefully ignored the standards that are actually generally accepted for evaluating the medical necessity of gender transition surgeries on the face, jumped to a knee-jerk application of an inapplicable exclusion instead of diligently reading and applying the Plan as written, and conducted such a slipshod review of Plaintiff's request for coverage that they denied even surgical procedures prescribed to treat a different condition, temporomandibular joint syndrome ("TMJ")—which even UnitedHealthcare does not deem "cosmetic"—under the same, inapplicable "Cosmetic Treatment" exclusion. AC ¶ 81. Defendants' breaches of duties caused them to deny coverage unreasonably, thereby giving rise to Plaintiff's Section (a)(1)(B) cause of action to enforce and clarify Plan terms.

Counts Two and Three explicitly reallege Count One, ***in the alternative***, under 29 U.S.C. § 1132(a)(3) ("Section (a)(3)"). *See* AC ¶¶ 122–23 (Count Two); *id.* ¶¶ 128–29 (Count Three).[5]

---

[4] Plaintiff also alleges that Defendants are liable as co-fiduciaries for each other's breaches. AC ¶ 119 (citing 29 U.S.C. § 1105(a)).

[5] Defendant UMR erroneously asserts that "Paragraph 107 of the Complaint describes Count Two of the Complaint as being asserted under 29 U.S.C. § 1132(a)(1)(B)." UMR SIS 2 n.4. This appears to refer to a typographical error in the original Complaint, which was corrected in the applicable paragraph of the operative Amended Complaint.

6

Specifically, having previously alleged that Defendants misinterpreted and misapplied her Plan—in part by relying on a separate internal policy to override the Plan terms—Plaintiff seeks an injunction under Section (a)(3)(A) barring Defendants' application of the Cosmetic Exclusion and the Gender Dysphoria Policy to her claims for coverage of her prescribed FFS. AC ¶¶ 124–27 (Count Two); *see also* 29 U.S.C. § 1132(a)(3)(A) (providing cause of action "to enjoin any act or practice which violates . . . the terms of the plan"). Plaintiff also seeks "other appropriate equitable relief" to redress the Plan violations and fiduciary breaches she previously alleged. AC ¶¶ 130–33; *see also* 29 U.S.C. § 1132(a)(3)(B) (providing cause of action for participant "to obtain other appropriate equitable relief (i) to redress [violations of ERISA or the terms of the plan] or (ii) to enforce any provisions of [ERISA] or the terms of the plan.").

### B. Count Four: Parity Violation

Count Four alleges a distinct claim under Section (a)(3), based on a different legal theory: that Defendants violated the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act"), which is incorporated into ERISA at 29 U.S.C. § 1185a. AC ¶¶ 134–44. The Parity Act prohibits plans from discriminating against mental health coverage by imposing separate or more restrictive treatment limitations on mental health benefits than apply to medical/surgical benefits. 29 U.S.C. § 1185a(a)(3)(A)(ii).

Plaintiff asserts at least two types of Parity Act violations. First, she alleges a facial violation, arising from the fact that the Plan's written terms impose more restrictive limitations on facial surgery when it is prescribed to treat a mental health condition than when it is prescribed to treat medical ones—specifically, physical impairments that affect function. AC ¶¶ 138–39. Second, she alleges an as-applied violation, arising from the Defendants' application of the Gender Dysphoria Policy, which is more restrictive, in operation, than the clinical policies Defendants apply to substantially all medical benefits in the same classification. *Id.* ¶¶ 140–41. Defendants

have moved to dismiss the allegations of a facial violation, but they do not argue that Plaintiff failed to state a claim as to the as-applied violation.

### C. Count Five: Statutory Penalties for Failure to Disclose Plan Information

Count Five alleges a distinct, standalone cause of action, which is <u>not</u> alleged as an alternative to any other Count: a claim under 29 U.S.C. § 1132(c)(1)(B) for statutory penalties arising from the Plan's failure to disclose a comparative analysis demonstrating that the non-quantitative treatment limitations Defendants imposed on Plaintiff comply with the Parity Act. AC ¶¶ 145–51. The Plan has affirmative statutory obligations not only to conduct a comparative analysis of any non-quantitative treatment limitations it imposes on mental health benefits (like coverage for treatment of gender dysphoria), but also to disclose that analysis to Plan participants upon request. *See* 29 U.S.C. § 1185a(a)(8)(A) (obligating plans to "perform and document comparative analyses of the design and application" of non-quantitative treatment limitations, including analysis to demonstrate that the "the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to mental health or substance use disorder benefits, as written and in operation, are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to medical or surgical benefits in the benefits classification"); 29 U.S.C. § 1024(b)(4) (requiring administrator to furnish instruments under which plan is operated); 29 C.F.R. § 2590.712(d)(3) (specifying that such instruments include "documents with information" on non-quantitative treatment limitations and "the processes, strategies, evidentiary standards, and other factors used to apply" them). Plaintiff requested the Plan's comparative analyses on May 1, 2021, but to date, the Plan has failed to produce an analysis that meets the statutory requirements. AC ¶¶ 91, 93–100.

### D. Counts Six Through Eight: Employment Discrimination

Counts Six through Eight are explicitly asserted as alternatives to Counts One through

Four, and are asserted only against JHA. *Id.* ¶ 154 (Count Six); *id.* ¶ 166 (Count Seven); *id.* ¶ 178 (Count Eight). Count Six alleges that JHA violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), when it discriminated against Plaintiff based on her transgender status by refusing to provide full and equal coverage for health conditions specific to transgender individuals. AC ¶¶ 153–163. Count Seven alleges that JHA violated the Americans with Disabilities Act, 42 U.S.C. § 12101, by discriminating against Plaintiff on the basis of her disabling mental health condition, gender dysphoria. AC ¶¶ 165–175. Count Eight alleges that JHA violated the Missouri Human Rights Act, Mo. Rev. Stat. § 213.010, by administering its Plan to exclude coverage for Plaintiff's mental health condition and by singling out her request for coverage for different treatment based on her transgender status. AC ¶¶ 177–188. JHA has moved to dismiss Counts Seven and Eight, but not Count Six. JHA SIS 1.

## ARGUMENT

### I.   THE COMPLAINT PLAUSIBLY ALLEGES THAT DEFENDANTS' DENIAL OF COVERAGE VIOLATED THE TERMS OF PLAINTIFF'S PLAN.

ERISA provides participants with at least two potential causes of action to redress plan violations when, as in this case, coverage is wrongfully denied on a pre-authorization basis and the treatment has not yet occurred. AC ¶¶ 76, 88, 120. First, a participant may sue "to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).[6] Second, a participant may sue "(A) to enjoin any act or practice

---

[6] UMR argues that Plaintiff does not state a claim under Section (a)(1)(B) because her allegations "do not describe a claim for benefits." UMR SIS 5. But an award of benefits is not the only form of relief available under Section (a)(1)(B), which comprises three different clauses all directed to distinct purposes. *See, e.g.*, *Knowlton v. Anheuser-Busch Cos. Pension Plan*, 849 F.3d 422, 431 (8th Cir. 2017) (relief available under Section (a)(1)(B) includes award of benefits, declaratory relief, and injunctive relief). *Jones v. Aetna Life Insurance Co.*, 541 (8th Cir. 2017), on which UMR relies (UMR SIS 5), is not to the contrary. There, the Court of Appeals discussed only the theories of recovery relevant to that case, in which the plaintiff *did* seek an award of benefits. 856 F.3d at 545 ("Two of ERISA's theories of recovery are relevant here."). Nothing in *Jones* purported to limit the remedies available pursuant to the second two clauses of Section (a)(1)(B).

which violates . . . the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3). As explained above, Plaintiff asserts claims under both sections, in the alternative, arising from Defendants' unreasonable interpretations of the terms of her Plan. *See* Background § II.A, *supra*.

The standard of review the Court should apply to Defendants' decisions in administering the Plan turns on fact issues the Court should not decide at this stage. *See, e.g.*, *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 829 (8th Cir. 2014), *as corrected* (July 15, 2014) (noting that review is *de novo* unless the plan grants discretionary authority, in which case review is for abuse of discretion); *see also id.* at 830–31 (serious "procedural irregularities" or breaches of fiduciary duty can render abuse of discretion review inappropriate). Even if the Court ultimately agrees that it should review Defendants' construction of the Plan's written terms for an "abuse of discretion," *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 717 (8th Cir. 2014), that standard, "though deferential, is not tantamount to rubber-stamping the result." *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005). Courts in this Circuit typically evaluate five factors to determine whether an administrator's interpretation of *ambiguous* plan language is reasonable. *Id.*; *see also, e.g.*, *Hankins v. Standard Ins. Co.*, 677 F.3d 830, 834 (8th Cir. 2012) (cited in UMR SIS 10).[7]

When the Plan language is unambiguous, however, the five factors collapse into one question: whether the administrator's decision is "contrary to the clear language of the Plan." *Janssen v. Minneapolis Auto Dealers Ben. Fund*, 447 F.3d 1109, 1115 (8th Cir. 2006) (finding

---

[7] The five factors are:

> (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Torres*, 405 F.3d at 680.

plan administrators' interpretation of key plan term was "contrary to the clear language of the Plan" and therefore "unreasonable"). *See also, e.g.*, *Doe Run Res. Corp. v. Lexington Ins. Co.*, 719 F.3d 868, 871 (8th Cir. 2013) (cited in UMR SIS 10–11) ("Where insurance policy terms unambiguously apply, including coverage exclusions, they will be enforced as written."); *Lickteig v. Bus. Men's Assur. Co. of Am.*, 61 F.3d 579, 585 (8th Cir. 1995) (significant weight should be given to a misinterpretation of unambiguous language in a plan). If the administrator's decision is contrary to the clear language of the plan, the misinterpretation—and the coverage decision based on it—is an abuse of discretion. *See, e.g.*, *Janssen*, 447 F.3d at 1115; *Lickteig*, 61 F.3d at 585 (citing cases).[8] As explained further below, Plaintiff has plausibly alleged that Defendants abused their discretion in denying her request for coverage, by unreasonably misinterpreting the Plan in at least two respects.

### A. The Plan Unambiguously Covers *All* Types of Gender Transition Surgeries, Including Facial Surgeries.

Defendants denied Plaintiff's claim pursuant to the Plan's Cosmetic Treatment exclusion. AC ¶ 78; *see also* Ex. 2 (May 28, 2020 Letter). That exclusion states, in full, that the Plan excludes coverage for "Cosmetic Treatment, Cosmetic Surgery, or any portion thereof, ***unless*** the procedure is ***otherwise listed as a covered benefit***." AC ¶ 49 (emphasis added); Ex. 1 (SPD) at 94. The Plan lists "Gender Transition" as a covered benefit, expressly including "[t]reatment, drugs, medicines, services, and supplies for, or leading to, ***gender transition surgery***." AC ¶ 47 (emphasis added);

---

[8] Contrary to this authority, UMR argues that Count One should be dismissed because Section (a)(1)(B) "does not provide a plan participant with a claim for relief based on an alleged misinterpretation of a plan's terms." UMR SIS 2; *see also id*. at 6 (arguing Section (a)(1)(B) "does not provide a remedy" when an administrator arbitrarily denies coverage for services covered under a plan when a plaintiff meets all prerequisites for coverage); *id*. at 7 (arguing that "declaratory and injunctive relief related to the interpretation of the SPD's terms" is "not a remedy available under" Section (a)(1)(B)). UMR offers no legal authority for this bizarre reading of the statute, which flies in the face of black-letter ERISA law. *See, e.g.*, *Lickteig*, 61 F.3d at 585 (affirming judgment for plaintiff under Section (a)(1)(B) based on finding that administrators misinterpreted the plan terms); *id*. at 585 (citing cases from multiple circuits holding that denials contrary to plan terms are arbitrary and capricious).

*see also* Ex. 1 (SPD) at 53; *id.* at 50–61 ("Covered Medical Benefits" section of Plan); UMR SIS 8 (admitting that "Gender Transition" "is identified as a Covered Medical Benefit."). The Plan does not limit the *types* of surgical procedures it covers in connection with gender transition, nor does the Plan limit the parts of the body on which surgical procedures may be performed in connection with a gender transition. According to this unambiguous Plan language, the Plan "lists as a covered benefit" *all* gender transition surgeries, which means the Cosmetic Treatment exclusion does not apply to *any* such surgery.

The Plan does not define "Gender Transition" or "gender transition surgery," but neither phrase is ambiguous, particularly in the context in which they are used in the Plan. *See, e.g.*, *Kutten v. Sun Life Assur. Co. of Canada*, 759 F.3d 942, 945 (8th Cir. 2014) (terms in an ERISA plan should be given their "ordinary meaning, which can be derived from 'the dictionary definition of the word and the context in which it is used.'").[9] Part of that context is the Plan's definition of "Gender Dysphoria," which refers to the clinically significant distress arising from an incongruence between a person's assigned gender and their "primary ***and/or secondary*** sex characteristics." Ex. 1 (SPD) at 123 (emphasis added); *see also* AC ¶ 33 (secondary sex characteristics are "features that appear during puberty in humans and that are not directly part of the reproductive system" and include "facial hair, cranial shape, Adam's apples, and breasts").

Another part of the context is the Plan's definition of "Cosmetic Treatment." According to the Plan, "Cosmetic Treatment means medical or surgical procedures that are ***primarily*** used to

---

[9] The Oxford English Dictionary, for example, includes the following definition of "transition":

> The process by which a transgender or transsexual person comes to live as the sex or gender with which that person identifies. Also more fully ***gender transition*** . . .

Transition, n.7, Oxford English Dictionary Online, https://www.oed.com/view/Entry/204815. In its ordinary usage, then, "gender transition surgery" refers to any surgery prescribed as part of the process by which a transgender person comes to live as the gender with which that person identifies.

improve, alter, or enhance appearance, whether or not for psychological or emotional reasons." Ex. 1 (SPD) at 121 (emphasis added). As alleged in the Complaint, the **primary** purpose of the surgery prescribed to Plaintiff is to treat her severe psychological distress arising from the incongruity between her physical features and her intrinsic gender identity. AC ¶¶ 71–74, 80. The fact that the surgery would necessarily alter her appearance does not change what the surgery is "primarily used" for, in general or in Plaintiff's particular case. In this regard, FFS is no different than reconstruction of a person's genitals, which also accomplishes the purpose of treating psychological distress through a surgery that necessarily alters the appearance of the body—yet Defendants do not deem surgical procedures affecting the appearance of genitals in gender affirmation surgeries to be "cosmetic." *See* Ex. 5 (UnitedHealthcare's Gender Dysphoria Policy) at 1–2. Nor does the distinction in treatment between procedures on the face and procedures on the genitals come down to functionality; Defendants also do not consider "cosmetic" procedures like hair removal in the genital area or addition of testicular prostheses. *Id.* at 2.

Even if the term "gender transition surgery" were ambiguous (it is not), Plaintiff has plausibly alleged sufficient facts to state a claim that Defendants' interpretation—i.e., that the phrase does not embrace surgeries on the face, head, or neck—was unreasonable and therefore an abuse of discretion. For example, the Complaint alleges that gender dysphoria and the psychological distress it causes can relate to primary *or* secondary sex characteristics (like facial and cranial structures and Adam's apples), or both. AC ¶¶ 33–34, 44. The Complaint, further, alleges that gender confirmation surgeries "to change primary and/or secondary sex characteristics" are recognized as effective treatments for some individuals with Gender Dysphoria, *id.* ¶¶ 38–40,[10] and that "[p]eer-reviewed literature and research in the relevant medical

---

[10] Indeed, as alleged, even the UnitedHealthcare Gender Dysphoria Policy acknowledges that surgery to alter *some* secondary sex characteristics may be medically necessary, insofar as it does cover breast reduction surgery for female-

field concludes that [FFS] should be considered medically necessary gender-confirming surgery when indicated for a given patient," *id*. ¶ 41. Moreover, Plaintiff alleges that her surgeon—an expert in the field—described the prescribed procedures as "facial ***gender confirmation*** surgery" and explained that it was a "critical part of" Plaintiff's transition from male to female. *Id.* ¶ 74 (emphasis added). Taking those factual allegations as true—as the Court must, on a motion to dismiss—the Complaint more than plausibly alleges that Defendants' application of the Cosmetic Surgery exclusion to deny coverage for Plaintiff's gender transition surgery was an abuse of discretion. *See, e.g.*, *Janssen*, 447 F.3d at 1115.

**B.     Defendants' Interpretation of the Plan's Medical Necessity Requirement Is Unreasonable**

On administrative appeal, Defendants upheld their denial of coverage on the ground that the surgery was "not medically necessary per the Plan's language." Ex. 3 (Aug. 13, 2020 Letter). The only reason Defendants gave for their conclusion that the surgery was not medically necessary for Plaintiff, however, was that "national criteria considers certain ancillary procedures such as facial feminization a cosmetic procedure," which "is excluded" by the Plan. *Id*. Plaintiff later learned that the "national criteria" to which the denial letter referred was UnitedHealthcare's internal Gender Dysphoria Policy. AC ¶¶ 85–86.

The Plan defines "medically necessary" services as those that are (among other things) "[i]n accordance with Generally Accepted Standards of Medical Practice," which the Plan further defines as "standards that are based on credible scientific evidence," "observational studies," or "Physician specialty society recommendations or professional standards of care." *Id.* ¶ 46; Ex. 1 (SPD) at 126. The term "Generally Accepted Standards of Medical Practice" is ambiguous as used

---

to-male transitions. AC ¶ 59; Ex. 5 (UnitedHealthcare's Gender Dysphoria Policy) at 2. Yet the policy stops coverage at the neck, and also will not cover breast *augmentation* for male-to-female transitions, *see* Ex. 5 at 2, demonstrating how untethered it is to any written Plan terms, Defendants' fiduciary duties, or the Parity Act.

in the Plan, rendering the definition of "medically necessary" ambiguous as well.

The Complaint plausibly alleges that Defendants' reliance on UnitedHealthcare's Gender Dysphoria Policy as the medical-necessity criteria according to which they evaluated Plaintiff's request for coverage was unreasonable and therefore an abuse of discretion. As alleged, the authoritative statement of generally accepted standards for transgender healthcare, worldwide, is set forth in the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (7th ed. 2011) ("*Standards of Care*"), published by the World Professional Association for Transgender Health ("WPATH"). AC ¶¶ 35–38. The *Standards of Care* recognize that FFS may be medically necessary to treat gender dysphoria, *id.* ¶ 40, and emphasize the importance of individualized assessment to determine the medical necessity of such procedures, *id*. ¶ 38. The Gender Dysphoria Policy, by contrast, categorically deems all facial surgeries to be "cosmetic" and therefore "not medically necessary," with no assessment of individualized medical need. *Id.* ¶ 58. These factual allegations set forth a plausible claim that the Gender Dysphoria Policy directly contradicts the generally accepted standards of care, which the Plan dictates must undergird all medical-necessity determinations that Defendants make as the Plan's fiduciaries.[11]

Defendants' interpretation of the Plan's medical necessity requirement sidesteps any actual assessment of medical need by simply dictating that gender transition surgeries performed on the face or neck are *never* medically necessary merely because UnitedHealthcare has decided to deem them "cosmetic." In so doing, Defendants import into their medical necessity determination the very exclusion the Plan carefully circumscribed to ensure it would *not* apply to gender transition

---

[11] Defendants' preference for the Gender Dysphoria Policy's automatic finding of lack of medical necessity also conflicts with the second part of the Plan's medical necessity definition, which requires services to be "clinically appropriate . . . for Your. . . mental illness." Ex. 1 (SPD) at 126. This is an individualized standard, dependent on the specific plan participant's clinical presentation. The Gender Dysphoria Policy, however, simply assumes that facial surgeries are never clinically appropriate.

surgeries. Defendants' construction, therefore, defeats multiple goals of the Plan, while also rendering key portions of the Cosmetic Treatment exclusion and the definition of "Medical Necessity" meaningless. *Torres*, 405 F.3d at 680 (an interpretation that is inconsistent with the goals of the Plan or that "renders any language in the Plan meaningless or internally inconsistent" are among the factors indicating an abuse of discretion); *see also Portell v. AmeriCold Logistics, LLC*, 571 F.3d 822, 824 (8th Cir. 2009) (cited in UMR SIS 7) (courts "construe each of the terms [of a contract] to avoid rendering the other terms meaningless.").

### C.  UnitedHealthcare's Clinical Policy Is Not a Term of the Plan

Recognizing that the Gender Dysphoria Policy is incompatible with the Plan's terms, UMR argues that UnitedHealthcare's clinical policy is, in reality, a term of the Plan. *See* UMR SIS 9. UMR contends that the Plan incorporates the Gender Dysphoria Policy by reference—through a generalized citation to all clinical policies available on UnitedHealthcareOnline.com that does not even purport to impact the meaning of or scope of coverage otherwise promised, *id.*—thereby importing severe limitations on gender transition surgery coverage that are otherwise absent from the Plan terms. Completing its rhetorical sleight of hand, UMR contends that reading the Plan as written, as Plaintiff urges, "would require the Court to ignore contradictory terms of the SPD," *id.* at 7—by which UMR means the "contradictory terms" of the Gender Dysphoria Policy. *Id.* at 10 (arguing that the Plan's reference to "gender transition surgery" cannot include "facial feminization surgery" because the Gender Dysphoria Policy "makes clear that facial feminization surgery is not covered"); *id.* at 11 (arguing that Defendants' decision was "consistent with the SPD's terms" only when the SPD and the Gender Dysphoria Policy are "taken together").

The Gender Dysphoria Policy—an internal, clinical policy developed by a UMR affiliate with no relationship to the JHA Plan—is not a Plan term. On its face, the policy provides that it "assist[s]" in interpreting the terms of "UnitedHealthcare standard benefit plans." Ex. 5

(UnitedHealthcare's Gender Dysphoria Policy) at 15. (The JHA Plan, of course, is a self-funded plan and not one issued by UnitedHealthcare. AC ¶ 13.) The policy further underscores the difference between clinical policies and plan terms by admonishing:

> When deciding coverage, the member specific benefit plan document must be referenced as the terms of the member specific benefit plan may differ from the standard plan. **In the event of a conflict, the member specific benefit plan document governs**. Before using this policy, please check the member specific benefit plan document and any applicable federal or state mandates. . . . This Medical Policy is provided for informational purposes.

Ex. 5 (UnitedHealthcare's Gender Dysphoria Policy) at 15 (emphasis added). As noted, UMR concedes that there is a conflict between the unambiguous terms of Plaintiff's Plan and the Gender Dysphoria Policy. Even the policy itself recognizes that the Plan terms, and not UnitedHealthcare's internal policies, govern.

UMR's argument that the Plan "incorporates" the Gender Dysphoria Policy by reference is also wrong as a matter of law, as UMR's own legal authority demonstrates. *See* UMR SIS 9 (citing *Halbach v. Great-W. Life & Annuity Ins. Co.*, 561 F.3d 872, 876 (8th Cir. 2009)). In *Halbach*, the question was whether an unsigned amendment to an SPD, referenced in *and attached to* a signed letter, constituted a single instrument such that the plan's requirements for amendment were satisfied. 561 F.3d at 876. The court explained that "a writing may incorporate another document if the terms of the incorporated document are known or easily available to the contracting parties." *Id*. Because the amended SPD was "attached to the letter and in the same mailing," the letter's reference to the SPD "was sufficient as a legal matter to incorporate the attached SPD." *Id.*; *see also id*. (letter's reference to the SPD stated, "Enclosed is a summary of all plan changes, decision-making tools, health plan overviews and a health care resource guide.").

The Plan language on which UMR relies falls far short of the standard applied in *Halbach*. Not only does the Plan fail to attach any purportedly "incorporated" terms, the Plan does not even

*identify* any specific UnitedHealthcare clinical policy. Rather, it refers generally to *all* clinical policies available on the UnitedHealthcare website. *See* Ex. 1 (SPD) at 127 (noting that UnitedHealthcare Clinical Services "develops and maintains clinical policies that describe the Generally Accepted Standards of Medical Practice," which are available "on UnitedHealthcareOnline.com"). Searching UnitedHealthcareOnline.com for "clinical policies" yields nearly 6,000 results. *See* Ex. 6 (Mar. 1, 2022 search results). Searching for "Gender Dysphoria Policy" is not much better—that search yields 742 results. *Id*. Making the reference even less definite, the Plan acknowledges that UnitedHealthcare revises its policies "from time to time." Ex. 1 (SPD) at 127. In short, it is impossible to tell from the Plan's language what UnitedHealthcare clinical policy or policies might apply to a given claim for coverage. Because the "terms of the incorporated document" are decidedly ***not*** "known or easily available to the contacting parties," the Plan language is not "sufficient as a legal matter" to incorporate any of UnitedHealthcare's thousands of clinical policies, including the Gender Dysphoria Policy at issue here. *Halbach*, 561 F.3d at 876. A contrary conclusion, moreover, would enable *UnitedHealthcare* to amend the Plan at its whim, which would contradict the Plan's own provisions reserving to the Plan Sponsor (i.e., JHA) the authority to amend the Plan, prohibiting oral amendments, and precluding agents of the Plan from amending it "either purposefully or inadvertently." *See* Ex. 1 (SPD) at 119.

### D. In Counts One Through Three, Plaintiff Seeks to Enforce Her Plan, Not Reform It.

The preceding sections explain why Plaintiff has (at least) plausibly alleged that her Plan, as written, covers her prescribed FFS. Her allegations in Count One (and, alternatively, Counts Two and Three) and the relief she requests unequivocally seek to enforce the existing Plan terms. *See, e.g.*, AC ¶¶ 112–114, 125, 132; *id*. at 36–38 ("Prayer for Relief"), ¶¶ B–C, E, K, L.

Defendants, however, persist in asserting that Plaintiff seeks to *reform* the Plan, and argue that Counts One through Three should be dismissed for that reason. JHA SIS 4; UMR SIS 7. These arguments have no merit.

JHA casts the relief Plaintiff requests under Count One as "plan reformation" because, JHA asserts, "Plaintiff wants to have FFS covered as gender transition surgery even though the terms of the Plan exclude FFS as a Cosmetic Treatment." JHA SIS 4. JHA conspicuously fails to support this assertion with any citation to any term of the Plan, however. *Id.* Nor could it; as Plaintiff has explained, the unambiguous terms of the plan *exempt* Plaintiff's prescribed FFS from the Cosmetic Treatment exclusion and therefore provide coverage for FFS. *See* Argument § II.A, *supra.* Plaintiff, unlike Defendants, merely seeks to enforce the Plan as written.

For its part, UMR's mischaracterization of Plaintiff's claims is primarily premised on its contention that the Gender Dysphoria Policy is a term of the Plan, such that disregarding it would "reform" the Plan. UMR SIS 6–7. Plaintiff has already explained why that argument fails, as a matter of both fact and law. *See* Argument § II.C, *supra.*

Because Count One does not seek to reform the Plan, but rather to enforce it as written, Defendants' reliance on cases holding that plan reformation remedies are unavailable under Section (a)(1)(B) is misplaced. *See* JHA SIS 3-4; UMR SIS 6-7; Quantum SIS 4-5; *Ross v. Rail Car Am. Grp. Disability Income Plan*, 285 F.3d 735, 741 (8th Cir. 2002); *Moore v. Apple Cent., LLC*, 893 F.3d 573, 577 (8th Cir. 2018); *Delcastillo v. Odyssey Res. Mgmt., Inc.* 431 F.3d 1124, 1130-31 (8th Cir. 2005); *Guthrie v. Dow Chem. Co.*, 445 F. Supp. 311, 314-15 (S.D. Tex. 1978); *O'Brien v. Sperry Univac*, 458 F. Supp. 1179 (D.D.C. 1978).[12]

---

[12] Quantum's reliance on *O'Brien*, a 44-year-old out-of-Circuit district court case, for this inapposite proposition is particularly befuddling. Quantum SIS 4. Quantum's parenthetical suggests it seeks to draw some distinction between the Plan and the SPD. *Id.* No such distinction can be made in this case, however, because the SPD itself says, "[t]his

**E.    In Counts One through Three, Plaintiff Seeks Equitable Relief Only, Not an Award of Benefits**

Another way Defendants repeatedly mischaracterize Plaintiff's Complaint is by arguing that she is asserting a "claim for benefits." *See* JHA SIS 4–5; UMR SIS 5–7; Quantum SIS 3–4. As explained above, because Defendants denied coverage to Plaintiff on a pre-service basis, she has not yet been able to obtain the surgery prescribed to treat her Gender Dysphoria. AC ¶ 88, 120. For that reason, Plaintiff does not seek an award of *monetary damages* as relief for the claims she asserts in Counts One through Three. Instead, her Prayer for Relief seeks only declaratory and injunctive relief for these counts. *See generally id.* at 36–38 (Prayer for Relief).

Since Plaintiff is not asking the Court to award her monetary damages,  the cases on which Quantum relies to argue that it is not a "proper defendant" for such a claim under Section (a)(1)(B) are inapposite. *See* Quantum SIS 3–4. The main concern of those cases—ensuring that the defendant has the authority to pay benefits or cause them to be paid—is not at issue here. *See Layes v. Mead Corp.*, 132 F.3d 1246, 1248–49 (8th Cir. 1998); *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997); *Daniel v. Eaton Corp.*, 839 F.2d 263, 266 (6th Cir. 1988). None of those cases holds that a claims administrator with delegated fiduciary responsibilities under a Plan who breached those duties and wrongfully denied coverage in violation of plan terms is immune from a claim under Section (a)(1)(B) for equitable relief to enforce or clarify plan terms.

Nor can there be any question that all three Defendants, including Quantum, are "proper defendants" to the extent Plaintiff's claims arise under Section (a)(3). As the Supreme Court explained in *Harris Trust*, that section "admits of no limit . . . on the universe of possible defendants. Indeed, § [1132](a)(3) makes no mention at all of which parties may be proper

---

document contains information on the benefits and limitations of the Plan and will serve as both the Summary Plan Description (SPD) and Plan document." Ex. 1 (SPD) at 1.

defendants." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 239 (2000).

## II.  THE COMPLAINT PLAUSIBLY ALLEGES THAT DEFENDANTS BREACHED THEIR FIDUCIARY AND CO-FIDUCIARY DUTIES.

### A.  Plaintiff's Breach of Fiduciary Duty Claims Are Cognizable Under Either Section (a)(1)(B) or (a)(3).

Defendant JHA's only argument for dismissing Count One of the Complaint is that it includes a claim for breach of fiduciary duty, which JHA contends is not cognizable under Section (a)(1)(B). JHA SIS 2–4.[13] JHA is wrong—but it takes its misplaced argument even further. JHA concedes that breach of fiduciary duty claims are cognizable under Section (a)(3), and even seems to concede that Plaintiff's allegations state a claim for breach of fiduciary duty, JHA SIS 2–3, but argues nevertheless that the breach of fiduciary duty claim should be dismissed, under all Counts, *with prejudice*, merely because Plaintiff also asserted it under Section (a)(1)(B). JHA SIS 3 (arguing Count One should be dismissed because it improperly pleads breach of fiduciary duty under Section (a)(1)(B)); *id*. at 4 (arguing that Count Two should be dismissed because it "asserts the exact same theory of liability" as Count One); *id*. at 5–6 (same as to Count Three); *id*. at 1 (seeking dismissal with prejudice). JHA's argument cannot be squared with ERISA's remedial purpose or the cases interpreting the statute.

Congress intended for ERISA to "protect . . . the interests of participants in employee benefit plans" by, among other things, "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," and by giving plan participants "ready access to the Federal courts." 29 U.S.C. § 1001(b). Consistent with that purpose, the statute's remedial

---

[13] JHA acknowledges that Count One also "alleges that Defendants violated the terms of the Plan . . . ," JHA SIS 4, but does not argue that the plan-violation claims are improperly asserted under Section (a)(1)(B). *Id.; see also id.* at 5 (arguing that "[w]hether defendants properly interpreted the plan is the basis for almost every § 1132(a)(1)(B) claim filed in any court and, indeed, is what Plaintiff seeks the Court to review in Count One."). Nor could JHA prevail in such an argument, for the reasons Plaintiff has explained above.

provision includes multiple, overlapping causes of action that allow plan participants to challenge unlawful conduct by those administering their plans. 29 U.S.C. § 1132(a); *Delker*, 21 F.4th at 1024 ("In relevant part, this section enables plan participants and beneficiaries to bring civil actions to recover benefits and enforce rights under the plans, 29 U.S.C. § 1132(a)(1)(B), and to obtain equitable relief for violations of the terms of the plan or to enforce the plan's terms, *id*. § 1132(a)(3)"). ERISA itself does not state that any part of its remedial provision is exclusive of any other part.

On its face, Section (a)(1)(B) provides a cause of action for plan participants to "enforce" or "clarify" the terms of their plans. 29 U.S.C. § 1132(a)(1)(B). There is no statutory basis for concluding that a participant could not seek that relief when the reason enforcement or clarification is needed is because a plan administrator breached its fiduciary duty. *Id*. The Supreme Court, moreover, agrees with this reading of the statute, explaining that in Section (a)(1)(B), "ERISA specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims . . . that runs directly to the injured beneficiary." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).

JHA ignores *Varity*, but the cases on which JHA rests its argument do not hold that breaches of fiduciary duty are not cognizable under Section (a)(1)(B).[14] In *Jones*, for example, that plaintiff asserted a claim for benefits due under Section (a)(1)(B) and claim for breach of fiduciary duty under Section (a)(3). The Court of Appeals evaluated whether the plaintiff could plead both claims (holding that he could) but did not address whether the plaintiff could have asserted a breach

---

[14] Indeed, most of the cases JHA cites in this section are completely inapposite to this question. *See* JHA SIS 3-4; *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987) (no discussion of pleading breach of fiduciary duty under ERISA); *LaSalle v. Mercantile Bancorporation Inc. Long Term Disability Plan*, 498 F.3d 805, 811 (8th Cir. 2007) (same); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (same); *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 644 (8th Cir. 2002) (same).

of fiduciary duty claim under Section (a)(1)(B). 856 F.3d at 545. In *Moore*, a case addressing ERISA preemption, the Court of Appeals explained that the plaintiff had alternative means to obtain money damages—i.e., under Section (a)(1)(B), if the insurer misapplied the plan, or under Section (a)(3), if the plan administrator failed to submit the required forms to enroll plaintiff in the plan. *Moore*, 893 F.3d at 577. Like *Jones*, however, the *Moore* court did not address whether the plaintiff could have asserted a breach of fiduciary duty claim under Section (a)(1)(B). *Id*. In any case, even if JHA were correct that all breach of fiduciary duty claims must always be asserted under Section (a)(3) (it is not), the solution would not be to dismiss Plaintiff's substantive claim with prejudice. Rather, the Court should grant Plaintiff leave to amend the Complaint to assert the claim only under Section (a)(3). Fed. R. Civ. P. 15(a) (leave to amend should be "freely" granted).

### B. The Complaint Plausibly Alleges That Defendants Breached Their Fiduciary and Co-Fiduciary Duties

"A claim for breach of fiduciary duty under ERISA requires three elements: '1) defendant was a fiduciary of the plan, 2) defendant was acting in that capacity, and 3) defendant breached a fiduciary duty.'" *Delker*, 21 F.4th at 1025 (quoting *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 312 F. Supp. 2d 1165, 1175 (D. Minn. 2004)). Plaintiff's Complaint more than plausibly alleges each of these elements as to each Defendant.

#### 1. Quantum

"Under ERISA, a person or entity may be explicitly named a fiduciary or may be deemed one based on the functional authority held by the same." *Delker*, 21 F.4th at 1025. An entity is a *de facto* ERISA fiduciary "to the extent" it either "has" discretionary authority or responsibility in the administration of a plan, or "exercises" discretionary authority or control over a plan. 29 U.S.C. § 1002(21)(A); *see also Delker*, 21 F.4th at 1025 ("A fiduciary duty arises as to aspects of an ERISA benefit plan over which a person or entity exercises authority." (citing *Moore v.*

*Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006))). The Complaint plausibly alleges that Quantum "had" and "exercised" just this sort of discretionary authority over Plaintiff's request for precertification of coverage.

As alleged in the Complaint, Quantum had discretionary responsibility for administering the Plan's "Care Coordination" process. AC ¶ 20; Ex. 1 (SPD) at 81–86. That discretionary authority included reviewing requests for pre-authorization of coverage and determining whether they "meet Plan criteria" and "utilization criteria established by the Plan." Ex. 1 (SPD) at 82–83. Although UMR is otherwise the "claims administrator" for the Plan and conducts all "clinical reviews" with respect to precertification requests, the Plan is explicit that UMR "does not administer the benefits" within the Care Coordination section, but rather, is part of the team of Care Coordinators administered by Quantum. *Id.* at 81.

Under the Plan, if the Plan's "criteria" are not satisfied with respect to a request for pre-authorization, Quantum's "medical directors" have the discretionary responsibility to "review all available information and if needed consult with the requesting provider," and "[i]f required," to "consult with other professionals and medical experts with knowledge in the appropriate field." *Id.* at 83. Only after completing that highly discretionary investigation and evaluation, the Plan states that Quantum will make a "recommendation" to the Plan Administrator as to "whether the request should be approved, denied, or allowed as an exception." *Id.* Determinations Quantum issues following the Care Coordination process, therefore, are necessarily issued on behalf of all three Defendants, as all three are involved in rendering the final and binding coverage decision.

The Complaint, further, plausibly alleges that Quantum acted in its fiduciary capacity when it issued the wrongful denials of Plaintiff's request for precertification of coverage. *See* AC ¶¶ 76–86 (alleging Defendants wrongfully denied Plaintiff's request for precertification); *see also* Exs.

2-4 (letters reflecting that Quantum issued the denials on behalf of JHA, in reliance on UMR's clinical reviews). And in response to Plaintiff's Parity Disclosure Request, JHA informed Plaintiff that "Quantum Health made the decision to reject the claim for facial feminization surgery." Ex. 7 (JHA Parity Disclosure Response); AC ¶ 96. Plaintiff has plausibly alleged Quantum is a fiduciary and JHA confirmed it. Quantum cannot be dismissed from this case.

### 2. UMR

UMR is *both* a named fiduciary and a *de facto* one. The Plan names UMR as the "Claims Appeal Fiduciary for Medical Claims," Ex. 1 (SPD) at 2, conferring fiduciary status on UMR with respect to administrative appeals from claim denials. *See* 29 U.S.C. § 1102(a)(2) ("the term "named fiduciary" means a fiduciary who is named in the plan instrument"). Plaintiff sought two levels of administrative appeal under her Plan, both of which she alleges were also wrongfully denied. AC ¶¶ 82–87. As a named fiduciary, UMR owed Plaintiff fiduciary duties with respect to those appeals.

In addition, as alleged in the Complaint, UMR is the named "Third Party Administrator" for medical claims (including behavioral health claims) under the Plan, which delegates to UMR the discretionary responsibility to make final and binding coverage determinations under the Plan. AC ¶ 18; Ex. 1 (SPD) at 1–3. The Plan further provides that "all clinical reviews that are done to determine Plan coverage, are conducted by the clinical staff of UMR Care Management department," including reviews of pre-authorization requests conducted within the Care Coordination process. Ex. 1 (SPD) at 81; AC ¶¶ 76–77. Consistent with that grant of discretionary authority, Plaintiff alleges that UMR conducted the clinical reviews on which Defendants' denials of Plaintiff's request for coverage were based. AC ¶ 85. As such, UMR both "had" and "exercised" discretionary authority in conducting clinical reviews, such that it was acting in a fiduciary capacity when reviewing Plaintiff's request for coverage.

3.    JHA

JHA is the "Named Fiduciary" under the Plan. *Id.* ¶ 17; Ex. 1 (SPD) at 2. As such, JHA is undisputedly a fiduciary under ERISA. *See also* 29 U.S.C. §§ 1102(a)(2). JHA, moreover, expressly reserved for itself the discretionary authority to "interpret all Plan documents" and to "make all interpretive and factual determinations as to whether any individual is entitled to receive any benefit under the terms of this Plan," except insofar as JHA "delegated certain responsibilities to the Third Party Administrators" of the Plan. Ex. 1 (SPD) at 3. As explained above, the Plan expressly delegates to Quantum discretionary authority to administer requests for precertification of coverage, and to UMR the discretionary authority to conduct all "clinical reviews" in connection with such requests. *Id.* at 81. The Plan suggests, however, that JHA was responsible for making the "final" coverage determination based on Quantum's recommendation. *Id.* at 83 (following review, Quantum recommends outcome to Plan Administrator). JHA, therefore, also plausibly acted as a fiduciary with respect to the denial of Plaintiff's request for precertification.

4.    Defendants Breached Their Fiduciary Duties

ERISA fiduciaries must carry out their duties with respect to a plan "***solely*** in the interest of benefit plan participants and beneficiaries," and for the "***exclusive*** purpose" of providing benefits to plan participants and beneficiaries while defraying reasonable administrative expenses. 29 U.S.C. § 1104(a)(1)(A); *see also Delker*, 21 F.4th 1025 (describing ERISA duty of loyalty). In doing so, they must act with "care, skill, prudence, and diligence," 29 U.S.C. § 1104(a)(1)(B); *see also Delker*, 21 F.4th 1025 (describing ERISA duty of prudence), and "in accordance with" the plan terms, insofar as those terms comply with ERISA itself. 29 U.S.C. § 1104(a)(1)(D).

As alleged in the Complaint, the Defendants breached their duty of loyalty by displacing the terms of Plaintiff's Plan with a clinical policy developed by UnitedHealthcare for its own purposes, not solely in the interests of the participants and beneficiaries of the JHA Plan. AC ¶ 118.

26

Defendants breached their duty of prudence by carelessly misinterpreting the plan terms, including by ignoring the Cosmetic Exclusion's inapplicability to services "otherwise listed as Covered Benefits," and by grossly mischaracterizing the generally accepted standards of care as deeming all facial feminization surgeries as "cosmetic." *Id*. ¶ 118. Those fiduciary breaches, further, caused Defendants to issue a denial that was not "in accordance with" the terms of Plaintiff Plan—an additional fiduciary breach. *Id*. ¶ 118. At the pleading stage, Plaintiff need not allege with specificity every act performed by each Defendant in connection with their fiduciary breaches. *Delker*, 21 F.4th at 1024 ("Specific facts are not necessary" to state a claim; "a plaintiff need only allege sufficient facts to provide fair notice of the claim and its basis.") (cleaned up). All the Complaint needs to do is "raise a reasonable expectation" that discovery will yield evidence of the Defendants' respective roles. *Id*. (citing *Twombly*, 550 U.S. at 555).

###### 5. Defendants Are Also Liable as Co-Fiduciaries

ERISA not only imposes strict fiduciary duties on the entities that administer ERISA plans, it also makes them responsible for the breaches of their co-fiduciaries if they either knowingly participate in the breach; enable the breach through their own failure to comply with their fiduciary obligations; or know of the breach but fail to remedy it. 29 U.S.C. § 1105(a).

The Complaint's factual allegations, and the inferences they create, make it at least plausible that all three Defendants were fiduciaries who played a role in the wrongful denial of Plaintiff's claim. *See* Argument §§ II.B.1–3, *supra*. These allegations are more than sufficient to state a claim for co-fiduciary liability. After all, a proper complaint need only allege facts sufficient to nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Plaintiff's Complaint has certainly met this standard.

### III.  ERISA ALLOWS FOR PLEADING IN THE ALTERNATIVE

Defendants' only argument for dismissing Counts Two and Three of the Complaint is that

they are "duplicative" of Count One. JHA SIS 4–6; UMR SIS 3–4, 14; Quantum SIS 5–7. Defendants correctly discern that Plaintiff pleads her plan-violation and breach-of-fiduciary-duty legal theories under Section (a)(1)(B) and also, in the alternative, under Section (a)(3). *See* Background § II.A, *supra*. But Defendants are wrong that this provides any justification for dismissing any of the claims Plaintiff asserts in these Counts—let alone *all* of them.

The law in this Circuit (and most others) is clear: ERISA plaintiffs are allowed to plead claims under both Sections (a)(1)(B) and (a)(3) in the alternative. *See Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547 (8th Cir. 2017); *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 726 (8th Cir. 2014). As the Court of Appeals explained in *Silva*:

> To dismiss an ERISA plaintiff's § 1132(a)(3) claim as duplicative at the pleading stage of a case would, in effect, require the plaintiff to elect a legal theory and would, therefore, violate the Federal Rules of Civil Procedure.

762 F.3d at 726 (cleaned up); *see also* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."); *id*. at 8(a)(3) (complaint may demand relief in the alternative).

ERISA itself, moreover, does not provide that any of its remedies is exclusive of any other. *See generally* 29 U.S.C. § 1132(a). What ERISA prohibits is duplicative *recoveries*—specifically, benefits payments. *Silva*, 762 F.3d at 726. For that reason, a plaintiff is not allowed to recover benefits under Section (a)(1)(B) and *also* obtain the same monetary remedy as make-whole relief on an unjust enrichment theory under Section (a)(3)(B). But where, as here, a plaintiff seeks only equitable remedies, and *not* an award of benefits, there is no risk of a "double" recovery and no justification for forcing the plaintiff to elect a remedy—certainly not at the pleading stage.[15]

---

[15] Nor does JHA's purported concern that Plaintiff is seeking to "use § 1132(a)(3) to get a second review of her benefit claim" make any sense. JHA SIS 5. The Court will make a single decision on the factual and legal bases for Plaintiff's plan-misinterpretation and breach-of-fiduciary-duty claims, even if Plaintiff is allowed to plead them in the alternative, under both Sections (a)(1)(B) and (a)(3).

Indeed, the Supreme Court's decision in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), suggests there is no reason to force a plaintiff to elect a remedy *at all*. There, the Court found that plan reformation was not an available remedy under Section (a)(1)(B), but that it *was* available under Section (a)(3)—and the Court had no difficulty issuing that ruling, even though the plaintiff had also brought a claim under Section (a)(1)(B). 563 U.S. at 440–41; *see also Silva*, 762 F.3d at 727 (noting that *Amara* "addressed the issue in terms of available relief and did not say that plaintiffs would be barred from initially bringing a claim under the [Section (a)(3)] catchall provision simply because they had already brought a claim under the more specific portion of the statute").

Defendants—who failed entirely to mention *Amara* and therefore ignore the combination of remedial provisions at play there—attempt to limit *Silva* and *Jones* by arguing that alternative pleading is only permitted when a plaintiff asserts "different theories of liability" under each section. JHA SIS 4–5; UMR SIS 14; Quantum SIS 6. But Plaintiff *has* asserted three distinct legal theories in these Counts. *See* Background § II, *supra*; *see also, e.g.*, *Christoff v. Unum Life Ins. Co. of Am.*, No. CV 17-3512 (DWF/KMM), 2018 WL 4110963, at *4 (D. Minn. Aug. 29, 2018) (holding that claims for "improper denial of benefits under the terms of the plan and breach of fiduciary duty" "arise under distinct legal theories") (footnote omitted); *cf. also Jones v. Aetna Life Ins. Co.*, 943 F.3d 1167, 1169 (8th Cir. 2019) (claim that administrator "failed to act with the 'care, skill, prudence, and diligence [of] a prudent man,'" would be "an independent statutory claim" distinct from Section (a)(1)(B) claim for benefits). Each of Plaintiff's legal theories is cognizable under *either* Section (a)(1)(B) *or* Section (a)(3), which is why she pled them under both sections, in the alternative. Defendants' motions attempt to force Plaintiff to choose between otherwise available causes of action—but that is exactly the outcome the Eighth Circuit rejected in *Silva* and

*Jones*. Plaintiff has permissibly pled Counts Two and Three in the alternative, and they must stand.

**IV.    COUNT FOUR OF THE COMPLAINT PLAUSIBLY ALLEGES THAT DEFENDANTS VIOLATED THE PARITY ACT**

Congress passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act"), 29 U.S.C. § 1185a, to end discrimination against mental health treatment in health insurance plans. Enacted as an amendment to ERISA, the Parity Act, as its name suggests, prohibits employer-sponsored health insurance plans from operating in a way that results in a disparity between coverage for treatments for mental health conditions and for medical/surgical conditions. Put simply, the statute "requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone." *Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 727–28 (S.D.N.Y. 2018) (cleaned up).

To accomplish this purpose, the Parity Act mandates, among other things: (1) that "the treatment limitations applicable to" the mental health benefits offered under a plan can be "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan" and (2) plans can contain "no separate treatment limitations that are applicable only with respect to mental health . . . benefits." 29 U.S.C. § 1185a(a)(3)(A)(ii).

The regulations implementing the Parity Act distinguish between "quantitative treatment limitations" ("QTLs"), which are expressed numerically, and "nonquantitative treatment limitations ("NQTLs"), which "otherwise limit the scope or duration of benefits for treatment under a plan." 45 C.F.R. § 146.136(a). The treatment limitations Defendants used to deny Plaintiff's request for coverage are NQTLs: the Cosmetic Exclusion and the Medical Necessity requirement. AC ¶¶ 25, 137.

Under the Parity Act's implementing regulations, a Plan "may not impose" an NQTL on mental health benefits unless, "under the terms of the plan . . . as written and in operation," the

"processes, strategies, evidentiary standards, or other factors used in applying" the NQTL to mental health benefits are "comparable to, and are applied no more stringently than," those used in applying the NQTL to medical/surgical benefits in the same "classification." 45 C.F.R. § 146.136(c)(4). The regulations identify six classifications: (1) inpatient, in-network, (2) inpatient, out-of-network, (3) outpatient, in-network, (4) outpatient, out-of-network, (5), emergency care, and (6) prescription drugs. *Id.* Plaintiff's prescribed surgery falls into the "inpatient, out-of-network" classification. AC ¶ 26.

Parity Act violations are actionable under Section (a)(3) of ERISA's remedial provision. *See* 29 U.S.C. § 1132(a)(3) (providing cause of action to enjoin or otherwise remedy any ERISA violation). To state a claim under the Parity Act, a plaintiff must plead four elements:

> (1) [the] insurance plan is subject to the Parity Act; (2) the plan provides benefits for both mental health/substance abuse and medical/surgical treatments; (3) there are differing treatment limitations on benefits for mental health care as compared to medical/surgical care; and (4) such limitations on mental health care are more restrictive.

*Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1236 (D. Utah 2019); *see also Gallagher v. Empire HealthChoice Assurance, Inc.*, 339 F. Supp. 3d 248, 256 (S.D.N.Y. 2018) (outlining similar test). Plaintiff has alleged, and Defendants do not (and cannot) dispute, (1) that the JHA Plan, as an employer-sponsored plan subject to ERISA, is also subject to the Parity Act; and (2) that the Plan provides mental health benefits in addition to medical/surgical benefits. AC ¶¶ 13, 16, 24, 42; *see also* Ex. 1 (SPD) at 50 (Plan provides coverage for treatment of "Illness or Injury"); *id*. at 125 ("Illness" defined to include "mental sickness").

As explained below, the Complaint also plausibly pleads the third and fourth elements. Plaintiff need not satisfy any heightened pleading standard; just as with any other claim, all that Rule 8 requires is that Plaintiff put the Defendants on notice of the grounds for relief. *Delker*, 21 F.4th at 1024 ("[A] plaintiff need only allege sufficient facts to provide 'fair notice' of the claim

and its basis."). Especially when a detailed comparison between how the "processes, strategies, evidentiary standards, or other factors" are used in applying an NQTL to mental health versus medical/surgical benefits would require information a plaintiff cannot obtain without discovery, overly rigid pleading standards would make it nearly impossible for Parity Act claims to survive the pleading stage. *See, e.g.*, *Bushell v. UnitedHealth Grp. Inc.*, 17-CV-2021 (JPO), 2018 WL 1578167, at *6 (S.D.N.Y. Mar. 27, 2018) ("[T]he nature of NQTL Parity Act claims counsels against a rigid pleading standard."). Unlike the abuse of discretion standard that governs Counts One through Three above, the Court must defer to Plaintiff's reading of Plan terms and allegations of Parity Act violations in Count Four. *E.g.*, *N.R. ex rel. S.R. v. Raytheon Co.*, 24 F.4th 740, 748 (1st Cir. 2022) (explaining that conflicting readings of the "complex Plan document and the actual application of the . . . exclusion" go in the plaintiff's favor on a motion to dismiss); *L.P. ex rel. J.P. v. BCBSM, Inc.*, 18-CV-1241 (MJD/DTS), 2020 WL 981186, at *4 (D. Minn. Jan. 17, 2020), *report and recommendation adopted*, CV 18-1241 (MJD/DTS), 2020 WL 980171 (D. Minn. Feb. 28, 2020) (explaining, on a motion for summary judgment, "to the extent this case requires a determination regarding the Plan's compliance with the Parity Act, this Court owes BCBSM no deference"). The First Circuit recently reversed, in relevant part, the case each Defendant relied on in its motion to dismiss—*N.R. ex rel. S.R. v. Raytheon Co.*—noting that the lower court "b[ought] into the defendants' representations of how the Plan works too much for this [motion to dismiss] stage in the litigation." 24 F.4th at 743. Furthermore, as administrators of the Plan, Defendants hold the burden of establishing that there are no differing treatment limitations or, if there are, that the differing treatment is permissible under the Parity Act. *C.M. v. Fletcher Allen Health Care, Inc.*, 5:12-CV-108, 2013 WL 4453754 (D. Vt. Apr. 30, 2013).

**A.** **The Complaint Plausibly Alleges an As-Applied Violation of the Parity Act, Which Defendants Do Not Challenge.**

Separate and apart from Counts One through Three, Plaintiff alleges an as-applied violation of the Parity Act in the Plan's application of additional criteria to deny her precertification request for FFS—a claim Defendants do not challenge. AC ¶ 27, 56 140, 142–143, which Defendants do not challenge. An as-applied violation is one that is "not necessarily evident on the face of an insured's plan terms and may be imposed during a claims administrator's application of the plan to a given claim for benefits or type of treatment coverage sought in a specific case." *David P. v. United Healthcare Ins. Co.*, 2:19-CV-00225-JNP-PMW, 2020 WL 607620, at *15 (D. Utah Feb. 7, 2020). As-applied claims are critical to the effectiveness of the Parity Act, because they prohibit insurers from "circumvent[ing] the law by administering in-parity plan language in a disparate manner." *L.P.*, 2020 WL 981186, at *6.

As alleged in the Complaint and explained above, *see* Argument § I.A, *supra*, notwithstanding the Plan's clear terms, Defendants applied additional criteria to deny Plaintiff's request for coverage—namely, those in the Gender Dysphoria Policy—that made the Plan's medical necessity requirement more restrictive, as applied, with respect to mental health benefits. AC ¶¶ 56, 58, 61–63. Defendants' use of the Gender Dysphoria Policy constitutes an as-applied violation of the Parity Act because the "mental health . . . services at issue meet the criteria imposed by [Plaintiff's] insurance plan," but "the insurer imposed some additional criteria to deny the coverage of the services at issue." *L.P.*, 2020 WL 981186, at *6 (quoting *H.H. v. Aetna Ins. Co.*, 342 F. Supp. 3d 1311, 1319 (S.D. Fla. 2018)).

First, Defendants' application of the Gender Dysphoria Policy imposes a separate categorical exclusion—otherwise absent from the Plan language—that applies only to Gender Dysphoria treatment. Specifically, the policy purports to categorically exclude coverage for any

surgical treatment for Gender Dysphoria that is performed on the face, head, or neck by deeming them, in all cases, "not medically necessary." Ex. 5 (UnitedHealthcare's Gender Dysphoria Policy) at 2. This categorical "neck-up" exclusion does not apply to *any* medical/surgical benefits, necessarily making it "more restrictive than the predominant . . . treatment limitations of that type applied to substantially all medical/and surgical benefits covered by the plan in the same classification." 29 C.F.R. § 2590.712(c)(2)(i).

Second, as explained above, Defendants' application of the Gender Dysphoria Policy jettisons the Plan's requirement that medical necessity be evaluated "[i]n accordance with *Generally Accepted Standards of Medical Practice*," Ex. 1 (SPD) at 126, and replaces it with a set of criteria that are more restrictive than those standards. *See* Argument § I.B, *supra*. Unlike the Gender Dysphoria Policy, the generally accepted standards of care recognize that facial gender confirmation surgeries can be medically necessary and call for an individualized assessment of medical need. AC ¶¶ 61–62. The Gender Dysphoria Policy, on the other hand, unconditionally deems all FFS "cosmetic" and automatically "not medically necessary" without any review of individualized clinical need. Ex. 5 (UnitedHealthcare's Gender Dysphoria Policy) at 2.

The clinical policies Defendants use to evaluate medical necessity of treatments for medical/surgical conditions, by contrast, abide by the Medical Necessity provision of the Plan because they provide for individualized assessment of clinical need. AC ¶¶ 63–64 (highlighting differences in UnitedHealthcare's rhinoplasty policy), *id.* ¶ 140. Thus, while Medically Necessary treatment is purportedly covered for both mental health and medical/surgical conditions, in practice, mental health conditions do not receive the benefit of an assessment of Medical Necessity that comports with generally accepted standards of medical practice.

These allegations at least plausibly state a claim that Defendants apply the Medical

Necessity requirement more restrictively as to mental health benefits than medical/surgical benefits, in violation of the Parity Act.

### B. The Complaint Plausibly Alleges a Facial Violation of the Parity Act.

Additionally, Plaintiff has plausibly alleged that the Plan's Cosmetic Exclusion, when read with the Reconstructive Surgery provisions, violates the Parity Act. A facial violation of the Parity Act is one that is evident in the terms of the plan. *A.Z. ex rel. E.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1081–82 (W.D. Wash. 2018). To allege a facial violation, the plaintiff "must identify that limitation and compare it to limitations imposed (or not imposed) on analogous medical or surgical services." *L.P.*, 2020 WL 981186, at *6 (quoting *H.H.*, 342 F. Supp. 3d at 1319). For the purposes of a motion to dismiss, it is "sufficient to allege . . . 'that a mental-health treatment is categorically excluded while a corresponding medical treatment is not.'" *Vorpahl v. Harvard Pilgrim Health Ins. Co.*, 17-CV-10844-DJC, 2018 WL 3518511, at *3 (D. Mass. July 20, 2018) (quoting *Bushell*, 2018 WL 1578167, at *6). Plaintiff plausibly alleges that the plain language of the Plan's Cosmetic Treatment exclusion and Reconstructive Surgery provisions exclude coverage for appearance-altering surgeries that treat mental health conditions, but exempt from the exclusion appearance-altering surgeries to treat medical conditions.

As discussed above, the Plan excludes from coverage "Cosmetic Treatment" and "Cosmetic Surgery," "unless the procedure is otherwise listed as a covered benefit." Ex. 1 (SPD) at 94; AC ¶ 49.[16] The Plan defines "Cosmetic Treatment" as "medical or surgical procedures that are primarily used to improve, alter, or enhance appearance, whether or not for psychological or emotional reasons." Ex. 1 (SPD) at 121; AC ¶ 50. It has no separate definition for "Cosmetic

---

[16] As previously explained, Plaintiff's position is that her FFS is listed as a covered benefit ("Gender Transition Surgery") and is therefore exempt from the Cosmetic Treatment exclusion for that reason. *See* Argument § I.A, *supra*. Defendants disagree with Plaintiff's interpretation, but by pointing to the Reconstructive Surgery provisions, Defendants only succeed in pointing out the additional, facial violation of the Parity Act.

Surgery." Ex. 1 (SPD) at 121.

The Plan lists certain types of "Reconstructive Surgery" as a covered benefit in some circumstances, *id.* at 59, and excluded in others, *id.* at 57. If a procedure meets the Plan's definition of "Reconstructive Surgery" and is not specifically excluded, it is exempt from the Cosmetic Treatment exclusion. *Id.* at 94. The Plan defines "Reconstructive Surgery" as "surgical procedures performed on abnormal structures of the body caused by congenital Illness or anomaly, Accident, or Illness." *Id*. at 129. The definition further provides:

> The fact that physical appearance may change or improve as a result of Reconstructive Surgery does not classify surgery as Cosmetic Treatment **when a physical impairment exists** and the **surgery restores or improves function**.

*Id.* Thus, the Plan exempts Reconstructive Surgeries that alter appearance from the Cosmetic Treatment exclusion—but only when the surgery "restores or improves function" affected by a physical impairment.

Reading these provisions together, as the Court must, the plain terms of the Plan impose a categorical exclusion on mental health benefits that does not apply to medical/surgical benefits in the same classification. As written, the Plan provides that surgeries that are "primarily used to improve, alter, or enhance appearance" are excluded as "Cosmetic Treatment" *unless* "a physical impairment exists and the surgery restores or improves function," in which case the surgery may be covered as "Reconstructive Surgery." *Id.* at 129; AC ¶ 138. The combined effect of these terms is that surgery modifying physical appearance can be covered under the Plan only if that surgery restores or improves function in a *physical* impairment. Anything else is excluded as "Cosmetic Treatment." AC ¶¶ 52, 138. This, on its own, establishes that the Cosmetic Treatment exclusion, as written, is more restrictive with respect to mental health benefits than medical/surgical benefits, in violation of the Parity Act.

Defendants attempt to argue this disparity away by focusing on the first sentence of the

Reconstructive Surgery definition. JHA SIS 8–9; UMR SIS 13; Quantum SIS 11. Defendants argue that, by definition, "Reconstructive Surgery" includes surgeries to treat a mental sickness. *Id*. Even if the first sentence of the definition supported Defendants' post-hoc rationale, the second sentence eviscerates it. This is because, even if Reconstructive Surgery includes surgery "performed on abnormal structures of the body caused by" mental sickness, surgeries that primarily *alter* appearance are excluded as Cosmetic *unless* they are saved by the definition's second sentence. In other words, even Reconstructive Surgery to treat a mental illness is excluded unless "a physical impairment exists and the surgery restores or improves function."

The Plan term providing that Reconstructive Surgery is *covered* further undermines Defendants' current position that Reconstructive Surgery includes surgery to treat mental illness. Aside from surgery following a mastectomy (which can include surgery on the non-affected breast for the entirely aesthetic purpose of "produc[ing] a symmetrical appearance"), the Plan provides that Reconstructive Surgery is only covered if it "restore[s] a bodily function." Ex. 1 (SPD) at 59. The Court may ultimately conclude that only a medical/surgical condition could require restoring a bodily function. After all, Merriam-Webster defines "body" as "the main part of a plant or animal body especially as *distinguished from* limbs and *head*" and "the organized *physical* substance of an animal . . . ," such as "the *material* part or nature of a human being." Body, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/body (emphasis added). Function is defined as "the *action* for which a person or thing is specially fitted or used or for which a thing exists" or "any of a group of related *actions* contributing to a larger *action*." Function, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/function (emphasis added). The example for the latter exemplifies the medical/surgical nature of functionality: "The function of the heart is to pump blood through the body." *Id*.

The "Reconstructive Surgery" exclusion further confirms that the Plan covers such surgeries only to restore function to physically impaired parts of the body. Reconstructive Surgery is excluded "when performed only to achieve a normal or nearly normal appearance," but **not** excluded when performed "to correct an underlying *medical* condition or impairment." Ex. 1 (SPD) at 97. Reconstructive Surgery to correct an underlying *mental health* condition is thus categorically excluded.

Reading all of these terms together, the Plan, on its face, deems cosmetic and excludes from coverage *any* surgical treatment that changes physical appearance if prescribed for a mental health condition. AC ¶ 52. But surgical treatments that change physical appearance may be covered when prescribed to treat a medical/surgical condition. Thus, the Cosmetic Treatment exclusion is more restrictive with respect to mental health benefits and is thus prohibited by the Parity Act. *Id.* at ¶¶ 53–54. These allegations plausibly state a claim that by enforcing the discriminatory exclusion to deny Plaintiff's request for coverage, Defendants violated the Parity Act.

\* \* \*

In sum, Plaintiff's multiple allegations of "a treatment limitation disparity based on the available information at this stage" are sufficient to state a claim under the Parity Act. *David P.*, 2020 WL 607620, at \*18. As exemplified by the Plan's refusal to provide Plaintiff with the information that is the subject of Count Five, AC ¶¶ 93–101, insurance plans and their administrators withhold information from plan participants. District courts nationwide have recognized this reality of information disparity and refuse to hold this against Parity Act plaintiffs. *See David P.*, 2020 WL 607620, at \*18. To dismiss as-applied claims for insufficient precision would strike a debilitating blow to the Parity Act's ability to effect its purpose. Plaintiff must be

allowed the opportunity to proceed to discovery. *See A.Z.*, 333 F. Supp. 3d at 1082.

## V. COUNT FIVE MUST STAND BECAUSE PLAN PARTICIPANTS ARE ENTITLED TO THE INFORMATION JHA REFUSES TO PROVIDE.

JHA moves to dismiss Count Five, attempting to discredit both Congressional action and controlling regulations by relying on outdated case law. JHA is obligated under the Parity Act to perform comparative analyses of its NQTLs. 29 U.S.C. §§ 1185a(a)(8)(i)–(v); *see also* JHA SIS 9 (admitting legal requirement to "perform and document" comparative analyses). As alleged in the Complaint, Plaintiff requested documents detailing the Plan's comparative analyses, AC ¶¶ 91–92, but its response to her request failed to disclose the required information. AC ¶¶ 93-100. JHA does not dispute those facts (nor could it, on a motion to dismiss), but rather, argues that the Plan has no duty to provide this information to Plan participants.[17] JHA is wrong, as a matter of law.

### A. Statutory and Regulatory Chronology

#### 1. ERISA

ERISA requires plan administrators, "upon written request of any participant or beneficiary," to "furnish" documents regarding the plan, including any "instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). It also entitles participants to a "full and fair review," in accordance with Department of Labor regulations, of any denial of benefits. 29 U.S.C. § 1133.

#### 2. The 2008 Parity Act and the Departments' Subsequent Regulations

In 2008, Congress passed the Parity Act, which substantially modified ERISA to include new and extensive provisions to eliminate discrimination against mental health coverage in ERISA health insurance plans. 29 U.S.C. § 1185a. Congress delegated authority to the Departments of

---

[17] JHA appears to acknowledge that it is obligated to provide some of this information since it did in fact, albeit insufficiently, respond to Plaintiff's request. AC ¶¶ 93–95; Ex. 7.

Labor, Treasury, and Health and Human Services ("Departments") to regulate compliance with the statute. *Id*. § 1185a(a)(6)(A).

In the Parity Act, Congress included a provision entitled "Availability of Plan Information," which specifies that "[t]he criteria for medical necessity determinations made under the plan with respect to mental health . . . benefits . . . shall be made available by the plan administrator . . . in accordance with regulations to any current or potential participant, beneficiary, or contracting provider upon request." *Id*. § 1185a(a)(4). That provision also entitles participants to "[t]he reason for any denial under the plan," also "in accordance with regulations." *Id.*

The Departments subsequently engaged in notice-and-comment rulemaking. In February 2010, they published interim final regulations implementing the Parity Act. 75 F.R. 5410. On November 13, 2013, they published the Final Rules. 78 F.R. 68240. The regulations for group health plans are codified at 29 C.F.R. § 2590.712 ("2013 Regulations") and became effective January 13, 2014. The 2013 Regulations explain that participants' entitlement under 29 U.S.C.§ 1024(b)(4) to receive, upon request, "[i]nstruments under which the plan is established or operated" include:

> documents with information on medical necessity criteria for both medical/surgical benefits and mental health . . . disorder benefits, as well as **the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation** with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan."

29 C.F.R. § 2590.712(d)(3) (emphasis added). The 2013 Regulations further specify that the same documents must also be made available to a participant "upon appeal of an adverse benefit determination" and upon request for the "all documents, records, and other information relevant to the claimant's claim for benefits." *Id.* Such documents "must generally be furnished by the plan administrator to plan participants within 30 days of request." *Id.*

40

3. <u>The 2021 Amendment to the Parity Act and the Departments' Consistent Guidance</u>

Congress passed further Parity Act legislation in the Consolidated Appropriations Act of 2021 ("2021 Amendment"), which became effective on December 27, 2020. The 2021 Amendment added sections (a)(6)–(8) to 29 U.S.C. § 1185a. The 2021 Amendment requires plans to perform extensive comparative analyses of their NQTLs to ensure Parity Act compliance, § 1185a(a)(8)(i)–(v), and delegates to the Departments the authority to issue guidance governing Parity Act compliance, including by issuing guidance on methods plans may use to provide participants "with documents containing information that the health plans . . . *are required to disclose to participants* . . . to ensure compliance" with the Parity Act or its implementing regulations. 29 U.S.C. § 1185a(a)(7)(B)(ii); *see also id.* §§ 1185a(a)(6)(A), (a)(7)(A), (a)(B)(ii)(I), (a)(C). Congress, further, mandated that ERISA plans subject to the Parity Act "perform and document comparative analyses of the design and application of NQTLs" and make them available to the Secretary of Labor within 45 days of the statute's effective date (that is, by February 10, 2021). *Id.* § 1185a(a)(8)(A). The comparative analyses and information the plans must have available are:

(i) The specific plan or coverage terms or other relevant terms regarding the NQTLs, that applies to such plan or coverage, and a description of all mental health or substance use disorder and medical or surgical benefits to which each such term applies in each respective benefits classification.

(ii) The factors used to determine that the NQTLs will apply to mental health or substance use disorder benefits and medical or surgical benefits.

(iii) The evidentiary standards used for the factors identified in clause (ii), when applicable, provided that every factor shall be defined, and any other source or evidence relied upon to design and apply the NQTLs to mental health or substance use disorder benefits and medical or surgical benefits.

(iv) The comparative analyses demonstrating that the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to mental health or substance use disorder benefits, as written and in operation, are comparable to,

and are applied no more stringently than, the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to medical or surgical benefits in the benefits classification.

(v) The specific findings and conclusions reached by the group health plan or health insurance issuer with respect to the health insurance coverage, including any results of the analyses described in this subparagraph that indicate that the plan or coverage is or is not in compliance with this section.

*Id*. § 1185a(8)(A).

The Departments explained the effect of the 2021 Amendment in guidance issued on April 2021. U.S. DEP'T OF LABOR, U.S. DEP'T OF HEALTH & HUMAN SERVS., DEP'T OF TREASURY, FAQS ABOUT MENTAL HEALTH AND SUBSTANCE USE DISORDER PARITY IMPLEMENTATION AND THE CONSOLIDATED APPROPRIATIONS ACT, 2021 PART 45 (Apr. 2, 2021), https://www.dol.gov/sites/ dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-45.pdf ("FAQ 45").[18] The Departments explained that they issued FAQ 45 "to help stakeholders understand" the 2021 Amendment. *Id.* at 1.

FAQ 45 explains that the 2013 Regulations' definition of "instruments governing the plan," 29 C.F.R. § 2590.712(d)(3), include the comparative analyses and additional information Congress mandated plans to perform and make available in the 2021 Amendment. FAQ 45, at 6. FAQ 45 explains that the documents to which participants are entitled "include any analyses performed by the plan as to how the NQTL complies with [the Parity Act]." *Id.* at 7. Thus, "for plans subject to ERISA, plans and issuers must make the comparative analyses and other applicable information required by the [2021 Amendment] available to participants, beneficiaries, and enrollees upon request." *Id.* FAQ 45, moreover, includes a link to the Department of Labor's "MHPAEA Disclosure Template," *id.* at 7 n.9, which is the document Plaintiff completed and submitted to

---

[18] Since the Parity Act was passed in 2008, the Departments have issued guidance on the statute through a series of "FAQ" documents. FAQ 45 is the 45th installment of this guidance.

JHA when making her request for information, AC ¶¶ 91–92.

**B.    The 2013 Regulations Receive *Chevron* Deference and JHA Must Provide Plaintiff with the Documents**

Despite the statutory and regulatory mandates set forth above, JHA conveniently omits any mention of the 2013 Regulations when it argues JHA is under no obligation to provide Plaintiff with the documents and information she requested. But under the 2008 Parity Act and the 2013 Regulations alone (that is, even without consideration of the 2021 Amendment or FAQ 45), JHA *still* would have provided insufficient information.

Starting with the statute, even before the 2021 Amendment, it was clear that JHA must provide Plaintiff with "instruments under which the plan is established or operated," 29 U.S.C. § 1024(b)(4), "[t]he criteria for medical necessity determinations made under the plan with respect to mental health . . . benefits," *id*. § 1185a(a)(4), "[t]he reason for any denial under the plan . . . for services with respect to mental health," *id.*, and "a reasonable opportunity . . . for a full and fair review . . . of the decision denying the claim, *id*. § 1133(2). The 2013 Regulations explain further what this information entails and therefore what JHA must provide to Plaintiff. 29 C.F.R. § 2590.712(d)(3).

JHA does not tell the Court about the 2013 Regulations, let alone challenge their binding effect. The 2013 Regulations, which are "an agency's construction of the statute which it administers," receive *Chevron* deference. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); 29 U.S.C. §§ 1185a(a)(6)–(8), (g) (Congress's delegation of administrative authority to the Departments); *id*. § 1133 (Congress's delegation of administrative authority to the Department of Labor).

The first part of the *Chevron* test is "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. The "precise question at issue" here is what

"instruments" plans must provide plan participants under 29 U.S.C. § 1024(b)(4). Section 1024(b)(4) is "silent or ambiguous" because it does not define "instruments under which the plan is established or operated" or enumerate what items would fall under this "other instruments" category. Second, since "the statute is silent or ambiguous . . . , the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. Since Congress made "an express delegation of authority" to the Departments to "elucidate" these "specific provision[s] of the statute by regulation," the Departments' regulations must be "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44. The Departments reasonably and permissibly construed the statute to mean that "instruments under which the plan is established or operated," 29 U.S.C. § 1024(b)(4), "include documents with information on medical necessity criteria for both medical/surgical benefits and mental health . . . disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan," 29 C.F.R. § 2590.712(d)(3). JHA does not even address the 2013 Regulations, let alone argue that this construction was arbitrary, capricious, or manifestly contrary to the statute—nor could it. The 2013 Regulations meet the *Chevron* test.

JHA's reliance on *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 860 (8th Cir. 1999), a case that predates the 2008 Parity Act and 2013 Regulations, is misplaced. The 2008 Parity Act and 2013 Regulations override *Brown*'s conclusion that "other instruments" in 29 U.S.C.§ 1024(b)(4) "need only be provided . . . if the specifically listed formal documents are not available." 190 F.3d at 861. The Supreme Court has held that "prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior

court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecommc'ns Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) ("*Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps."). *Brown* did not hold that § 1024(b)(4) was unambiguous, and in fact analyzed its terms in depth, demonstrating the statute's ambiguity. *See Brown*, 190 F.3d at 861–62.

JHA's reliance on *Spizman v. BCBSM, Inc.*, 14-CV-3568 (MJD/TNL), 2015 WL 4569249 (D. Minn. July 27, 2015), *aff'd*, 855 F.3d 924 (8th Cir. 2017), and *Mueller v. SPX Corp.*, CIV. 12-1121 RHK/AJB, 2013 WL 656619 (D. Minn. Feb. 22, 2013), is also misplaced. Neither case addressed the argument that the Parity Act and the 2013 Regulations supersede *Brown*—and they could not have. Neither case involved mental health conditions. And contrary to JHA's misstatement, *Mueller* did not hold that "failure to timely provide a claim file is not actionable under § 1132(c)." JHA SIS 11. What *Mueller* held was that § 1132(c) can only be used to penalize an administrator who does not provide information it "*is required . . . to furnish*." 2013 WL 656619, at *5. Plaintiff has sufficiently alleged that ERISA, the Parity Act, and the 2013 Regulations require JHA to provide her with the requested information.

The 2013 Regulations receive *Chevron* deference and JHA must provide the documents Plaintiff requested in May 2021. 29 C.F.R. § 2590.712(d)(3); *see* AC ¶ 85. JHA's paltry two-and-a-half-page response falls far short of the information mandated in the 2013 Regulations. *Id.* ¶¶ 93–101; *see* Ex. 7 (JHA Parity Disclosure Response). JHA's conclusory statements of compliance with the Parity Act come nowhere close to providing an adequate disclosure of "the processes, strategies, evidentiary standards, and other factors" JHA uses to apply its NQTLs 29 C.F.R. § 2590.712(d)(3). Nor does the SPD or the Gender Dysphoria Policy. *See* Ex. 7 (attaching the same). Any doubt as to JHA's compliance with the relevant statutory provisions and 29 C.F.R.

§ 2590.712(d)(3) must be resolved in Plaintiff's favor for the purposes of this motion to dismiss.

1.    The 2021 Amendment Further Clarified the "Processes, Strategies, Evidentiary Standards, and Other Factors," Which FAQ 45 Confirms

In the 2021 Amendment, Congress mandated that plans perform and document specific comparative analyses of NQTLs and make that and other information available. § 1185a(a)(8)(A). It is consistent with the 2013 Regulations that this newly specified information is now part of the documents covered by 29 C.F.R. § 2590.712(d)(3) and thus §§ 1024(b)(4), 1185a(a)(4), and 1133. For the benefit of "stakeholders," the Departments explained the connections between ERISA, the Parity Act, the 2013 Regulations, and the 2021 Amendment in FAQ 45.

The 2013 Regulations already required plans to provide participants with "the processes, strategies, evidentiary standards, and other factors used to apply [NQTLs]." 29 C.F.R. § 2590.712(d)(3). In this regard, the 2021 Amendment and the 2013 Regulations are nearly mirror images, except that Congress provided further detail on what "processes, strategies, evidentiary standards, and other factors" plans needed to provide. *Compare id. with* § 1185a(a)(8)(A)(ii) ("The *factors* used to determine that the NQTLs will apply. . . ." (emphasis added)), *and* § 1185a(a)(8)(A)(iii) ("The *evidentiary standards used for the factors* . . ." (emphasis added)). Congress chose to incorporate language from the 2013 Regulations into the statute, expressly approving of 29 C.F.R. § 2590.712(d)(3) and impliedly incorporating it into the entire statutory scheme. The *Brown* court's narrow reading of "other instruments" contradicts Congress's clear purposes in the Parity Act and its express incorporation of the 2013 Regulations' language to give plan participants access to documentation JHA says *Brown* prohibits. Even if *Brown* correctly interpreted § 1024(b)(4) (it did not), the 2021 Amendment impliedly amended that statutory language and overrode *Brown. See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662–63 (2007). *Brown* does not control here.

46

### C. Even if *Auer* Deference Were Applicable, Count Five Would Stand

JHA argues that the Court must treat FAQ 45 with *Auer* deference because "the FAQs are an informal interpretation of ERISA and the regulations thereunder." JHA SIS at 11. *Auer* deference applies to "agencies' reasonable readings of genuinely ambiguous regulations." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019). *Auer* is inapplicable here because plans' obligation to provide information to participants is not "a creature of the [Departments'] own regulations." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). Congress legislated this obligation in both § 1024 and § 1185a. The proper focus is therefore the 2013 Regulations and the 2021 Amendment, which, as described above, independently confirm the language in the FAQs.

Nevertheless, the *Auer* test still supports Plaintiff's position. Under this approach, the FAQs are "controlling unless plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (cleaned up). The FAQs are neither plainly erroneous nor inconsistent with the 2013 Regulations. As described at length above, the FAQs are consistent with both the 2013 Regulations and the 2021 Amendment. An agency's interpretations of its own regulations are afforded substantial deference, especially as it relates to "a complex and highly technical regulatory program"—here, Parity Act compliance. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

And they are certainly not "plainly erroneous." If Congress thought the 2013 Regulations were "inconsistent with the plain language," it could have included legislation to that effect in the 2021 Amendment. It did not. Instead Congress imposed even more disclosure obligations. What would be inconsistent with plain language would be the reading of the Parity Act, the 2013 Regulations, and the 2021 Amendment that JHA suggests: Congress mandated plans to document and provide the information in § 1185a(a)(8)(A) to the Secretary of Labor, the Departments mandated plans to provide participants with "processes, strategies, evidentiary standards, and other

factors" on NQTLs, but that to the extent the Venn diagram of these two sets of information does not fully overlap into one circle, plans should not disclose *anything* to their participants. It would also be unreasonable to conclude that if that Venn diagram were not one circle of complete overlap, Congress intended the Secretary of Labor to be entitled to slightly more information than participants would be on "processes, strategies, evidentiary standards, and other factors" on NQTLs. This would conflict with the Parity Act's purpose of giving plan participants access to information about their plans. It would also mean the 2021 Amendment included a significant inefficiency of requiring plans to parse through all the information they must provide the DOL and remove whatever does not fall under the "processes, strategies, evidentiary standards, and other factors" on NQTLs.

*     *     *

JHA does not cite a single case ruling that plan participants are not entitled to the specific information Plaintiff seeks. In fact, the First Circuit ruled against JHA's position in *Raytheon*, a case JHA cited an earlier iteration of for a different proposition. *N.R.*, 24 F.4th at 753–54 ("ERISA leaves no doubt that Congress intended plan participants and beneficiaries to know about mandatory terms of their plans," *id.* at 754).

## VI.  COUNT SEVEN SHOULD NOT BE DISMISSED BECAUSE GENDER DYSPHORIA IS NOT EXCLUDED FROM ADA PROTECTION.

Plaintiff is an employee of JHA and an individual eligible to participate in the Plan by virtue of her employment. AC ¶ 11. There is no dispute that the Plan is subject to the Americans with Disabilities Act ("ADA"), which bars disability discrimination in this type of employer-sponsored health insurance plan, 42 U.S.C. § 12112(a)–(b), which is a fringe benefit that inures to Plaintiff as a privilege of her employment.

JHA does not dispute its status as a "covered entity," *id.* §§ 12111(2), (5)(A), nor does it

dispute that Plaintiff is a "qualified individual" who can perform the essential functions of her job, *id*. § 12111(8). Rather, JHA contends that Plaintiff should not receive ADA protection merely because of the nature of her disability. JHA SIS 11–12. JHA's argument—that the ADA does not protect individuals with gender dysphoria from discrimination—fails because it ignores the difference between gender dysphoria, a mental health condition characterized by significant psychological distress, and gender identity disorder ("GID"), an outdated diagnosis that effectively included all transgender individuals, because psychological distress was not a necessary diagnostic criterion.

### A.    Gender Dysphoria is Not Excluded from ADA Protection.

ADA protections extend to those with a "mental impairment" that "substantially limits one or more major life activities," including social, occupational, neurological, or brain functions. 42 U.S.C. §§ 12102(1), (2). The applicable regulations define "mental impairment" to include "[a]ny mental or psychological disorder such as . . .   emotional or mental illness . . . ." 28 C.F.R. § 36.105(b)(1)(ii). Such an impairment constitutes a disability under the ADA and the statute prohibits discrimination on that basis. 42 U.S.C. § 12112(a). Plaintiff's mental impairment (her diagnosed gender dysphoria) substantially limits these major life activities. AC ¶¶ 1, 67–73, 80, 88, 171. Plaintiff, therefore, has plausibly stated a claim that she is a qualified individual with an impairment that constitutes a disability under the ADA.

JHA's argument for dismissal is based on the ADA's exclusion from coverage of homosexuality, bisexuality, "transvestism, transsexualism, . . . [and] gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211(b)(1) [hereinafter the "GID-Exclusion Language"]. Contrary to JHA's argument, the GID-Exclusion Language does not apply to gender dysphoria, which is therefore a covered disability.

Gender dysphoria is not a "gender identity disorder" ("GID"). The first is premised on

clinically significant distress and the second on a sense of identity. Gender dysphoria is a medical diagnosis in the DSM-V,[19] which is defined differently than GID, which was defined in the DSM-IV but is not in the DSM-V, the current version of the manual. "In contrast to DSM-IV, which had defined 'gender identity disorder' as characterized by a 'strong and persistent cross gender-identification' and a 'persistent discomfort' with one's sex or 'sense of inappropriateness' in a given gender role, the diagnosis of [gender dysphoria] in DSM-V requires attendant *disabling physical symptoms*, in addition to manifestations of clinically significant emotional distress." *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 WL 2994403, at *6 (D. Mass. June 14, 2018) (emphasis added). The DSM-V no longer includes any diagnostic criteria for GID.

Nevertheless, JHA relies on *Doe v. Northrop Grumman Sys. Corp.*, 418 F. Supp. 3d 921, 929 (N.D. Ala. 2019), for the proposition that gender dysphoria and GID are legally synonymous. But the *Northrop* court's analysis is incorrect for two reasons: first, the DSM-V authors do not equate the two diagnoses, and second, the court fails to consider the ADA Amendments Act ("ADAAA"), which took effect in 2009.

First, in its flawed analysis, the *Northrop* court misreads commentary in the DSM-V to infer that the DSM-IV's GID diagnosis has merely been relabeled as gender dysphoria in the DSM-V. 418 F. Supp. 3d at 929. Not so. The DSM-V makes clear that the "clinical problem" of each diagnosis is distinct. For GID, the clinical problem is a person's gender *identity* being different from what was assigned at birth. For gender dysphoria, the clinical problem is the *psychological distress* caused by incongruence between assigned and expressed gender. As reflected in the DSM-IV criteria, a person could have had a diagnosis of GID and yet have experienced no clinically

---

[19] DSM refers to the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, which is published by the American Psychiatric Association. The DSM-V is the fifth and current edition.

significant mental impairment. But a person cannot be diagnosed with gender dysphoria without mental impairment since mental impairment is the basis of the diagnosis. Nothing in the DSM-V indicates that GID and gender dysphoria are equivalent.[20] Indeed, the DSM-V's language is rather emphatic that they are *not*. The *Northrop* court got this wrong.

In any case, whether the two terms refer to distinct conditions or the one is a question of fact that the Court should not resolve on a motion to dismiss. *See*, *e.g.*, *Tay v. Dennison*, No. 19-CV-00501-NJR, 2020 WL 2100761, at *3 (S.D. Ill. May 1, 2020) ("At this point in the case, the Court cannot categorically say that gender dysphoria falls within the ADA's exclusionary language and will allow this claim to proceed."); *Venson v. Gregson*, No. 3:18-CV-2185-MAB, 2021 WL 673371, at *3 (S.D. Ill. Feb. 22, 2021) ("As to Defendants' argument that gender dysphoria is excluded from the definition of disability under ADA, this issue is not nearly as straightforward as Defendants let on. . . . Given the unsettled state of the law . . ., the Court cannot say for certain that gender dysphoria falls within the ADA's exclusionary language."). The Complaint alleges that the generally accepted standards of care for treatment of gender dysphoria are set forth by WPATH. AC ¶¶ 34–41. Plaintiff also alleges that the APA, publisher of the DSM, endorses the WPATH's *Standards of Care. Id.* ¶ 37. WPATH also distinguishes between nonconforming gender *identity*—previously termed "gender identity disorder" in the DSM-IV—and gender *dysphoria*. In fact, in its *Standards of Care*, WPATH stresses that "[o]nly *some* gender-nonconforming people experience gender dysphoria at *some* point in their lives." *Standards of Care* 5; *see also Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 594–95 (4th Cir. 2020), *as*

---

[20] To the extent there is ambiguity in the language of the DSM, its meaning depends on issues of fact that must be elucidated by a medical practitioner. Resolution of this question necessarily encompasses matters outside the pleadings and cannot be a basis for dismissal at this stage. *See BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687 (8th Cir. 2003). For now, the terms' non-equivalence is a reasonable inference raised by the complaint and its incorporation of the WPATH *Standards of Care*, the APA's reliance on those standards, and the reference to the peer-reviewed literature. That inference must be taken in Plaintiff's favor. *Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017).

*amended* (Aug. 28, 2020), *cert. denied*, 141 S. Ct. 2878 (2021) ("Being transgender is also not a psychiatric condition, and 'implies no impairment in judgment, stability, reliability, or general social or vocational capabilities.' . . . [However,] many transgender people are clinically diagnosed with gender dysphoria, 'a condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex.'"). In interpreting the language of the DSM, the *Northrop* court failed to consider that the APA endorses the clinical distinction set forth in WPATH's *Standards of Care* and that the court's equivalency interpretation is inconsistent with that endorsement. But this Court must consider Plaintiff's allegations as true and draw all reasonable inferences from them in Plaintiff's favor— including that gender dysphoria is a mental disorder that differs materially from the inapposite definition of GID on which the *Northrop* court relied. *See, e.g.*, *Torti*, 868 F.3d at 671; *see also Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 134–35 (E.D. Pa. 2020) ("The Court recognizes the dynamic nature of both the legal and medical precedent with respect to issues surrounding 'transgenderism,' 'gender identity,' and 'gender dysphoria.' In light of that dynamism, the Court declines at this stage of the proceeding to dismiss Doe's hostile work environment claim under the ADA based on her alternative theories of disability related to either gender dysphoria or some other neuroanatomical disability related to her gender identity."); *Iglesias v. True*, 403 F. Supp. 3d 680, 688 (S.D. Ill. 2019) (denying motion to dismiss based on ADA's transgender exclusion given the disagreement between courts as to whether the ADA's transgender exclusion applied to gender dysphoria).

Second, the *Northrop* court failed to address the fact that gender dysphoria is not enumerated in the ADA's GID-Exclusion Language. Although the plaintiff brought that fact to the court's attention, the court mistakenly concluded that it was not relevant because the GID

exclusion "ha[d] not been amended since it was enacted on July 26, 1990." 418 F. Supp. 3d at 929. While the GID-Exclusion Language has not been amended since 1990, the ADA has. In 2009, Congress passed the ADAAA, which made the broad, remedial purpose of the ADA more explicit. Under the ADAAA, "[t]he definition of disability . . . shall be construed in favor of broad coverage." *Gardea v. JBS USA, LLC*, 915 F.3d 537, 541 (8th Cir. 2019); *see also Strand v. Charles Mix Cty.*, No. 16-CV-4037, 2017 WL 1854695, at *4 (D.S.D. May 5, 2017) ("Under the ADAAA 'disability' is to be broadly construed and coverage is to apply to the 'maximum extent' permitted by the ADA and the ADAAA.") (quoting 42 U.S.C. § 12102(4)).

Bearing that legislative admonishment in mind, and the fact that gender dysphoria (which is a distinct diagnosis) is not explicitly enumerated in the GID-Exclusion Language, this Court should construe the definition of "disability" under the ADA to include a diagnosis of gender dysphoria. Adopting this interpretation is in line with both the plain language and legislative purpose animating this remedial statute. *See Doe v. Pa. Dep't of Corr.*, No. 1:20-CV-00023, 2021 WL 1583556, at *7 (W.D. Pa. Feb. 19, 2021), *report and recommendation adopted*, No. 1:20-CV-00023, 2021 WL 1115373 (W.D. Pa. Mar. 24, 2021) (relying on ADAAA to construe the ADA's coverage broadly—and thus the GID-Exclusion Language narrowly—to permit an ADA claim by person diagnosed with gender dysphoria).

Unlike *Northrop*, *Blatt v. Cabela's Retail, Inc.*, No. 5:14-CV-04822, 2017 WL 2178123 (E.D. Pa. May 18, 2017), is correct in its analysis of how to read the GID-Exclusion Language as it relates to gender dysphoria. The *Blatt* court read the "term gender identity disorders . . . narrowly to refer to only the condition of identifying with a different gender, not to encompass (and therefore exclude from ADA protection) a condition like [plaintiff's] gender dysphoria, which goes beyond merely identifying with a different gender and is characterized by clinically significant stress and

other impairments that may be disabling." *Id.* at *2, *2 n.1 (noting further that the defendant's interpretation aligned with the long-outdated DSM-III). The court went on to reason that the GID-Exclusion Language "can be read as falling into two distinct categories: first, non-disabling conditions that concern sexual orientation or identity," *id.* at *3, specifically, homosexuality and bisexuality, § 12211(a), "and second, disabling conditions that are associated with harmful or illegal conduct[,]" *Blatt* at *3, such as "pedophilia, exhibitionism, voyeurism . . . , compulsive gambling, kleptomania, [and] pyromania, § 12211(b).

> The *Blatt* court opined further,
>
> If the term gender identity disorders were understood, as [defendant] suggests, to encompass disabling conditions such as [plaintiff's] gender dysphoria, then the term would occupy an anomalous place in the statute, as it would exclude from the ADA conditions that are actually disabling but that are not associated with harmful or illegal conduct. But under the alternative, narrower interpretation of the term, this anomaly would be resolved, as the term gender identity disorders would belong to the first category described above.
>
> . . . This [narrower] interpretation is also consistent with the legislative history of § 12211, which reveals that Congress was careful to distinguish between excluding certain sexual identities from the ADA's definition of disability, on one hand, and not excluding disabling conditions that persons of those identities might have, on the other hand.

2017 WL 2178123, at *3. *Blatt*'s reasoning and conclusions are more persuasive than *Northrop*'s because *Blatt* accounts for the actual differences between what the ADA refers to as gender identity disorders and what the DSM-V, the medical community, and Plaintiff identify as gender dysphoria. The GID-Exclusion Language should be interpreted narrowly in this context "to refer to simply the condition of identifying with a different gender, not to exclude from ADA coverage disabling conditions that persons who identify with a different gender may have—such as [Plaintiff's] gender dysphoria," *Blatt*, 2017 WL 2178123, at *4, which, as Plaintiff has alleged, substantially limits her major life activities, including social, occupational, neurological, or brain functions. *See* AC ¶¶ 1, 67–73, 80, 88, 171.

The three other cases on which JHA relies are likewise unavailing and misplaced. *Michaels v. Akal Security, Inc.* included no legal analysis to support its conclusion that "gender dysphoria" was a "gender identity disorder" under the statute, ignored the ADAAA entirely, and was decided before the DSM-V was published in 2013 clarifying the distinction between the two conditions. No. 09-CV-01300-ZLW-CBS, 2010 WL 2573988 (D. Colo. June 24, 2010). *Williams v. Kincaid*, No. 1:20-CV-1397, 2021 WL 2324162 (E.D. Va. June 7, 2021), which is pending appeal, should also not persuade this Court to dismiss Count Seven. In *Williams*, the court appears to have relied on the incorrect assumption that gender dysphoria was synonymous with GID and then found that the only issue to be decided was whether gender dysphoria results from physical impairments. *See id.* at *2 (discussing the GID-Exclusion Language and remarking that "[t]he issue in this case is whether gender dysphoria is the result of a physical impairment and thus excluded from the scope of the ADAA and RA"). As in *Northrop*, the analysis failed to consider the changes made to the diagnostic criteria and diagnoses between the DSM-IV and DSM-V, and incorrectly required that the plaintiff "allege some physical impairment that resulted in her gender dysphoria." *Id.* at *2. Even if this were a requirement (it is not), the *Williams* court has the causation backwards: gender dysphoria causes psychological distress that can be physically impairing, not the other way around. Finally, *Kaprielian v. Stringer*, No. 4:15-CV-1598-CEJ, 2016 WL 1586488 (E.D. Mo. Apr. 20, 2016), is inapposite because the plaintiff "ha[d] not alleged that she has any impairments affecting major life activities." *Id.* at *2. Here, Plaintiff has done so. *E.g.*, AC ¶¶ 1, 67–73, 80, 88, 171, 185.

### B. Plaintiff Exhausted Administrative Remedies for Her Discriminatory Disparate Treatment ADA Claim and Is Not Raising a Separate Failure to Accommodate Claim.

Plaintiff sought coverage for FFS, a medically necessary procedure to treat her gender dysphoria. There is no dispute that Plaintiff requested that the Plan approve coverage for her prescribed FFS. There is also no dispute that Plaintiff timely appealed the denial of coverage and

exhausted the Plan's administrative requirements. To the extent JHA reads the complaint to include an allegation that JHA violated the ADA by failing to accommodate Plaintiff's disability, its arguments are misplaced. As JHA acknowledges, claims for failure to accommodate (not asserted here) are distinct from claims alleging the plan itself violates the ADA because of its disparate treatment of persons diagnosed with gender dysphoria, which Plaintiff does assert here. Plaintiff exhausted her remedies and plausibly plead a claim of a disparate-treatment violation. JHA does not dispute this.

"To obtain relief under the ADA, [a plaintiff] must show that [s]he (1) has a 'disability' within the meaning of the ADA, (2) is a 'qualified individual' under the ADA, and (3) 'suffered an adverse employment action as a result of the disability.'" *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 711 (8th Cir. 2003) (citation omitted). An adverse employment action can be the basis for discriminatory disparate treatment claim, a failure to accommodate claim, or both. *See id.* at 711–12.

JHA disputes whether Plaintiff's disability is covered within the meaning of the ADA, but makes no argument that she is not a qualified individual or that she has insufficiently alleged an adverse employment action (i.e., the refusal to cover the cost of her prescribed gender dysphoria treatment under the Plan). Count Seven is intended only to allege a disparate-treatment claim under the ADA, the sufficiency of which JHA does not dispute. Count Seven must stand.

## VII. PLAINTIFF'S MHRA CLAIMS ARE NOT PREEMPTED BY ERISA, BUT EVEN IF THEY WERE, ANY ALLEGED PREEMPTION IS IRRELEVANT AT THIS STAGE IN THE CASE BECAUSE ALL OF THE DISCRIMINATION CLAIMS ARE BROUGHT IN THE ALTERNATIVE TO THE ERISA CLAIMS.

### A. Plaintiff's MHRA Claims Are Not Preempted by ERISA.

Plaintiff does not dispute that, in certain circumstances, claims brought under the MHRA have been found to "relate to" a covered employee benefit in such a way as to trigger the broad

preemption provisions found in 29 U.S.C. § 1144(a). *See, e.g.*, *Bennett v. Hallmark Cards Inc.*, No. 92-CV-1073, 1993 WL 327842, at *2 (W.D. Mo. Aug. 17, 1993) (finding that ERISA preempted a challenge to the terms of a long-term disability plan based on allegations that it discriminates by treating persons with disabling mental conditions differently than persons with disabling physical conditions). Plaintiff also does not dispute that her claims of discrimination under the MHRA are based upon the Plan's denial of coverage for her FFS. However, the MHRA claims here are not preempted because they mirror the claims raised under Title VII and the ADA, and therefore fall within the narrow exception to preemption which exempts "state laws which effectuate another federal law." *Id.* at *4 (citing 29 U.S.C. 1144(d)).

"State laws obviously play a significant role in the enforcement of Title VII." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 101 (1983). Title VII both preserves nonconflicting state laws, like MHRA, and "requires recourse to available state administrative remedies." *Id.* at 101–02. "When an employment practice prohibited by Title VII is alleged to have occurred in a State or locality which prohibits the practice and has established an agency to enforce that prohibition, the Equal Employment Opportunity Commission (EEOC) refers the charges to the state agency." *Id.* "If ERISA were interpreted to pre-empt [the MHRA] with respect to covered benefit plans, the State no longer could prohibit the challenged employment practice and the state agency no longer would be authorized to grant relief." *Id.* at 102. This would result in the EEOC being unable to refer claims to state agencies and thus discourage joint state/federal enforcement of federal nondiscrimination laws, like Title VII and the ADA. *See id.*

In other words, if ERISA preemption applied here, Plaintiff's "only remedies for discrimination prohibited by Title VII in ERISA plans would be federal ones[, and s]uch a disruption of the enforcement scheme contemplated by Title VII would, in the words of

§ [1144](d), 'modify' and 'impair' federal law." *Id.* The same reasoning in *Shaw* that resulted in a finding that the state nondiscrimination law at issue was not preempted applies to the claims of sex and disability discrimination Plaintiff asserts under both state and federal law. *Id.*; *see also Bennett*, 1993 WL 327842, at *4 (acknowledging that Title VII's procedural requirements are also applicable to ADA claims and "to preempt the application of the Missouri Human Rights Act would subject the federal enforcement scheme established under the ADA to the sort of impairment the Supreme Court held in *Shaw* was intended to be avoided by § 1144(d), if the conduct were federally prohibited at the time it occurred").

Taking the allegations here as true, Plaintiff has alleged that the conduct at issue here was unlawful under both state *and federal* law when it occurred, making the MHRA claims exempt from ERISA preemption.

### B. Plaintiff's MHRA Claims Should Not Be Dismissed at This Stage Because They Are Brought in the Alternative to Her ERISA Claims.

A plaintiff may plead alternative claims. Under Federal Rule of Civil Procedure 8(d)(2), "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *See also* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Plaintiff's discrimination claims under Title VII, ADA, and MHRA have been brought in the alternative to her ERISA and Parity Act claims. The Complaint specifically states this. (*See* AC ¶¶ 123, 129, 154, 166.) "[P]leadings should not be construed 'as an admission against another alternative or inconsistent pleading in the same case.'" *Grissom v. Arnott*, No. 09-CV-03244 SWH, 2012 WL 1309266, at *21 (W.D. Mo. Apr. 16, 2012) (quoting *McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1219 (9th Cir. 1990)).

"In the ERISA context, in particular, there will often be good reason for alternatively pleading state and federal claims." *Coleman v. Standard Life Ins. Co.*, 288 F. Supp. 2d 1116, 1120, 1122 (E.D. Cal. 2003) (finding that "Rule 8 dictates that the proper course is to allow plaintiff to go forward with both his federal and state law claims"). Because they are alternative claims and given the early stage in the case, all claims should move forward. *See Holland v. Bordelon*, No. 4:20-CV-00344-KGB, 2021 WL 966422, at *7 (E.D. Ark. Mar. 15, 2021) (denying motion to dismiss and explaining that preemption is a mixed question of fact and law such that "dismissal based on ERISA preemption at this stage of the litigation is not appropriate"); *Collins v. Aetna Life Ins. Co.*, No. 12-CV-5049-TOR, 2012 WL 5377797, at *3 (E.D. Wash. Nov. 1, 2012) (finding that plaintiff's "ERISA-related allegations are not fatal to her state law claims" and she could assert both types of claims at the pleading stage, even if she believed the benefits policy was subject to ERISA); *see also Silva*, 762 F.3d at 727 (permitting plaintiff to proceed on alternative claims under two separate provisions of ERISA and commenting that "[a]t the motion to dismiss stage . . . it is difficult for a court to discern the intricacies of the plaintiff's claims to determine if the claims are indeed duplicative, rather than alternative, and determine if one or both could provide adequate relief").

## **<u>CONCLUSION</u>**

Defendants' motions to dismiss should be denied.

Dated: March 1, 2022

/s/ Caroline E. Reynolds

ZUCKERMAN SPAEDER LLP
Caroline E. Reynolds (*pro hac vice*)
1800 M St., NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
creynolds@zuckerman.com

Leila Bijan (*pro hac vice*)
485 Madison Ave., 10th Floor
New York, NY 10022
Tel: (212) 704-9600
lbijan@zuckerman.com

Anthony E. Rothert, #44827
Jessie Steffan, #64861
Molly E. Carney, #70570
Emily Lazaroff, #73811
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Tel.: (314) 652-3114
arothert@aclu-mo.org
jsteffan@aclu-mo.org
mcarney@aclu-mo.org
elazaroff@aclu-mo.org

Gillian R. Wilcox, #61278
ACLU of Missouri Foundation
406 W. 34th Street, Suite 420
Kansas City, Missouri 64111
Tel.: (816) 470-9938
gwilcox@aclu-mo.org

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2022 a true and correct copy of the foregoing was filed with the Court using the Court's CM/ECF system and served upon all parties of record.

/s/ Caroline E. Reynolds