## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| SABRINA BRIONY DUNCAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:21-cv-03280-RK |
| | ) | |
| (1) JACK HENRY & ASSOCIATES, INC. ("JHA"), | ) ) | |
| | ) | |
| (2) THE JACK HENRY & ASSOCIATES, INC., GROUP HEALTH BENEFIT PLAN, ("THE PLAN"), | ) ) ) | |
| | ) | |
| (3) UMR, INC. ("UMR"), | ) | |
| | ) | |
| (4) QUANTUM HEALTH, INC. ("QUANTUM HEALTH"), | ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This lawsuit asserts various claims under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, among others. Now before the Court are Defendants' motions to dismiss Plaintiff's amended complaint for failure to state a claim. (Docs. 52, 54, 57.) The motions are fully briefed. (Docs. 53, 55, 58, 65, 71, 75, 76, 79, 82.) After careful consideration and for the reasons explained below, Defendants' motions to dismiss (Docs. 52, 54, 57) are **GRANTED in part** and **DENIED in part**. Specifically, Defendant JHA's motion to dismiss Counts Five and Seven are granted, and these counts are dismissed. Defendants' motions to dismiss Counts One, Two, Three, and Four are denied.[1]

---

[1] Accordingly, only Counts One, Two, Three, Four, and Six remain. (Count Six is asserted only against JHA and was not included in JHA's motion to dismiss.)

## I. Background [2]

### A. The Parties

Plaintiff Sabrina Duncan is employed by Defendant Jack Henry & Associates, Inc. ("JHA"). (Doc. 46 at ¶ 11.) As part of its employment benefits, JHA offers a self-funded, non-grandfathered health and welfare benefit plan to its employees. This plan, Defendant Jack Henry & Associates, Inc. Group Health Benefit Plan ("the Plan") [3], is governed by ERISA and provides both medical/surgical and mental health/substance use disorder benefits. (*Id.* at ¶¶ 13, 16; *see generally* Doc. 65-1.) [4] JHA is the plan administrator and named fiduciary of the Plan. (Docs. 46 at ¶ 17; 65-1 at 6.) Defendant UMR, Inc., ("UMR") is named as a "Third Party Administrator" for the Plan, as well as a claims administrator for medical claims. (Docs. 46 at ¶ 18; 65-1 at 5.) UMR has the delegated fiduciary responsibility to make coverage determinations under the Plan and manages a "Care Coordination Process," under which it determines precertification of coverage and "conducts 'all clinical reviews.'" (Doc. 46 at ¶¶ 18, 20; Doc. 65-1 at 85.) Finally, UMR "delegated some of the administrative responsibilities of the Care Coordination Process" to Defendant Quantum Health, Inc. ("Quantum Health"). (Doc. 46 at ¶ 20; Doc. 65-1 at 85.) Plaintiff alleges these administrative responsibilities, "[a]mong other things," include using Quantum Health's "administrative system to process requests for precertification of coverage." (Doc. 46 at ¶ 20.)

---

[2] For purposes of ruling on Defendants' motions to dismiss, the Court accepts as true the well-pleaded facts asserted in Plaintiff's amended complaint. (Doc. 46.) *Hafley v. Lohman*, 90 F.3d 264, 267 (8th Cir. 1996).

[3] Every party with the exception of UMR, Inc., refers to "the Plan" to mean both the Defendant The Jack Henry & Associates, Inc., Group Health Benefit Plan and the actual plan document itself. For ease of reference and because Plaintiff's amended complaint broadly refers to "the Plan" to mean both the plan-defendant and the plan document itself, the Court does the same here.

[4] Exhibit 1 attached to Plaintiff's consolidated suggestions in opposition to Defendants' motions to dismiss is the "Health Benefit Summary Plan Description, which "serve[s] as both the Summary Plan Description . . . and the Plan Document." (Doc. 65-1 at 5.) Generally, courts do not consider "matters outside the pleadings" in deciding a Rule 12(b)(6) motion to dismiss. Rule 12(d). Nonetheless, the Eighth Circuit has explained that in ruling on a motion to dismiss courts may consider "materials that are necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citation and quotation marks omitted). Here, the parties all agree the document stating the Plan's terms is embraced by the pleadings and, moreover, the dispute in this case rests heavily on the terms of the Plan. Therefore, the Court will consider Doc. 65-1, the document that sets forth the Plan's terms in deciding Defendants' motions to dismiss. *See Burke v. Heartland Health*, No. 08-6049-CV-SJ-SOW, 2008 WL 11429293, at *3 (W.D. Mo. Oct. 27, 2008) (considering plan documents in an ERISA case when ruling on defendant's partial motion to dismiss). For ease of reference, the Court will refer to the Plan document attached to Plaintiff's consolidated suggestions in opposition, Doc. 65-1.

### B. The Facts

Plaintiff is a transgender woman who has been diagnosed with, and continues to receive treatment for, gender dysphoria. (Doc. 46 at ¶¶ 66, 68, 69.) Plaintiff's gender dysphoria causes severe distress, anxiety, and depression because of the incongruence between her remaining secondary male sex characteristics – including masculine facial and skull features – and her female gender identity. (*Id.* at ¶¶ 71, 72.) Both Plaintiff's current primary care provider and licensed clinical psychologist have concluded full facial reconstruction is medically necessary to treat her gender dysphoria. (*Id.* at ¶ 73.)

On May 27, 2020, Plaintiff was evaluated for facial feminization surgery.[5] (*Id.* at ¶ 74.) The surgeon concluded Plaintiff was "an appropriate candidate for facial gender confirmation surgery," particularly because the procedure "is a critical part" of the male-to-female transition process and because Plaintiff otherwise satisfied the World Professional Association for Transgender Health's guidelines for surgical treatment of gender dysphoria. (*Id.*) Plaintiff's facial feminization surgery treatment plan includes the following procedures: forehead cranioplasty, bone removal around the orbit, midface reconstruction, rhinoplasty, jaw surgery, genioplasty, and tracheal shave. (*Id.* at ¶ 75.) Accordingly, on Plaintiff's behalf, the surgeon requested precertification of coverage for these procedures under the Plan through Quantum Health, following the Care Coordination Process. (*Id.* at ¶ 76.)

After UMR's clinical staff within the Care Management department reviewed Plaintiff's precertification request, Defendants denied precertification for the prescribed facial feminization surgery on May 28, 2022. (*Id.* at ¶¶ 77, 78.)[6] Defendants denied precertification under the Plan's Cosmetic Treatment exclusion. (*Id.* at ¶ 78.) Plaintiff appealed the denial,[7] which was upheld on August 13, 2020, based on a finding that the facial feminization surgery was "not medically necessary because national criteria considers [it] a cosmetic procedure," and thus the Cosmetic

---

[5] In her amended complaint, Plaintiff states facial feminization surgery "is a classification for medical procedures that surgically modify masculine facial characteristics to make them more typically feminine" and "is recognized as medically necessary treatment for some individuals with gender dysphoria." (Doc. 46 at ¶ 2.)

[6] Plaintiff's amended complaint refers jointly to "Defendants" as denying her precertification request. Although the specific role of each defendant in this decision is somewhat unclear, the parties have accepted this joint reference in their motion to dismiss pleadings, and to avoid confusion and consistent with the standard of review, the Court will do the same.

[7] The Plan provides for both a mandatory "First Level of Appeal" and a voluntary "Second Level of Appeal." (Doc. 65-1 at 109-10.)

3

Treatment exclusion applies. (*Id.* at ¶ 82 (alteration in original); Doc. 65-3 at 2.) Plaintiff then filed a second-level appeal under the Plan, which was similarly denied on October 5, 2020. (Doc. 46 at ¶ 84.) This second-level appeal also found that the requested facial feminization surgery procedures "would be considered cosmetic based on the Plan's definition of cosmetic treatment," and that this conclusion was based on "clinical practice standards and peer-reviewed literature established by the relevant medical community." (*Id.*)

During the appeal process, Plaintiff requested documents Quantum Health relied on to deny her precertification request. (*Id.* at ¶ 85.) In response, Quantum Health provided a Gender Dysphoria Policy setting forth clinical coverage criteria for services to treat gender dysphoria. (*Id.* at ¶¶ 55, 85.) [8] Plaintiff alleges that the reference to "national criteria" and "clinical practice standards" in the appeal letters denying her precertification request "refer to the Gender Dysphoria Policy." (*Id.* at ¶ 86.) Specifically, Plaintiff alleges that "Defendants applied United's Gender Dysphoria Policy to determine that [Plaintiff] Duncan's [facial feminization surgery] was excluded as 'Cosmetic Treatment'" under the Plan. (*Id.* at ¶ 56.) In sum, "the only reason Defendants denied coverage for Plaintiff's [facial feminization surgery] was their determination, based on the Gender Dysphoria Policy, that the prescribed surgery was cosmetic. If not for that faulty determination, Defendants would have approved coverage for Plaintiff's surgery." (*Id.* at ¶ 87.)

### C.   The Plan

As relevant here, the Plan "provides coverage for . . . covered benefits if services are authorized by a Physician . . . and are necessary for the treatment of an Illness or Injury, subject to any limits, maximums, exclusions, or other Plan provisions shown in this [document]." (Doc. 65-1 at 54.) It "does not provide coverage for services if medical evidence shows that treatment is not expected to resolve, improve, or stabilize the Covered Person's condition, or if a plateau has been reached in terms of improvement from such services." (*Id.*) Before benefits will be paid, the Plan requires "[p]rior authorization." (*Id.*) For "Covered Medical Benefits," the Plan includes the following:

---

[8] This Gender Dysphoria Policy is an internal coverage policy issued by UnitedHealth Group to "assist [UnitedHealth Group's] personnel in interpreting the term of 'standard' United benefit plans." (*Id.* at ¶ 19.) UMR, a wholly-owned subsidiary of UnitedHealth Group, "follows United[Health Group]'s clinical policies when administering benefits" under the Plan. (Doc. 46 at ¶¶ 14, 19.)

Like the Plan, the Gender Dysphoria Policy is necessarily embraced by the amended complaint and may be considered here. For ease of reference, the Court refers to the Gender Dysphoria Policy as attached to Plaintiff's consolidated suggestions in opposition to Defendants' motions to dismiss. (Doc. 65-5.)

- **"Gender Transition**: Treatment, drugs, medicines, services, and supplies for, or leading to, gender transition surgery."

- **"Reconstructive Surgery** includes: . . . Surgery to restore a bodily function that has been impaired by a congenital Illness or anomaly, or by an Accident, or from an infection or other disease of the involved part."

(Doc. 65-1 at 57, 63.) Under "General Exclusions," the Plan provides:

Exclusions . . . are not considered covered benefits under this Plan and will not be considered for payment as determined by the Plan.

The Plan does not pay for expenses Incurred for the following, unless otherwise stated below. The Plan does not apply exclusions to treatment listed in the Covered Medical Benefits section based upon the source of the Injury when the Plan has information that the Injury is due to a medical condition (including both physical and mental health conditions) or domestic violence.

. . .

16. **Cosmetic Treatment, Cosmetic Surgery**, or any portion thereof, unless the procedure is otherwise listed as a covered benefit.

. . .

39. **Maintenance Therapy** if, based on medical evidence, treatment or continued treatment could not be expected to resolve or improve a condition, or if clinical evidence indicates that a plateau has been reached in terms of improvement from such services.

. . .

47. **Not Medically Necessary**: Services, supplies, treatment, facilities, or equipment that the Plan determines are not Medically Necessary. Furthermore, this Plan excludes services, supplies, treatment, facilities, or equipment that reliable scientific evidence has shown does not cure the condition, slow the degeneration/deterioration or harm attributable to the condition, alleviate the symptoms of the condition, or maintain the current health status of the Covered Person. See also Maintenance Therapy above.

. . .

57. **Reconstructive Surgery** when performed only to achieve a normal or nearly normal appearance, and not to correct an underlying medical condition or impairment, as determined by the Plan, unless covered elsewhere in this [Summary Plan Description].

(*Id.* at 98, 100-01.) Finally, in the "Glossary of Terms," the Plan defines the following terms:

- **"Accident** means an unexpected, unforeseen, and unintended event that causes bodily harm or damage to the body."

5

- "**Cosmetic Treatment** means medical or surgical procedures that are primarily used to improve, alter, or enhance appearance, whether or not for psychological or emotional reasons."

- "**Covered Expense** means any expense, or portion thereof, that is Incurred as a result of receiving a covered benefit under this Plan."

- "**Covered Person** means an Employee . . . who is enrolled under this Plan."

- "**Gender Dysphoria** means a disorder characterized by the following diagnostic criteria classified in the current edition of the Diagnostic and Statistical Manual of the American Psychiatric Association ["DSM"]: [diagnostic criteria omitted]

- "**Illness** means a bodily disorder, disease, physical or mental sickness, functional nervous disorder, pregnancy, or complication of pregnancy. . . ."

- "**Injury** means a physical harm or disability to the body that is the result of a specific incident caused by external means. . . . The term "Injury" does not include Illness or infection of a cut or wound."

- "**Medically Necessary/Medical Necessity** means health care services provided for the purpose of preventing, evaluating, diagnosing, or treating an Illness, Injury, mental illness, substance use disorder, condition, or disease or its symptoms, that generally meet the following criteria as determined by us or our designee, within our sole discretion:

  o In accordance with *Generally Accepted Standards of Medical Practice*; and

  o Clinically appropriate, in terms of type, frequency, extent, site, and duration, and considered effective for Your Illness, Injury, mental illness, substance use disorder, or disease or its symptoms; and

  o Not mainly for Your convenience . . . ;

  o Is the most appropriate, most cost-efficient level of service(s), supply, or drug that can be safely provided to the member and that at least as likely [*sic*] to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of Your Illness, Injury, disease, or symptoms; and

  The fact that a Physician has performed, prescribed, recommended, ordered, or approved a service, treatment plan, supply, medicine, equipment, or facility, or that it is the only available procedure or treatment for a condition, does not, in itself, make the utilization of the service, treatment plan, supply, medicine, equipment, or facility Medically Necessary.

  *Generally Accepted Standards of Medical Practice* are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally

6

recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.

If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. . . .

UnitedHealthcare Clinical Services develops and maintains clinical policies that describe the Generally Accepted Standards of Medical Practice scientific evidence, prevailing medical standards, and clinical guidelines supporting our determinations regarding specific services. These clinical policies (as developed by UnitedHealthcare Clinical Services and revised from time to time), are available to Covered Persons by calling UMR at the telephone number on the Plan ID card, and to Physicians and other health care professionals on UnitedHealthcareOnline.com."

- "**Mental Health Disorder** means a disorder that is a clinically significant psychological syndrome associated with distress, dysfunction or Illness."

- "**Reconstructive Surgery** means surgical procedures performed on abnormal structures of the body caused by congenital Illness or anomaly, Accident, or Illness. The fact that physical appearance may change or improve as a result of Reconstructive Surgery does not classify surgery as Cosmetic Treatment when a physical impairment exists and the surgery restores or improves function."

(Doc. 65-1 at 124, 125, 127, 129, 130-31, 133.)

D.    The Procedural Posture

On December 28, 2021, Plaintiff filed an amended complaint against Defendants asserting various claims for relief under ERISA, Title VII, and the ADA, as set forth in the table below:

| COUNT | DEFENDANTS | VIOLATION (THEORY OF LIABILITY) | REMEDY (RELIEF SOUGHT) |
|---|---|---|---|
| **Ct. One** | All Defendants | (1) Wrongful Denial of Coverage in Violation of Plan<br><br>(2) Breach of Fiduciary Duty by Misinterpreting Plan Coverage<br><br>(3) Breach of Fiduciary Duty by Applying Gender Dysphoria Policy | ERISA, § 1132(a)(1)(B)<br><br>(1) Enforce current rights under the Plan<br><br>(2) Clarify rights to future benefits |
| **Ct. Two**<br><br>(Alternative to Ct. One) | All Defendants | (1) Violation of Plan by applying Cosmetic Treatment exclusion<br><br>(2) Violation of Plan by applying Gender Dysphoria Policy | ERISA, § 1132(a)(3)(A)<br><br>(1) Enjoin Defendants' misinterpretation of Cosmetic Treatment exclusion<br><br>(2) Enjoin Defendants' application of Gender Dysphoria Policy |
| **Ct. Three**<br><br>(Alternative to Ct. One) | All Defendants | (1) Breach of Fiduciary Duty by Misinterpreting Plan Coverage<br><br>(2) Breach of Fiduciary Duty by applying Gender Dysphoria Policy | ERISA, § 1132(a)(3)(B)<br><br>Appropriate equitable relief to remedy fiduciary breaches, Plan violation, and wrongful denial of precertification |
| **Ct. Four** | All Defendants | Cosmetic Treatment Exclusion Violates Parity Act on its Face<br><br>Cosmetic Treatment Exclusion Violates Parity Act as Applied to Plaintiff's Precertification Request | ERISA, §§ 1185a, 1132(a)(3)(A) & (B)<br><br>Injunctive & Equitable Relief |
| **Ct. Five** | JHA | Failure of JHA to Comply with Request and Provide Information | ERISA, § 1132(c)(1)(B)<br><br>Statutory Penalty of $100/day |
| **Ct. Six**<br><br>(Alternative to Cts. 1-4) | JHA | Employment Discrimination by JHA because of Plaintiff's Transgender Status and Sex | Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e), *et seq.*<br><br>All relief just and proper to remedy sex discrimination |
| **Ct. Seven**<br><br>(Alternative to Cts. 1-4) [9] | JHA | Disability Discrimination by JHA because of Plaintiff's Gender Dysphoria diagnosis | ADA, § 12101, *et seq.*<br><br>All relief just and proper to remedy disability discrimination |

---

[9] Plaintiff's amended complaint also included an eighth claim, asserted only against JHA under the Missouri Human Rights Act. After the filing of Defendants' motion to dismiss, this claim was voluntarily dismissed without prejudice by the parties. (Doc. 70.)

8

In the various motions to dismiss now before the Court, Defendants move to dismiss Counts One through Four under Rule 12(b)(6) for failure to state a claim, and JHA moves to dismiss Counts Five and Seven also for failure to state a claim.

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to file a motion to dismiss a party's claims for "failure to state a claim upon which relief can be granted[.]" To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court "accept[s] the allegations contained in the complaint as true and draw[s] all reasonable inferences in favor of the nonmoving party." *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 861 (8th Cir. 2010) (citation and quotation marks omitted). "In addressing a motion to dismiss, [t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record." *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (citation and quotation marks omitted).

## III. Discussion

In Counts One, Two, and Three of her amended complaint, Plaintiff alleges Defendants (1) wrongfully denied her precertification request and (2) breached their fiduciary duties by misinterpreting or misapplying the Plan's terms, including the Cosmetic Treatment Exclusion, and by applying the Gender Dysphoria Policy. As to each of these three counts, Plaintiff seeks relief under ERISA, § 1132(a)(1)(B), (a)(3)(A), and (a)(3)(B), respectively. Relatedly, in Count Four, Plaintiff alleges the Plan violates the Parity Act, 29 U.S.C. § 1185a, and similarly seeks equitable relief under ERISA, § 1132(a)(3)(A) & (B). In Count Five, Plaintiff alleges JHA failed to provide certain information related to the Plan on request and therefore seeks a statutory penalty pursuant to ERISA, § 1132(c)(1)(B). Finally, in Count Seven, Plaintiff asserts a claim for disability discrimination under the ADA against JHA to the extent the Plan discriminates against her by not providing coverage based on her disability (i.e., gender dysphoria).

### A. Plaintiff's ERISA Claims – Counts One, Two, Three, Four, and Five

As relevant to the five ERISA claims asserted by Plaintiff, federal law provides the following:

**(a) Persons empowered to bring a civil action**

A civil action may be brought –

> (1) by a participant or beneficiary –
>
> > . . .
>
> > (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan

. . .

**(c) Administrator's refusal to supply requested information; penalty for failure to provide annual report in complete form**

> (1) Any administrator . . . (B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. . .

§ 1132(a)(1)-(3), & (c).

1. **Counts One, Two, and Three: ERISA Claims seeking remedies under § 1132(a)(1)(B), (a)(3)(A), and (a)(3)(B) against all Defendants for wrongful denial of precertification and breach of fiduciary duties**

    i. **Whether Quantum Health is a Proper Party**

Initially, the Court considers Quantum Health's argument it is not a proper defendant as to the ERISA claim Plaintiff asserts under § 1132(a)(1)(B). Federal courts have generally had some difficulty answering the very question Quantum Health now places before the Court: Who is a proper defendant in a civil action brought under ERISA? *See Slayhi v. High-Tech Inst., Inc.*, No. 06-CV-2210 (PJS/JJG), 2007 WL 4284859, at *6 (D. Minn. Dec. 3, 2007) (noting who is a proper defendant for a claim under § 1132(a)(1)(B) "is a surprisingly complex question"). More than twenty years ago, the Eighth Circuit recognized a split in the caselaw whether an ERISA claim

10

under § 1132(a)(1)(B) may be brought against any party other than the ERISA-governed plan itself. *Hall v. LHACO, Inc.*, 140 F.3d 1190, 1194 (8th Cir. 1998) (collecting cases). While the Eighth Circuit has not yet specifically addressed this question, a review of the caselaw reveals a few guiding principles.

First, the "primary defendant" – although by no means the only defendant – in an action under § 1132(a)(1)(B) is the employee benefit plan itself. *Ross v. Rail Car Am. Grp. Disability Income Plan*, 285 F.3d 735, 740 (8th Cir. 2002). Second, a defendant in an ERISA action must have had some role in the underlying ERISA dispute. In *Delker v. MasterCard International, Inc.*, 21 F.4th 1019 (8th Cir. 2022), the Eighth Circuit reversed the district court's dismissal of an ERISA claim for breach of fiduciary duties under § 1132(a)(3) against an employer as a "functional fiduciary." *Id.* at 1024-25. In doing so, the Eighth Circuit recognized "[t]he district court accurately observed that an employee's claim to recover benefits cannot be brought against an employer under § 1132(a)(1)(B)," because "an employer is generally not considered to be an appropriate defendant." *Id.* at 1024 (citing *Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1194 (8th Cir. 1998)). Below, the district court had dismissed the ERISA claim under § 1132(a)(1)(B) asserted against the employer because the employer was not the plan administrator and the plaintiff did not allege the employer otherwise "exercised discretionary authority regarding [plaintiff']s claim for benefits or appeals" under the ERISA-governed plan at issue. *Delker v. Mastercard Int'l, Inc.*, No. 4:19 CV 43 RWS, 2020 WL 6708522, at \*5 (E.D. Mo. Nov. 16, 2020) (citing *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 438 (6th Cir. 2006) (other citation omitted) [10] ), *rev'd on other grounds*, 21 F.4th 1019.

---

[10] In *Moore*, the Sixth Circuit held the claims administrator – not the plan administrator – was the proper defendant in an ERISA action. 458 F.3d at 438. The Sixth Circuit reasoned:

> Under ERISA a person is a fiduciary only with respect to those aspects of the plan over which he or she exercises authority or control. When an insurance company administers claims for employee welfare benefit plans and has authority to grant or deny claims, the insurance company is a "fiduciary" for ERISA purposes. An employer who does not control or influence the decision to deny benefits is not the fiduciary with respect to denial of benefit claims. Here . . . Lafayette is the *claims* administrator and exercised full authority in adjudicating Plaintiff's claim for benefits. It was Lafayette who made a decision with respect to Plaintiff's benefits, not [the plan administrator]. Lafayette, and not [the plan administrator] is therefore the proper party defendant for a denial of benefits claim by Plaintiff.

*Id.* (citations omitted).

More than twenty years prior, the Eighth Circuit similarly held in *Layes v. Mead Corp.*, 132 F.3d 1246 (8th Cir. 1998), that an employer was not a proper defendant in an ERISA action under § 1132(a)(1)(B) where the insurance company (also a named defendant in the lawsuit) "was at all relevant times the sole administrator of the long-term disability plan offered by [the employer]." *Id.* at 1249 (citing *Garren v. John Hancock Mut. Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir. 1997) (other citation omitted)). Shortly thereafter, the Eighth Circuit expressly recognized *Layes* as holding "that the proper party against whom a claim for ERISA benefits may be brought [under § 1132(a)(1)(B)] is the party that controls administration of the plan," although the court declined to definitively decide whether a "de facto plan administrator" may be a proper defendant for such claims. *Hall*, 140 F.3d at 1194, 1195 (citation and quotation marks omitted).

Finally, in *Brown v. J.B. Hunt Transport Services, Inc.*, 586 F.3d 1079 (8th Cir. 2009), the Eighth Circuit – also favorably citing the Sixth Circuit's *Moore* decision as had the district court in *Delker* – affirmed the dismissal of the plaintiff's claim under § 1132(a)(1)(B) for improperly naming the employer/plan administrator as a defendant. In *Brown*, the Eighth Circuit reasoned that the employer/plan administrator was not a proper defendant where it was "undisputed the Plan requires [the insurer], not [the employer/plan administrator], to pay . . . benefits" under the ERISA-governed plan. *Id.* at 1088. In other words, the Eighth Circuit equated the insurer in *Brown* (the entity responsible for paying benefits to the plaintiff under the ERISA plan) with the claims administrator in *Moore* (responsible for adjudicating the plaintiff's claim for benefits under the ERISA plan).

In sum, the caselaw largely supports the following guiding principle as to who may be a proper defendant in an ERISA action brought under § 1132(a)(1)(B): "The proper party in an action concerning ERISA benefits is the party that controls administration of the plan or the plan itself." *Harris v. SWAN, Inc.*, 459 F. Supp. 2d 857, 862 (E.D. Mo. 2005) (citing *Layes*, 132 F.3d at 1249); *see Brant v. Principal Life & Disability Ins. Co.*, 6 F. App'x 533, 535 (8th Cir. 2001) (holding both plaintiff's employer and the insurance provider "were proper defendants in such an action [(a breach of fiduciary duty action under ERISA based on the denial or refusal to pay plan benefits)]" where the agreement "gave them discretionary authority to determine eligibility for benefits and to construe the terms of the plan") (citation omitted); *Anderson v. Nationwide Mut. Ins. Co.*, 592 F. Supp. 2d 1113, 1133 (S.D. Iowa 2009) (noting "several district courts in the Eighth Circuit have agreed that a party's actual role in an ERISA plan, rather than its named role, will

12

determine whether it administered the plan and, thus, whether it can be a named defendant in a section [1132](a)(1)(B) suit") (collecting cases); *Delker*, 2020 WL 6708522, at *5 (finding employer was not proper defendant in action under § 1132(a)(1)(B) where plaintiff failed to allege the employer "exercised discretionary authority regarding his claim for benefits or appeals") (citing *Moore*, 458 F.3d at 438; *Brown*, 586 F.3d at 1088); *but see White v. Martin*, 286 F. Supp. 2d 1029, 1045 (D. Minn. 2003) (declining to employ "de facto administrator" analysis to ERISA claim).

Quantum Health correctly observes Plaintiff does not allege in her amended complaint that it is either the ERISA-governed plan at issue or the plan administrator. Nonetheless, Plaintiff does allege UMR delegated authority to Quantum Health to administer the "Care Coordination Process," including to process precertification requests under the Plan. Additionally, Plaintiff alleges in her amended complaint that her surgeon requested precertification for the prescribed facial feminization surgery from Quantum Health, a request that was then denied.

In its reply, Quantum Health argues it "performs purely ministerial functions within the Plan's framework and therefore is not a fiduciary," and points to language in the Plan that UMR Care Management Department staff conducts "all clinical reviews that are done to determine Plan coverage." (Docs. 71 at 2, 3; 65-1 at 85.) The Court notes, however, the Plan language also includes that "UMR Care Management is part of Your overall Care Coordinators team," and specifically provides as follows:

> The Care Coordinators will review each pre-notification request to evaluate whether the care, requested procedures, and requested care setting all meet utilization criteria established by the Plan. The Plan has adopted the utilization criteria in use by the Care Coordinators. If a pre-notification request does not meet these criteria, the request will be reviewed by one of the medical directors for Quantum Health, who will review all available information and if needed consult with the requesting provider. If required, the medical director will also consult with other professionals and medical experts with knowledge in the appropriate field. He or she will then provide, through the Care Coordinators, a recommendation to the Plan Administrator whether the request should be approved, denied, or allowed as an exception.

(Doc. 65-1 at 87.)

Accepting the factual allegations in Plaintiff's amended complaint as true and considering the Plan language as noted above, at this early stage the Court finds the allegations reasonably support a finding Quantum Health is a proper defendant in this ERISA action. Accordingly, the Court declines to dismiss Plaintiff's claims against Quantum Health on that basis. *See Ramsey v.*

*Se. Emp. Benefit Serv., Inc.*, No. 4:07CV00790, 2008 WL 4418958, at *2 (E.D. Ark. Sept. 26, 2008) (recognizing at the motion to dismiss stage, the inquiry "is not whether Defendants will ultimately be found to have been fiduciaries, but whether Plaintiffs have alleged sufficient facts . . . which taken as true, create a plausible claim to relief," and that whether a defendant is a fiduciary "is a fact sensitive inquiry" that generally does not lead to dismissal, particularly "where the complaint sufficiently pleads defendants' ERISA fiduciary status") (citation and quotation marks omitted); *see also Delker*, 2020 WL 6708522, at *5 ("Under ERISA a person is a fiduciary only with respect to aspects of the plan over which they exercise authority or control.") (citing *Moore*, 458 F.3d at 438); 29 U.S.C. § 1002(21)(A) (defining a "fiduciary with respect to a plan" as one who "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan"). Therefore, Quantum Health's motion to dismiss for failure to state a claim because it is an improper defendant is **DENIED**.

### ii. Count One: ERISA claim seeking remedies under § 1132(a)(1)(B) against all Defendants to enforce current rights and clarify rights to future benefits under the Plan

In Count One, Plaintiff alleges Defendants violated the Plan's terms by denying her request for precertification of the facial feminization surgery because she "satisfied all prerequisites for coverage under the Plan and the Plan explicitly covers treatment for gender dysphoria, including gender transition surgery." (Doc. 46 at ¶ 112.) In other words, Plaintiff asserts (1) the facial feminization surgery for which she requested precertification is a covered benefit under the terms of the Plan, and (2) the Cosmetic Treatment exclusion does not apply to the requested procedures. (*Id.* at ¶ 114.)[11] In addition, Plaintiff alleges that Defendants breached their fiduciary duties by, *inter alia*, (1) misinterpreting the terms of the Plan, and

---

[11] While the parties also include argument whether the facial feminization surgery is "medically necessary" as the Plan otherwise requires, the Court notes that (1) Plaintiff specifically alleges Defendants denied the precertification request based on the Cosmetic Treatment exclusion, not because it is independently not medically necessary, and (2) when considering ERISA claims, particularly those under § 1132(a)(1)(B) challenging the denial of benefits, courts look to the final decision denying a claim rather than preceding denials. *Cf. Galman v. Prudential Ins. Co. of Am.*, 254 F.3d 768, 770 (8th Cir. 2001) (in considering the exhaustion of an ERISA claim, the Eighth Circuit recognized the purposes of exhaustion "are best served if the reviewing court reviews the claims administrator's final decision to deny a claim, rather than the initial denial that was reconsidered during the internal appeal"). Here, the decision issued with Plaintiff's second-level appeal relied on the Cosmetic Treatment exclusion. Only the decision issued with Plaintiff's first-level appeal found the requested facial feminization surgery was not medically

[2] by applying the United Gender Dysphoria Policy to deny Plaintiff's request for coverage even though the internal United policy was not created solely in the interests of any ERISA plan participants; contradicted the terms of the . . . Plan; and flouted the generally accepted standards of care for the treatment of gender dysphoria.

(*Id.* at ¶ 118.)  Accordingly, pursuant to ERISA, § 1132(a)(1)(B), Plaintiff seeks "to enforce her rights under the Plan and to clarify her rights to future benefits under the Plan" (*id.* at ¶ 121), with the following relief:

- An order declaring that Defendants "violated their legal obligations";

- An order declaring that the Cosmetic Treatment exclusion does not apply to facial feminization surgery;

- An order declaring that the United Gender Dysphoria Policy "violates" the Plan's terms;

- An order declaring that facial feminization surgery to treat Plaintiff's gender dysphoria is not "Cosmetic Treatment";

- An order enjoining Defendants "from denying coverage" for facial feminization surgery based on the Plan's Cosmetic Treatment exclusion and definition of "cosmetic treatment"; and

- An order enjoining Defendants "from denying coverage" for facial feminization surgery "based on the United Gender Dysphoria Policy."

(*Id.* at 37-38, ¶¶ A-C, E, J-M.)

Defendants argue Count One must be dismissed for failing to state a claim for the following five reasons:

(1)  Plaintiff's claim does not properly seek a claim for benefits as allowed under ERISA, § 1132(a)(1)(B);

(2) Plaintiff's claim that Defendants breached their fiduciary duties is not cognizable under ERISA, § 1132(a)(1)(B);

(3)  Plaintiff failed to state a claim Defendants wrongfully denied her precertification request under the terms of the Plan;

(4) Plaintiff failed to cite or rely on the administrative record; and

---

necessary, and even only "because national criteria [which Plaintiff alleges refers to the Gender Dysphoria Policy] considers certain ancillary procedures such as facial feminization a cosmetic procedure." (Doc. 65-3 at 2.)  For these reasons, at least as presented to the Court at this early stage, at least as to Plaintiff's ERISA claims, the focus is solely on the Cosmetic Treatments exclusion.

(5) Plaintiff failed to exhaust her administrative remedies.[12]

The Court addresses each argument, in turn, below.

## (1) Plaintiff's claim properly seeks a claim for benefits under § 1132(a)(1)(B):

First, Defendants UMR and Quantum Health argue that Count One fails to state a claim because Plaintiff does not seek proper relief available under § 1132(a)(1)(B), but rather seeks to reform the Plan. As set out above, § 1132(a)(1)(B) authorizes an ERISA-plan participant to bring a lawsuit in order to (1) recover benefits, (2) enforce rights, or (3) clarify rights to future benefits under the terms of the ERISA-governed plan. Relief under this provision "may take the form of accrued benefits due, a declaratory judgment on entitlement to benefits, or an injunction against a plan administrator's improper refusal to pay benefits." *Pilot Life Ins. v. Dedeaux*, 481 U.S. 41, 53 (1987).

In support of their argument, Defendants rely on *Ross v. Rail Car America Group Disability Income Plan*, 285 F.3d 735. There, the Eighth Circuit held that § 1132(a)(1)(B) does not authorize a claim where the relief an ERISA-plaintiff seeks is not to obtain benefits under the terms of the insurance plan at issue but is instead "to reform the Plan," a form of equitable relief. *Id.* at 740 & 741. The Eighth Circuit found the plaintiff ultimately intended to "reform the Plan by obtaining a declaration that the purported 1990 and 1991 amendments are void" because the amendments did not comply with the "procedures articulated in the policy itself." *Id.* at 739 & 740. The court concluded: "The two counts which seek to invalidate the amendments can only be characterized as arising under 29 U.S.C. § 1132(a)(3), section 502(a)(3) of ERISA," rather than § 1132(a)(1)(B) which "does not authorize such a claim." *Id.* at 740.

Unlike *Ross*, though, Plaintiff's argument in Count One appears to be that the prescribed facial feminization surgery *is* a covered benefit under the terms of the Plan and *is not* excluded under the Cosmetic Treatment exclusion based on the Plan's language. Specifically, Plaintiff alleges the Plan's coverage for "gender transition surgery" includes treatment for gender dysphoria

---

[12] In filing separate motions to dismiss, the defendants did not all assert the same claims for relief under Rule 12(b)(6). To the extent any of the defendants addressed arguments for relief they did not themselves raise in their motion to dismiss, the Court notes that generally, arguments raised for the first time in reply are not considered. *See O'Saughnessy v. McClatchy Co.*, No. 4:13-cv-00492-DGK, 2013 WL 12203246, at *1 n.1 (W.D. Mo. July 17, 2013). Nonetheless, Plaintiff filed a consolidated response in which she collectively responded to the various motions to dismiss. Under these circumstances, the Court will generally consider arguments made in reply to the extent the ground was properly asserted in a motion to dismiss. *See also Barham v. Reliance Standard Life Ins. Co.*, 441 F.3d 581, 584 (8th Cir. 2006).

Case 6:21-cv-03280-RK    Document 95    Filed 07/27/22    Page 16 of 51

for which the facial feminization surgery was prescribed to treat. (Doc. 46 at ¶ 112.) Further, Plaintiff alleges the Cosmetic Treatment exclusion simply does not apply by its own terms because the surgery she requested is otherwise a covered benefit. (*Id.* at ¶ 113.)

Section 1132(a)(1)(B) permits an ERISA-participant-plaintiff to "recover accrued benefits, to obtain a declaratory judgment that [the participant] is entitled to benefits under the provisions of the plan contract, and to enjoin the plan administrator from improperly refusing to pay benefits in the future." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146-47 (1985); *see Reid v. BCBSM, Inc.*, 984 F. Supp. 2d 949, 956 (D. Minn. 2013) (contrasting a claim challenging the *validity* of an exclusion – i.e., that a particular procedure should be covered by the plan – a claim that does not arise under § 1132(a)(1)(B) – with a claim challenging the *interpretation* of the policy exclusion – i.e., that the procedure is covered by the plan – a claim that does arise under § 1132(a)(1)(B).) Here, as UMR recognizes, Plaintiff "seeks only declaratory and injunctive relief related to the interpretation of the [Plan]'s terms[.]" (Doc. 53 at 11.) Unlike *Ross*, the "vehicle for [Plaintiff's] requested relief" – here, ultimately precertification of the requested facial feminization surgery – is not an equitable remedy like reformation but is a declaratory judgment and injunctive relief which falls squarely under § 1132(a)(1)(B). In other words, despite Defendants' clear disagreement with Plaintiff's interpretation of the Plan's terms, Count One fundamentally relies on the interpretation and application of the Plan's terms. Plaintiff asserts both a wrongful denial and breach of fiduciary duty theory under Count One, under which she seeks relief under the Plan's terms. Plaintiff properly seeks a claim to clarify her rights and enforce her rights under the terms of the Plan pursuant to § 1132(a)(1)(B). Defendants' motions to dismiss Count One on this basis are denied.

## (2) Plaintiff's breach-of-fiduciary theory for relief under § 1132(a)(1)(B) is not improper:

Second, JHA and the Plan argue Count One improperly seeks relief under a breach-of-fiduciary-duty claim under § 1132(a)(1)(B). In Count One, Plaintiff asserts a claim under § 1132(a)(1)(B) that Defendants breached their fiduciary duties by

> carelessly misinterpreting the terms of Plaintiff's Plan and by applying the United Gender Dysphoria Policy to deny Plaintiff's request for coverage even though that internal United policy was not created solely in the interests of any ERISA plan participant[]; contradicted the terms of the JHA Plan; and flouted the generally accepted standards of care for the treatment of gender dysphoria.

(Doc. 46 at 24, ¶ 118.)

As the Eighth Circuit has recognized: "ERISA is a 'comprehensive legislative scheme' that includes 'an integrated system of procedures for enforcement' that are 'essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans.'" *Dakotas & W. Minn. Elec. Indus. Health & Welfare Fund by Stainbrook & Christian v. First Agency, Inc.*, 865 F.3d 1098, 1101 (8th Cir. 2017) (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004)). The several civil remedies contained within § 1132(a) are no exception. Here, Defendants argue, essentially, that a claim for relief under § 1132(a)(1)(B) cannot be based on a theory that a defendant breached their fiduciary duties, therefore misinterpreting and misapplying the Plan's terms.

In support of this argument, JHA and the Plan primarily rely on *Delcastillo v. Odyssey Resource Management, Inc.*, 431 F.3d 1124 (8th Cir. 2005). (Doc. 55 at 9.) In *Delcastillo*, to be sure, the Eighth Circuit recognized that § 1132(a)(3) "provides a distinct cause of action for 'other appropriate equitable relief' to remedy a breach of ERISA fiduciary duties." 431 F.3d at 1130. The Eighth Circuit found that the plaintiffs "asserted no claim under § 1132(a)(1)(B)," but at the same time they "sought to recover denied benefits on the theory . . . that '[b]y failing to provide coverage, [the employer] violated their statutory fiduciary duty.'" *Id.* Ultimately, however, because the record "[did] not reveal whether [the employer] also argued to the district court that the [plaintiffs] may not recover wrongfully denied benefits under a breach of fiduciary duty theory because the remedy under § 1132(a)(1)(B) is exclusive," the Eighth Circuit remanded the case for the district court to determine "whether the [plaintiffs] are entitled to recover damages equal to their unreimbursed covered medical expenses during the period from February 1, 1999, to June 30, 2000." *Id.* at 1131. On remand, the district court found (1) "the evidence establishes [the employer]'s liability for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B)," and therefore, (2) the employer was "liable for medical expenses that would have been covered had the [plaintiffs] elected COBRA coverage, as well as medical claims improperly denied from February 1, 1999 to June 30, 2000." *Delcastillo v. Odyssey Res. Mgmt., Inc.*, 479 F. Supp. 2d 1087, 1097 (D. Neb. 2007), *reversed in part on other grounds*, 292 F. App'x 519 (8th Cir. 2008) (reversing award of statutory penalties awarded under 29 U.S.C. § 1132(c)(1)(B)). Importantly, *Delcastillo* did not hold that the only remedies available for breach of ERISA fiduciary duties are under the provisions of § 1132(a)(3).

18

In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court recognized as a general matter that subsection (a)(1)(B) "specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims, . . . one that runs directly to the injured beneficiary." *Id.* at 512 (other citation omitted). And indeed, the Court openly considered the possibility that wrongful denial claims under subsection (a)(1)(B) may sometimes be characterized as breach-of-fiduciary duty claims, but concluded that doing so would have no impact because the standard of review as to the plain administrator's decision to deny benefits would not change in either case. *Id.* at 514; *see also id.* at 511 (recognizing that "a plan fiduciary engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents"); *Aetna Health Inc v. Davila*, 542 U.S. 200, 218 (2004) (noting that benefits determinations are "part and parcel of the ordinary fiduciary responsibilities connected to the administration of a plan").

*Varity*, of course, specifically addressed when subsection (a)(3)(B) – providing broad relief for "other appropriate equitable relief" – was a viable avenue for relief. Based on the text and construction of ERISA, the Court concluded subsection (a)(3) operates only as a "catchall" section or "safety net" that "offer[s] appropriate equitable relief for injuries caused by violations that § [1132(a)] does not elsewhere remedy." *Id.* at 512. In other words, § 1132(a)(3) only provides a viable avenue for relief when the other provisions of § 1132 do not. *See id.* at 515 (recognizing that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'") (holding plaintiffs could proceed in breach of fiduciary duty claim under subsection (a)(3) because they could not otherwise proceed under subsections (a)(1)(B) or (a)(2)) (citation omitted). [13]

---

[13]  As the Supreme Court explained, the plaintiffs in *Varity* could not proceed in a claim under subsection (a)(1)(B) because they were no longer members of the ERISA-governed plan underlying their claim and a claim under subsection (a)(1)(B) only provides "benefits due . . . under the terms of [the plan]." *Varity*, 516 U.S. at 515. Moreover, subsection (a)(2) did not provide the plaintiffs with relief because this subsection "does not provide a remedy for individual beneficiaries." *Varity*, 516 U.S. at 515 (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 144 (1985)). In *Russell*, the Supreme Court had earlier recognized that subsection (a)(2) – the "enforcement provision" for 29 U.S.C. § 1109 ("liability for breach of fiduciary duty") – only authorizes lawsuits for breach-of-fiduciary-duty "in a representative capacity on behalf of the plan as a whole." 473 U.S. at 142 n.9; *see id.* at 144 (holding § 1109 does not authorize any relief "except for the plan itself").

Here, in Count One, Plaintiff asserts a § 1132(a)(1)(B) claim that Defendants wrongfully denied her precertification request under the Plan. In making her claim, Plaintiff relies on two theories: (1) she satisfied all prerequisites for coverage under the terms of the Plan and the Cosmetic Treatment exclusion does not apply to her request under the terms of the plan, and (2) Defendants breached their fiduciary duties in denying her precertification request by (i) "carelessly misinterpreting the terms of Plaintiff's plan" and (ii) by applying the United Gender Dysphoria Policy. JHA and the Plan argue that Count One must be dismissed "because it seeks relief for breach of fiduciary duty, which is not available" under subsection (a)(1)(B). This argument misses the mark.

First, this argument ignores the initial theory on which Plaintiff relies in Count One – that Defendants wrongfully denied Plaintiff's precertification request because the terms of the Plan prove she is entitled to coverage (a theory that is clearly within the scope of wrongful denial-of-benefits claims). No defendant challenges the sufficiency of Count One in this respect. Second, this argument suggests no breach-of-fiduciary duty theory can be asserted to support a claim under § 1132(a)(1)(B) to remedy a specific injury – the wrongful denial of benefits under the terms of an ERISA-governed plan).

Of course, the Supreme Court's reasoning in *Varity* suggests that *had* subsection (a)(1)(B) been a viable avenue for relief for the plaintiffs, (a)(3) may no longer have been a viable avenue for relief to the extent the relief provided would no longer be "appropriate" in light of the relief otherwise provided under (a)(1)(B), regardless of the specific theory presented to support a claim under subsection (a)(1)(B). *See Varity*, 516 U.S. at 515. Here, Plaintiff has pleaded a claim under § 1132(a)(1)(B) for appropriate relief under that provision, as explained above, to remedy the harm she has suffered – the denial of precertification under the terms of the Plan for facial feminization surgery. To the extent Plaintiff includes a breach-of-fiduciary-duty theory, she seeks ultimately to remedy this harm. Here, then, the Court finds Count One does not impermissibly plead a claim for relief under § 1132(a)(1)(B) for wrongful denial of benefits under a breach-of-fiduciary-duty theory.[14] *See also Christoff v. Unum Life Ins. Co. of Am.*, No. 17-3512 (DWF/KMM), 2018 WL

---

[14] This is entirely independent of Defendants' argument challenging the sufficiency of Counts Two and Three, breach-of-fiduciary-duty claims made pursuant to § 1132(a)(3). At the same time, as the arguments Defendants make challenging Counts Two and Three as improperly duplicative and thus subject to dismissal under Rule 12(b)(6) emphasize, the focus here is necessarily less on the *claim* or *theory* asserted or presented in pursuing a civil remedy for relief under § 1132(a) and more on the *relief* sought or ultimately

4110963, at *4 n.3 (D. Minn. Aug. 29, 2018) (recognizing claim under § 1132(a)(1)(B) that the defendant's termination of plaintiff's ERISA-governed plan benefits was a violation of the defendant's fiduciary duties as distinct from "plaintiff's fiduciary-duty claim invoking 29 U.S.C. § 1132(a)(3)"); *Boyd v. ConAgra Foods, Inc.*, No. 4:14-CV-01435-JAR, 2015 WL 170572, at *2 (E.D. Mo. Jan. 13, 2015) (declining to dismiss claims under § 1132(a)(1)(B) and (a)(3) as improperly duplicative, even where both claims relied on a theory that the defendant had breached its fiduciary duty to the plaintiff). Defendants' motion to dismiss Count One for failure to state a claim on this basis is denied.

### (3) Plaintiff adequately states a claim that Defendants improperly denied her precertification request for facial feminization surgery under the terms of the Plan:

Third, Defendant UMR also argues that Plaintiff fails to state a claim in Count One because the denial was not inconsistent with the Plan's terms. Specifically, Defendants argue Plaintiff fails to state a claim for benefits because facial feminization surgery is not a covered benefit under the terms of the Plan and is excluded under the Cosmetic Treatment exclusion.

In Count One, Plaintiff first alleges that Defendants "violated the terms of Plaintiff's Plan by arbitrarily denying her request for precertification of coverage" for facial feminization surgery because Plaintiff "satisfied all prerequisites for coverage" and because "the Plan explicitly covers treatment for gender dysphoria, including gender transition surgery." (Doc. 46 at 25, ¶ 112.) Plaintiff also asserts that Defendants therefore wrongfully denied her precertification request because the Plan's exclusion for cosmetic treatment does not apply where facial feminization surgery is otherwise covered by the Plan's terms. Second, Plaintiff alleges Defendants breached their fiduciary duties by misinterpreting the terms of the Plan and by applying the Gender Dysphoria Policy, a policy that was "not created solely in the interests of any ERISA plan participants; contradicted the [Plan]'s terms . . . ; and flouted the generally accepted standards of care for the treatment of gender dysphoria." (*Id.* at 26, ¶¶ 115, 118.)

At the motion-to-dismiss stage, the relevant inquiry is not whether Plaintiff is ultimately entitled to the relief she seeks, but instead is whether Plaintiff has alleged sufficient facts to state a plausible claim that she is entitled to the relief she seeks. *See Henrikson v. Choice Prods. USA, LLC*, No. 16-1317 (MJD/LIB), 2017 WL 449591 (D. Minn. Feb. 2, 2017) ("[T]o survive dismissal under Rule 12(b)(6), Plaintiff need not prove that his arguments are winning ones; he only need

---

obtained (should Plaintiff prevail). *See infra* § III.A.1.iii.

show that success on the merits is more than a 'sheer possibility.'") (Citation omitted). Plaintiff alleges (1) the Plan covers facial feminization surgery as "gender transition" (which is a covered medical benefit), and (2) facial feminization surgery is not excluded under the Cosmetic Treatment exclusion of coverage.

The Plan defines "gender transition" (a covered medical benefit) as "[t]reatment, drugs, medicines, services, and supplies for, or leading to, gender transition surgery." The Plan does not further define the term "gender transition surgery." Plaintiff alleges "the facial gender confirmation surgery prescribed to treat [her] gender dysphoria, is gender transition surgery." (Doc. 46 at 11, ¶ 48.) Additionally, the Plan defines "cosmetic treatments" as: "medical or surgical procedures that are primarily used to improve, alter, or enhance appearance, whether or not for psychological or emotional reasons." (Doc. 65-1 at 125.) Plaintiff alleges "the primary *purpose* for [Plaintiff]'s [facial feminization] procedures is not to improve, alter, or enhance her appearance," but is instead "to treat her gender dysphoria." (Docs. 46 at ¶ 80; 65 at 24.) Finally, cosmetic treatments are excluded from coverage under the Plan "unless the procedure is otherwise listed as a covered benefit." (Doc. 65-1 at 98, ¶ 16.)

Defendants argue Plaintiff has failed to state a claim for relief because the Plan's coverage for gender transition cannot be interpreted to include facial feminization surgery and therefore the requested facial feminization surgery is subject to the Cosmetic Treatment exclusion. Although not explicitly recognized by either party, the initial question presented to the Court at this early stage is whether the Plan is ambiguous, particularly as to whether facial feminization surgery is a covered benefit. As one district court in this circuit has explained in the context of ERISA actions:

> Whether the [ERISA] Plan is ambiguous . . . is a threshold question the Court may consider in the context of a Rule 12(b)(6) motion. If the Court determines that the provision is ambiguous, however, the actual and ultimate interpretation of an ambiguous provision is a question of fact which is not properly disposed of in a motion to dismiss for failure to state a claim.

> Conversely, when the language of an ERISA-governed benefits plan is clear and unambiguous, courts should not accept a contrary interpretation. *See Lickteig v. Bus. Men's Assurance Co. of Am.*, 61 F.3d 579, 585 (8th Cir. 1995).

*Henrikson v. Choice Prods. USA, LLC*, No. 16-1317 (MJD/LIB), 2017 WL 449591, at * 1 (D. Minn. Feb. 2, 2017) (other citations omitted).

Implicitly recognizing this, in its reply, UMR cites a recent decision from the Eastern District of Kentucky, *Poloncyzk v. Anthem BlueCross and BlueShield*, __ F. Supp. 3d __, 2022

WL 551215 (E.D. Ky. Feb. 23, 2022), in which the district court dismissed a plaintiff's ERISA claim that she was wrongfully denied precertification under an ERISA-governed plan for facial surgeries relating to gender dysphoria. In *Poloncyzk*, the plaintiff sought – and was denied – precertification of "facial surgery to assist in her transition," including the following procedures: Rhytidectomy – Cheek, Chin, & Neck; Rhytidectomy – Neck with Platysmal Tightening; Repair Brow Ptosis; Osteoplasty – Facial Bones Reduction; Genioplasty – Sliding Osteotomies; Osteoplasty – Facial Bones Augmentation; and Tissue Grafts – Other. *Id.* at *1. At the motion to dismiss stage, the district court concluded the "plain text" of the ERISA-governed plan at issue "provides that certain surgeries in the context of gender reassignment are considered cosmetic and therefore [are] not covered." *Id.* at *4. Specifically, the district court found the Rhytidectomy, Osteoplasty, and Genioplasty procedures were explicitly listed as not medically necessary under the ERISA-governed plan,[15] and that other procedures (including the brow ptosis and tissue grafts) "were not *explicitly* listed as cosmetic and therefore [are] not covered under Plaintiff's Plan." *Id.* at *3 & *4 (emphasis in original).

Here, Plaintiff alleges she was prescribed the following specific procedures for facial feminization surgery: forehead cranioplasty, bone removal around the orbit, midface reconstruction, rhinoplasty, jaw surgery, genioplasty, and tracheal shave. (Doc. 46 at 17-18, ¶ 75.) Unlike the ERISA-governed plan at issue in *Poloncyzk* that specifically listed "cosmetic" procedures that would not be covered, the ERISA-governed plan that applies here relies on broad language and definitions of its coverage (and exclusions). Specifically, the Plan only broadly defines what constitutes a "cosmetic treatment" and, in addition, the plain language states that such procedures are only excluded to the extent they are not otherwise listed as covered benefits. Similarly, the Plan broadly provides as a covered benefit "gender transition," which is defined in relevant part as "[t]reatment . . . [and] services . . . for, or leading to, gender transition surgery." The question, it seems then, is the interpretation of the term "gender transition surgery." The parties all treat the Plan's language and terms as clear and in a conclusory manner. Unlike the

---

[15] The ERISA-governed plan in *Poloncyzk* specifically enumerated as procedures that "are considered cosmetic and not medically necessary when used to improve the gender-specific appearance of a patient who has undergone or is planning to undergo gender reassignment surgery," the following: facial bone reconstruction and face-lift. 2022 WL 551215, at *3. The district court noted (1) that Rhytidectomies are "commonly known as a facelift," (2) that "Osteoplasty refers to facial bone surgery," and (3) that a Genioplasty – "meant to alter or reshape a patient's chin" – is a "form of facial bone reconstruction." *Id.*

ERISA-governed plan at issue in *Poloncyzk* that unambiguously excluded the requested procedures as "cosmetic," the Plan does not so clearly or obviously or unambiguously either cover or exclude the requested facial feminization surgical procedures. Even if they are considered "cosmetic treatments" as defined by the Plan – which Plaintiff alleges they are not because their primary purpose is to treat her gender dysphoria rather than merely "to improve, alter, or enhance appearance" – the Cosmetic Treatment exclusion only applies to the extent the "procedure is [not] otherwise listed as a covered benefit." Despite the parties' conclusory assertions otherwise, the Plan does not unambiguously answer this question. This ambiguity should not and cannot be resolved at this early motion to dismiss stage. Accordingly, Defendant's motion to dismiss Count One for failure to state a claim on this basis is denied.[16]

### (4) Plaintiff adequately pleaded facts to state to state a claim for relief under § 1132(a)(1)(B) even if not specifically referencing the administrative record:

Fourth, UMR separately argues that Plaintiff fails to state a claim for benefits in Count One under § 1132(a)(1)(B) in that the amended complaint fails to "cite to or rely on any information purportedly in the administrative record" because the Court's "[r]eview of a plan participant's claim for benefits under Section [1132](a)(1)(B) is typically based on the administrative record." (Doc. 53 at 10.) UMR cites no legal authority to support this argument for dismissal of Count One. And in fact, Plaintiff's amended complaint pleads and references (1) the terms of the Plan, (2) her request for precertification for the prescribed facial feminization surgery, (3) Defendants' denials of her request including appeals, and (4) the reasons given for those denials. At this early stage and considering the federal pleading requirements, it is not clear what more UMR believes or what more Plaintiff should allege in her amended complaint to this point. UMR's motion to dismiss Count One for failure to state a claim on this basis is denied.

---

[16] The parties appear to mostly agree that Plaintiff's § 1132(a)(1)(B) claim regarding the denial of her precertification request will ultimately be reviewed for an abuse of discretion. *See also Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 829 (8th Cir. 2014) (where ERISA-governed plans "give[] the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," federal courts review the denial decision for an abuse of discretion). Unlike *Poloncyzk*, the Plan does not expressly exclude the requested procedures. Thus, it would be improper to determine whether Defendants abused their discretion in interpreting and applying the Plan regarding Plaintiff's request for precertification at this early stage. Additionally, Defendants do not specifically challenge in their motion to dismiss Plaintiff's theory that she is entitled to relief under § 1132(a)(1)(B) to the extent Defendants breached their fiduciary duties by relying on or applying the Gender Dysphoria Policy.

**(5) Plaintiff did not fail to exhaust her administrative remedies:**

Finally, in its reply, Quantum Health asserts for the first time among any of the defendants that Plaintiff also fails to state a claim because she did not exhaust her administrative appeals. (Doc. 71 at 5-6.) The Court generally does not consider arguments raised for the first time in a reply. *Hesse v. Mo. Dep't of Corr.*, No. 4:21-cv-00472-RK, 2022 WL 479142, at *3 n.4 (W.D. Mo. Feb. 16, 2022). Nonetheless, because the Court granted Plaintiff leave to file a sur-reply to in part address this exhaustion issue the Court will consider the argument.

In her amended complaint, Plaintiff pleads she undertook a first and second-level appeal. Although not explicitly required under ERISA, "the Eighth Circuit has recognized a judicially created exhaustion requirement under ERISA." *Van Natta v. Sara Lee Corp.*, 439 F. Supp. 2d 911, 938-39 (N.D. Iowa 2006) (collecting Eighth Circuit cases). Generally, where a plan document provides a review procedure – whether in mandatory or permissive language – "'claimants with notice of an available review procedure . . . must take advantage of that procedure if they wish to bring wrongful benefit denial claims to court.'" *Wert v. Liberty Life Assurance Co. of Boston, Inc.*, 447 F.3d 1060, 1066 (8th Cir. 2006) (quoting *Kinkead v. Sw. Bell Corp. Sickness & Accident Disability Benefit Plan*, 111 F.3d 67, 69 (8th Cir. 1997)). In *Kinkead*, the Eighth Circuit explained the exhaustion requirement exists because "benefit plans are required by law to include a claim review procedure, and the duty to exhaust furthers important ERISA purposes." 111 F.3d at 70. Thus, an ERISA-governed plan claim review procedure that otherwise satisfies statutory and regulatory review requirements (*see* 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1(f) and (g)) "will trigger the judicially imposed duty to exhaust that remedy." *Id.*; *see also Galman*, 254 F.3d at 770 (explaining the exhaust requirement's several purposes, including: "giving claims administrators an opportunity to correct errors, promoting consistent treatment of claims, providing a non-adversarial dispute resolution process, decreasing the cost and time of claims resolution, assembling a fact record that will assist the court if juridical review is necessary, and minimizing the likelihood of frivolous lawsuits").

Here, as to exhaustion, Quantum Health points to Plaintiff's failure to pursue an "external review" beyond the Plan's "internal appeals" process as permitted by the Plan in certain circumstances. (*See* Doc. 65-1 at 112.) Quantum Health cites no caselaw or legal authority in support of its extremely broad application of the ERISA-exhaustion requirement, however, and the Court is not aware of any legal authority that supports this largely conclusory exhaustion

argument. Plaintiff alleges she exhausted her administrative remedies by pursuing both a First Level of Appeal and Second Level of Appeal. Accordingly, at this time, the Court does not find Plaintiff's amended complaint fails to state a claim to the extent she is required to exhaust her ERISA claim for benefits.

### (6) Conclusion:

For these reasons, Defendants' motions to dismiss Count One for failing to state a claim are **DENIED**.

### iii. Counts Two and Three: ERISA claims seeking remedies under § 1132(a)(3)(A)-(B) against all Defendants

Next, the Court turns to Count Two (seeking injunctive relief) and Count Three (seeking equitable relief). As set out above, § 1132(a)(3) authorizes ERISA-plan participants to pursue a civil action to (1) "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan," or (2) "to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan." § 1132(a)(3)(A)-(B).

Here, in Count Two Plaintiff seeks injunctive relief to "enjoin Defendants' misinterpretation of the Cosmetic Exclusion and their application of the Plan-violating Gender Dysphoria Policy." (*See* Doc. 46 at 27-28.) And in Count Three, Plaintiff seeks "appropriate equitable relief to redress Defendants' fiduciary breaches [by denying her precertification request based on a misinterpretation of the Plan's terms and applying the incompatible Gender Dysphoria Policy] and Plan violations." (*See id.* at 28-29.) Defendants argue Plaintiff fails to state a claim under Counts Two and Three because the claims she raises are improperly duplicative of Count One, her claim for wrongful denial of benefits and breach of fiduciary duty under § 1132(a)(1)(B). (Docs. 53 at 18; 55 at 9-10; 58 at 9-11.)

In *Silva*, the Eighth Circuit recognized that ERISA-plaintiffs may not obtain "duplicate recoveries" under both § 1132(a)(1)(B) and (a)(3). 762 F.3d at 726; *see also Varity*, 516 U.S. at 512. Later, in *Jones v. Aetna Life Insurance Co.*, 856 F.3d 541 (8th Cir. 2017), the Eighth Circuit summarized the rule for this circuit after *Silva* as follows: a plaintiff may plead claims under both § 1132(a)(1)(B) and (a)(3) "so long as [the] two claims 'assert different theories of liability.'" *Id.* at 547 (quoting *Silva*, 762 F.3d at 728 & n.12). The Eighth Circuit in *Silva* rejected the argument defendants appear to rely here – that a plaintiff may plead only a single a cause of action to recover benefits under an ERISA-governed plan:

We do not read *Varity* . . . to stand for the proposition that [a plaintiff] may only plead one cause of action to seek recovery of [benefits under an ERISA-governed plan]. Rather, we conclude those cases prohibit duplicative *recoveries* when a more specific section of the statute, such as § 1132(a)(1)(B), provides a remedy similar to what the plaintiff seeks under the equitable catchall provision, § 1132(a)(3).

*Silva*, 762 F.3d at 726. [17] The Ninth Circuit has explicitly joined *Silva*'s holding that "a plaintiff may seek relief under § 1132(a)(1)(B) and § 1132(a)(3) . . . as alternative – rather than duplicative – theories of liability." *Moyle v. Liberty Mut. Retirement Benefit Plan*, 823 F.3d 948, 961 (9th Cir. 2016).

In support of their argument for dismissal of Counts Two and Three as improperly duplicative, Defendants each cite *G.F. v. Blue Cross & Blue Shield of Texas*, No. 2:21-cv-4079-MDH, 2021 WL 3557651 (W.D. Mo. Aug. 11, 2021). Critically, however, in *G.F.*, the district court found the ERISA claim was duplicative and thus was subject to dismissal where the second claim sought "the same remedy (ERISA plan benefits) pursuant to the same theory of liability (improper denial of healthcare claims) clearly under the same statutory section of ERISA [§ 1132(a)(1)(B)]." *Id.* at *2. Here, in contrast, while Count One seeks relief under § 1132(a)(1)(B) to enforce her rights under the terms of the Plan and clarify her rights to future benefits under the Plan, Counts Two and Three assert alternative claims for equitable and injunctive relief under § 1132(a)(3), including to enjoin Defendants' misinterpretation of the Cosmetic Treatment exclusion and application of the Gender Dysphoria Policy (Count Two), and appropriate equitable relief to remedy Defendants' breach of fiduciary duties (Count Three). Even to the extent the remedies are similar, as Defendants suggest, this would not necessarily require dismissal at this early stage. *See Silva*, 762 F.3d at 728 n.12 (recognizing that "[t]he fact that the remedy sought is the same amount of money in this case does not affect our analysis because the arguments [the plaintiff] makes to reach that remedy remain alternate, equitable theories of liability").

---

[17] In support of this proposition, the Eighth Circuit cited two cases as follows: *A.A., ex rel J.A. v. Blue Cross & Blue Shield of Ill.*, No. 2:13-cv-00357, 2014 WL 910144, at *11 (W.D. Wash. Mar. 7, 2014) ("Dismissal of a Section [1132](a)(3) claim is appropriate at the summary judgment stage where a plaintiff has asserted, *and obtained relief for*, a claim under Section [1132](a)(1)(B)." (emphasis added by *Silva*)); *Jones v. Allen*, No. 2:11-cv-380, 2014 WL 1155347, at *9 (S.D. Ohio Mar. 21, 2014) ("It [is] well established in [the Sixth] Circuit that plaintiffs [can] bring claims for breaches of fiduciary duty in ERISA cases, and [can] even do so alongside a claim for benefits in certain circumstances."). *Silva*, 762 F.3d at 726.

In the context of complex ERISA cases, the Eighth Circuit has cautioned that "[a]t the motion to dismiss stage . . . it is difficult for a court to discern the intricacies of the plaintiff's claims to determine if the claims are indeed duplicative, rather than alternative, and determine if one or both could provide adequate relief." *Silva*, 762 F.3d at 727 (citations omitted). "'To dismiss an ERISA plaintiff's § 1132(a)(3) claim as duplicative at the pleading stage of a case would, in effect, require the plaintiff to elect a legal theory,'" otherwise violating the Federal Rules of Civil Procedure that clearly permit alternative pleading. *Id.* at 726 (quoting *Black v. Long Term Disability Ins.*, 373 F. Supp. 2d 897, 902-03 (E.D. Wis. 2005)); *see also* Fed. R. Civ. P. 8(d)(2). Accordingly, at this early motion to dismiss stage, the Court declines to dismiss Counts Two and Three as improperly duplicative. Defendants' motions to dismiss Counts Two and Three for failing to state a claim are **DENIED**.

### 2. Count Four: ERISA claim pursuant to § 1132(a)(3) against all Defendants for violation of the Parity Act, 29 U.S.C. § 1185a

Next, Defendants argue Plaintiff fails to state a claim in Count Four brought under § 1132(a)(3) pursuant to the Parity Act. Specifically, Defendants argue that the Cosmetic Treatment exclusion does not violate the Parity Act because the terms of the exclusion do not restrict mental health benefits more so than medical or surgical benefits.

Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act"), P.L. 110-343, 122 Stat. 3765 (Oct. 3, 2008), codified at 29 U.S.C. § 1185a, Congress established as a matter of federal law, in part, ERISA health plans that provide both (1) medical/surgical and (2) mental health/substance use disorder benefits must ensure each category of benefits are treated the same. *See L.P. ex rel. J.P. v. BCBSM, Inc.*, No. 18-cv-1241 (MJD/DTS), 2020 WL 981186, at *5 (D. Minn. Jan. 17, 2020) (the Parity Act requires ERISA plans to "treat sicknesses of the mind in the same way that they would a broken bone") (citation and quotation marks omitted). As relevant here, the Parity Act requires that

> treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

§ 1185a(a)(3)(A)(ii). "Treatment limitations" are defined as "limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope of duration of treatment." § 1185a(a)(3)(B). Within implementing regulations promulgated by the Department of Labor

28

pursuant to authority delegated under ERISA, the agency has explained: "Treatment limitations include both quantitative treatment limitations, which are expressed numerically . . . , and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." 29 C.F.R. § 2590.712(a). In other words, federal law provides:

> A group health plan . . . that provides both medical/surgical benefits and mental health . . . benefits may not apply any . . . treatment limitation to mental health . . . benefits in any classification that is more restrictive than the predominant . . . treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification.

§ 2590.712(c)(2)(i). Furthermore, as relevant here, regulations establish the following as to nonquantitative treatment limitations:

> A group health plan . . . may not impose a nonquantitative treatment limitation with respect to mental health . . . benefits in any classification unless, under the terms of the plan . . . as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health . . . benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.

§ 2590.712(c)(4)(i). Finally, the regulations include as an example of a nonquantitative treatment limitation, "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness[.]" § 2590.712(c)(4)(ii).

Generally, violations of the Parity Act arise from the face of the ERISA-governed plan or from application of the ERISA-governed plan. A facial Parity-Act challenge involves showing that the plaintiff "was denied coverage for mental health . . . services based on an existing limitation" as compared to "limitations imposed (or not imposed) on analogous medical or surgical services." *BCBSM, Inc.*, 2020 WL 981186, at *6 (citation and quotation marks omitted). Alternatively, an as-applied Parity-Act challenge involves showing that "the mental health . . . services at issue meet the criteria imposed by [plaintiff's] insurance plan [but] the [administrator] imposed some additional criteria to deny coverage of the services at issue." *Id.* (citation and quotation marks omitted); *see Peter E v. United HealthCare Serv., Inc.*, 2019 WL 6118422, at *2 (D. Utah Nov. 18, 2019) ("To sufficiently plead an as-applied Parity Act violation, the plaintiff must allege that a defendant differentially applied a facially neutral plan term.") (footnote citation and quotation marks omitted). As one district court from a sister circuit has recognized: "The

29

ultimate question in any Parity Act case is whether the plaintiff has plausibly alleged that his health insurance plan applies a separate or more restrictive treatment limitation to mental health and substance abuse services versus medical and surgical services."  *Smith v. Golden Rule Ins. Co.*, 526 F. Supp. 3d 374, 388 (S.D. Ind. 2021).

Here, Plaintiff alleges the Plan violates the Parity Act on its face because the definition of "cosmetic treatment" – ostensibly for purposes of the Cosmetic Treatment exclusion – applies when procedures are necessary for psychological reasons but does not apply when procedures are necessary for physical reasons.  Because the Plan violates the Parity Act, then, Count Four alleges Defendants violated their fiduciary duties by denying Plaintiff's precertification request under the Cosmetic Treatment exclusion.  Second, Plaintiff also asserts an as-applied Parity-Act challenge to the extent the Gender Dysphoria Policy "deems all facial surgeries prescribed to treat gender dysphoria as 'cosmetic' and *never* medically necessary," whereas the "medical policies applicable to facial surgeries for medical or physical reasons contain no such restriction." (Doc. 46 at ¶ 141.)

In their motions to dismiss, Defendants only challenge Plaintiff's amended complaint to the extent Count Four asserts a facial Parity-Act challenge and do not otherwise challenge any "as-applied" violation asserted by Plaintiff in her amended complaint.  (*See* Docs. 53 at 15-17; 55 at 11-14; 58 at 12-16.)[18]  Instead, Defendants argue only that Plaintiff fails to state a claim in Count Four because the Plan's terms, particularly the Cosmetic Treatment exclusion, do not on their face restrict mental health benefits more so than medical or surgical benefits.  Thus, for purposes of ruling on the motions to dismiss now before the Court, the Court only considers whether the amended complaint adequately states a claim that the Plan's terms on its face violate the Parity Act.

Plaintiff alleges the Cosmetic Treatment exclusion violates the Parity Act because the exclusion "applies to such surgeries only when they are prescribed solely for psychological reasons, rather than physical ones."  Specifically, Plaintiff states in her amended complaint:

---

[18] In their reply, JHA and the Plan suggest an "as-applied" Parity Act challenge is "not before the Court" and that Defendants did "not mov[e] to dismiss [Plaintiff's] as-applied challenge." (Doc. 75 at 10-11.)  However, UMR suggests in its reply that "Plaintiff is incorrect that UMR's Motion only sought dismissal of her facial challenge under the Parity Act – the Motion sought complete dismissal of Count Four of the [Amended] Complaint." (Doc. 76 at 8.)  In its motion to dismiss, however, UMR only addressed Plaintiff's facial challenge under the Parity Act.  (*See* Doc. 53 at 16-17; *id.* at 17 (concluding "the [Plan] is in accord with the requirements of the Parity Act").)  Accordingly, the Court does not address any argument that Plaintiff's amended complaint fails to state an as-applied Parity-Act challenge to the Plan.

On its face, the Plan's definition of "Cosmetic Treatment" applies to "medical or surgical procedures that are primarily used to improve, alter, or enhance appearance," including for "psychological or emotional reasons," *except* "when a physical impairment exists and the surgery restores or improves function." The Plan's "Cosmetic Treatment" exclusion, therefore, applies to such surgeries only when they are prescribed solely for psychological reasons, rather than physical ones.

(Doc. 46 at ¶ 138; *see* Doc. 65 at 18.) In so doing, Plaintiff points to the Plan's Cosmetic Treatment and Reconstructive Surgery exclusions, definitions, and benefits.

As best as the Court can discern, Plaintiff asserts the Plan's terms violate the Parity Act because of how the Plan defines "cosmetic treatments." As previously explained, the Plan excludes "Cosmetic Treatment . . . unless the procedure is otherwise listed as a covered benefit." In turn, the Plan defines "cosmetic treatment" as "medical or surgical procedures that are primarily used to improve, alter, or enhance appearance, whether or not for psychological or emotional reasons." In addition to the Cosmetic Treatment exclusion, however, the Plan also excludes "Reconstructive Surgery when performed only to achieve a normal or nearly normal appearance, and not to correct an underlying medical condition or impairment,[19] as determined by the Plan, unless covered elsewhere." (Doc. 65-1 at 101.) The Plan defines "reconstructive surgery" as "surgical procedures performed on abnormal structures of the body caused by congenital Illness or anomaly, Accident, or Illness." (*Id.* at 133.) Further, the Plan provides that reconstructive surgery is not considered cosmetic treatment (and thus is not excluded) simply because the physical appearance may change or improve "when a physical impairment exists and the surgery restores or improves function." (*Id.* at 133.) The Plan defines "Illness" as "a bodily disorder, disease, [or] physical or mental sickness[.]" (*Id.* at 129.) In other words, when a surgical procedure is performed on an abnormal structure of the body caused by a physical or mental sickness or bodily disorder, for instance, and is performed to correct an underlying medical condition or impairment, the procedure is not excluded as cosmetic treatment so long as the surgery restores or improves function vis-à-vis an existing physical impairment.

Reading these provisions together as Plaintiff suggests, the Court concludes at this early stage that Plaintiff adequately pleads a facial Parity-Act challenge. To be sure, as Defendants argue, under the terms of the Cosmetic Treatment exclusion, whether a procedure is sought for psychological or emotional reasons (as opposed to physical or medical reasons), the procedure is

---

[19] The Plan does not define the terms "medical condition or impairment."

31

excluded when its primary use is to improve, alter, or enhance appearance. At the same time, a reconstructive surgery – that is, a surgery on an abnormal structure of the body caused by a physical or mental sickness – is excluded when performed only to achieve a normal or nearly normal appearance. Such reconstructive surgery is not excluded, however, when performed to correct an underlying medical condition or impairment (of which neither term is explicitly defined by the Plan), including when the procedure restores or improves function vis-à-vis an existing physical impairment, regardless of whether the surgery impacts or changes one's physical appearance. Simply, Plaintiff sufficiently pleads that under the terms of the Plan, a surgical treatment prescribed for a mental health condition is excluded, whereas a surgical treatment prescribed for a medical or physical reason is allowed (because it would be exempted from the Cosmetic Treatment exclusion). This is a plausible reading of the text of the Plan.[20]

At this early stage, where the Court must accept as true allegations of fact and give Plaintiff the benefit of all reasonable inferences, it is not apparent Plaintiff's facial claim under the Parity Act is foreclosed by the Plan's plain text as Defendants argue here. The only question before the Court is whether Plaintiff plausibly pleads the Plan facially violates the Parity Act. Given Plaintiff's allegations and the text of the Plan as noted above, the Court finds Plaintiff has satisfied this initial benchmark. Defendants' motions to dismiss Count Four's facial challenge under the Parity Act for failing to state a claim are **DENIED**.

### 3. Count Five: ERISA claim pursuant to § 1132(c)(1)(B) against JHA seeking statutory penalty

Next, Defendant JHA argues that Plaintiff fails to state a claim for a statutory penalty under § 1132(c)(1)(B). In Count Five, Plaintiff asserts an ERISA claim under § 1132(c)(1)(B) only against JHA, seeking a statutory penalty for JHA's alleged failure to provide information Plaintiff requested as a plan participant. Section 1132(c)(1)(B) authorizes the assessment of a statutory penalty up to a $100 per day against an ERISA plan administrator – for which the administrator is "personally liable" to a participant or beneficiary – "who fails or refuses to comply with a request

---

[20] Defendants primarily rely on a District of Massachusetts decision granting a motion to dismiss regarding a plaintiff's facial Parity-Act challenge, *N.R. ex rel. S.R. v. Raytheon Co.*, No. 20-10153-RGS, 2020 WL 3065415 (D. Mass. June 9, 2020). After the filing of Defendants' motions to dismiss, however, the First Circuit reversed the district court's decision granting the motion to dismiss as to the plaintiff's claim that the ERISA-governed plan facially violated the Parity Act. *N.R. ex rel. S.R. v. Raytheon Co.*, 24 F.4th 740, 747-49 (1st Cir. 2022). As a result, the district court's decision in *Raytheon* wholly lacks any persuasive value for present purposes.

for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . by mailing the material requested . . . within 30 days after such request."

As best as the Court can discern, Count Five is fairly narrow: Plaintiff requested, but JHA (as the plan administrator) did not provide, particular comparative analyses that Defendant is otherwise required to perform and document under federal law. (Docs. 46 at ¶¶ 30, 91, 99, 100, 150-51; 65 at 19 (describing Count Five as a claim "for statutory penalties arising from [JHA]'s failure to disclose a comparative analysis demonstrating that the non-quantitative treatment limitations . . . comply with the Parity Act").) Thus, the only inquiry before the Court is whether Plaintiff states a claim under § 1132(c)(1)(B) regarding JHA's alleged failure to provide the specific comparative analyses requested by Plaintiff.

The statutory penalty authorized under § 1132(c)(1)(B) only applies when the ERISA plan administrator fails to comply with a request for information that the administrator "is required by this subchapter to furnish" upon request. § 1132(c)(1)(B). Plaintiff points to two statutory provisions that she argues requires JHA to provide the requested comparative analyses: 29 U.S.C. § 1185a(a)(8)(A) and 29 U.S.C. § 1024(b)(4).

Under § 1185a(a)(8)(A), federal law requires ERISA plans or issuers to

perform and document comparative analyses of the design and application of NQTLs and, beginning 45 days after December 27, 2020, make available to the Secretary, upon request, the comparative analyses and the following information:

(i) The specific plan or coverage terms or other relevant terms regarding the NQTLs, that applies to such plan or coverage, and a description of all mental health or substance use disorder and medical or surgical benefits to which each such term applies in each respective benefits classification.

(ii) The factors used to determine that the NQTLs will apply to mental health or substance use disorder benefits and medical or surgical benefits.

(iii) The evidentiary standards used for the factors identified in clause (ii), when applicable, provided that every factor shall be defined, and any other source or evidence relied upon to design and apply the NQTLs to mental health or substance use disorder benefits and medical or surgical benefits.

(iv) The comparative analyses demonstrating that the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to mental health or substance use disorder benefits, as written and in operation, are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to medical or surgical benefits in the benefits classification.

33

(v) The specific findings and conclusions reached by the group health plan or health insurance issuer with respect to the health insurance coverage, including any results of the analyses described in this subparagraph that indicate that the plan or coverage is or is not in compliance with this section.

Second, § 1024(b)(4) more broadly requires ERISA plan administrators to provide "upon written request of any participant or beneficiary . . . a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated."

JHA argues Plaintiff fails to state a claim in Count Five because (1) no statutory provision under subchapter I requires ERISA plan administrators to provide to plan participants the comparative analyses it is otherwise required to perform, document, and "make available to the Secretary [of Labor], upon request" under § 1185a(a)(8)(A), and (2) the comparative analyses do not fall within the scope of documents required to be disclosed upon request as "other instruments under which the plan is established or operated" pursuant to § 1024(b)(4). Plaintiff argues federal law – including relevant formal regulation and informal guidance promulgated by the Departments of Labor, Health and Human Services, and the Treasury – requires JHA to provide the comparative analyses Plaintiff requested.

### i.     Relevant Legislative and Regulatory History

Before proceeding further, the Court finds it is helpful to consider the relevant statutory and regulatory history (which Plaintiff included in her combined response to Defendants' motions to dismiss). In 2008, Congress passed the Parity Act. In particular, the Parity Act amended section 512 of ERISA, codified at § 1185a to include a provision for "Availability of plan information," requiring ERISA plan administrators to "ma[k]e available"

> [t]he criteria for medical necessity determinations made under the plan with respect to mental health or substance use disorder benefits . . . in accordance with regulations to any current or potential participant, beneficiary, or contracting provider upon request . . . [and] [t]he reason for any denial under the plan (or coverage) of reimbursement or payment for services with respect to mental health or substance use disorder benefits in the case of any participant or beneficiary . . . in accordance with regulations.

Parity Act, § 512(a)(1), 122 Stat. 3765, 3881-82, codified at § 1185a(a)(4). Additionally, the Parity Act delegated authority to the Departments of Labor, Health and Human Services, and the Treasury to "publish and widely disseminate guidance and information . . . concerning the requirements of this section." Parity Act, § 512(a)(6), 122 Stat. 3765, 3884.

34

Following notice-and-comment rulemaking that included publication of interim final regulations implementing the Parity Act in 2010, *see* 75 Fed. Reg. 5410, and publication of final rules on November 13, 2013 ("2013 Regulation"), 78 Fed. Reg. 68240, the relevant agencies promulgated the regulations now codified at 29 C.F.R. 2590.712. Specifically, regarding § 512(a)(1) of the Parity Act's provision for availability of plan information, the regulations included the following:

(d) Availability of plan information –

(1) Criteria for medical necessity determinations. The criteria for medical necessity determinations made under a group health plan with respect to mental health or substance use disorder benefits (or health insurance coverage offered in connection with the plan with respect to such benefits) must be made available by the plan administrator (or the health insurance issuer offering such coverage) to any current or potential participant, beneficiary, or contracting provider upon request.

(2) Reason for any denial. The reason for any denial under a group health plan (or health insurance coverage offered in connection with such plan) of reimbursement or payment for services with respect to mental health or substance use disorder benefits in the case of any participant or beneficiary must be made available by the plan administrator (or the health insurance issuer offering such coverage) to the participant or beneficiary in a form and manner consistent with the requirements of § 2560.503–1 of this chapter for group health plans.

(3) Provisions of other law. Compliance with the disclosure requirements in paragraphs (d)(1) and (d)(2) of this section is not determinative of compliance with any other provision of applicable Federal or State law. In particular, in addition to those disclosure requirements, provisions of other applicable law require disclosure of information relevant to medical/surgical, mental health, and substance use disorder benefits. For example, ERISA section 104 [codified at § 1024] . . . provide[s] that, for plans subject to ERISA, instruments under which the plan is established or operated must generally be furnished to plan participants within 30 days of request. Instruments under which the plan is established or operated include documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation[21] with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan. . . .

---

[21] At the time of this regulation, ERISA did not include a specific provision for "nonquantitative treatment limitations," but provided only that "treatment limitations" applicable to mental health benefits must not be more restrictive than those applied to substantially all medical and surgical benefits covered by the plan and that separate treatment limitations could not be applied only with respect to mental health benefits, for instance. *See also* Consolidated Appropriations Act, 2021, Pub. L. 116-120, 134 Stat. 1182, Sec. 203(a)(2) amending § 512(a) of ERISA, codified at § 1185a(a), to refer specifically to "nonquantitative treatment limitations." Rather, in the 2013 Regulation, the agencies provided that "[t]reatment limitations

35

§ 2590.712(d)(1)-(3).

Next, as relevant here, Congress again amended the Parity Act as codified at § 1185a with the Consolidated Appropriations Act, 2021 ("CAA"), Pub. L. 116-260, 134 Stat. 1182. Specifically, section 203(a)(2) of the CAA amended § 1185a(a) to add the following provisions:

(8) COMPLIANCE REQUIREMENTS.—

(A) NONQUANTITATIVE TREATMENT LIMITATION (NQTL) REQUIREMENTS.—In the case of a group health plan or a health insurance issuer offering group health insurance coverage that provides both medical and surgical benefits and mental health or substance use disorder benefits and that imposes nonquantitative treatment limitations (referred to in this section as 'NQTLs') on mental health or substance use disorder benefits, such plan or issuer shall perform and document comparative analyses of the design and application of NQTLs and, beginning 45 days after the date of enactment of the Consolidated Appropriations Act, 2021,[22] make available to the Secretary, upon request, the comparative analyses and the following information:

(i) The specific plan or coverage terms or other relevant terms regarding the NQTLs, that applies to such plan or coverage, and a description of all mental health or substance use disorder and medical or surgical benefits to which each such term applies in each respective benefits classification.

(ii) The factors used to determine that the NQTLs will apply to mental health or substance use disorder benefits and medical or surgical benefits.

(iii) The evidentiary standards used for the factors identified in clause (ii), when applicable, provided that every factor shall be defined, and any other source or evidence relied upon to design and apply the NQTLs to mental health or substance use disorder benefits and medical or surgical benefits.

(iv) The comparative analyses demonstrating that the processes, strategies, evidentiary standards, and other factors used to apply the NQTLs to mental health or substance use disorder benefits, as written and in operation, are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, and other factors used to

---

include both quantitative treatment limitations, which are expressed numerically . . . and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." 78 Fed. Reg. 68240, 68277. Indeed, through the 2013 Regulation, § 2590.712(c)(4) sets forth the parity requirements for nonquantitative treatment limitations. 78 Fed. Reg. 68240, 68282.

[22] The CAA was enacted December 27, 2020.

36

apply the NQTLs to medical or surgical benefits in the benefits classification.

(v) The specific findings and conclusions reached by the group health plan or health insurance issuer with respect to the health insurance coverage, including any results of the analyses described in this subparagraph that indicate that the plan or coverage is or is not in compliance with this section.

134 Stat. 1182, 2907-08, codified at § 1185a(a)(8)(A).

Since the most recent amendment to the Parity Act through the CAA, the relevant agencies have issued guidance (although not through formal adjudication or notice-and-comment rulemaking) referred to as "FAQ 45," intended "to help stakeholders understand" the most recent amendment to § 1185a. Within this guidance, the agencies state:

[P]articipants and beneficiaries . . . in ERISA-covered plans are entitled to comparative information on medical necessity criteria for both medical/surgical benefits and [mental health/substance use disorder] benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a[ nonquantitative treatment limitation] with respect to medical/surgical benefits and [mental health/substance use disorder] benefits under the plan. The types of documents contemplated in previous guidance would include any analyses performed by the plan as to how the [nonquantitative treatment limitation] complies with [the Parity Act]. Therefore, for plans subject to ERISA, plans and issuers must make the comparative analyses and other applicable information required by the Appropriations Act available to participants, beneficiaries, and enrollees upon request.

U.S. Dep't of Lab. & U.S. Dep't of Health & Human Servs., FAQs ABOUT MENTAL HEALTH AND SUBSTANCE USE DISORDER PARITY IMPLEMENTATION AND THE CONSOLIDATED APPROPRIATIONS ACT, 2021 PART 45, 6-7 (April 2, 2021), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/faqs/aca-part-45.pdf (last visited April 26, 2022).

<strong>ii.    Discussion</strong>

JHA argues first and foremost that Plaintiff fails to state a claim under § 1132(c)(1)(B) as to the comparative analyses because federal law does not require it to provide those comparative analyses to an ERISA-plan beneficiary or participant upon request. As reflected above, under its plain terms, § 1185a(a)(8)(A) only requires that the comparative analyses that federal law otherwise requires must be completed are only required to be made available to the Secretary of Labor, not an ERISA-plan participant or beneficiary. Moreover, § 1185a(a)(4)'s provision for "[a]vailability of plan information," as established by the Parity Act, only requires the disclosure upon request by an ERISA plan participant or beneficiary of (1) criteria for medical necessity

determinations made under the plan regarding mental health benefits and (2) the reason for any denial under the plan (or coverage) of reimbursement or payment for services regarding mental health disorder benefits. While both must be disclosed "in accordance with regulations," Plaintiff points to no regulation suggesting that the comparative analyses themselves – which a plan administrator must perform and document as required by § 1185a(a)(8)(A) – constitute either criteria for medical necessity determinations or the reason for denials regarding mental health benefits under the plan.

As a result, whether Plaintiff sufficiently pleads a claim under § 1132(c)(1)(B) turns on § 1024(b)(4)'s final catchall provision requiring ERISA plan administrators to disclose upon request "other instruments under which the plan is established or operated." In its motion to dismiss, JHA points to a decision by the Eighth Circuit holding the otherwise undefined statutory phrase "other instruments under which the plan is established or operated" means "not any document relating to a plan, but only formal documents that establish or govern the plan." *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 861 (8th Cir. 1999) (citing cases across the Second, Fourth, and Ninth Circuits holding the same).

In response, Plaintiff points to the 2013 Regulation in conjunction with FAQ 45 as the authority that requires JHA to disclose the comparative analyses it is otherwise required to perform and document under § 1185a(a)(8)(A) to comply with § 1024(b)(4)'s final provision. Plaintiff argues the Court must defer to the 2013 Regulation's interpretation of "other instruments under which the plan is established or operated" under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Correspondingly, Plaintiff argues to the extent the 2013 Regulation's apparent interpretation would conflict with *Brown* (and by extension the majority of circuits that have otherwise narrowly interpreted § 1024(b)(4)'s catch-all provision), the 2013 Regulation controls. Of course, at the time of the 2013 Regulation, § 1185a(a)(8)(A) (requiring the performance of comparative analyses like that which Plaintiff requested from JHA) had not yet been enacted.[23] Moreover, to the extent the 2013 Regulation's interpretation of

___

[23] The Court also notes the 2013 Regulation was not promulgated as a "final rule[] implementing the [Parity Act]." 78 Fed. Reg. 68240, 68240. Section 1024 was not enacted or amended as part of the Parity Act in 2008. Moreover, the final regulation refers to "FAQs" the agencies had previously published "clarifying the breadth of disclosure requirements applicable to group health plans" under ERISA, and that [t]he substance of these FAQs [are] included in new paragraph (d)(3) of the final regulations." 78 Fed. Reg. 68240, 68247. Nonetheless for present purposes, the Court readily presumes § 2590.712(d)(3) is an otherwise authoritative interpretation of § 1024(b)(4) as promulgated by the administrative agency.

§ 1024(b)(4)'s "other instruments" clause is broader, it is not a foregone conclusion, as Plaintiff's argument appears to suggest, that the Court is no longer bound by *Brown* and must defer to the agency's interpretation of the statutory language in the regulation.

Ultimately, the question here is whether the comparative analyses JHA must perform and document under § 1185a(a)(8)(A) are "other instruments under which the plan is established or operated" which must be disclosed under § 1024(b)(4). In *Brown* – otherwise binding precedent on this Court – the Eighth Circuit interpreted the statutory language narrowly to encompass "only formal documents that establish or govern the plan." 190 F.3d at 861. As a matter of statutory interpretation, this construction remains the majority rule across the federal courts. *See Williamson v. Travelport, LP*, 953 F.3d 1278, 1294 & 1295 (11th Cir. 2020) (recognizing "most circuits" interpret the phrase "narrowly" to mean "'formal legal documents' and not merely any documents *related to* a plan") (collecting cases) (applying the rule to hold the requested e-mails were not "other instruments" since "they are not formal legal instruments governing the plan"); *Murphy v. Verizon Commc'ns, Inc.*, 587 F. App'x 140, 144 (5th Cir. 2014) (joining "the majority of the circuits which have construed [§1024(b)(4)]'s [other instruments] provision narrowly so as to apply only to formal legal documents that govern a plan").

Through the 2013 Regulation, however, § 2590.712(d)(3) appears to interpret the same statutory phrase broadly to encompass the following:

> documents with information on medical necessity criteria for both medical/surgical benefits and mental health and substance use disorder benefits, as well as the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

In *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), the Supreme Court specifically addressed the issue that at least implicitly underlies the parties' arguments here: When a conflict arises regarding the interpretation of a statute as between a judicial decision and an administrative agency action, which controls? In *Brand X*, the Supreme Court explained:

> A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. ... *Chevron* established a "presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree

39

of discretion the ambiguity allows." ... *Chevron*'s premise is that it is for agencies, not the courts, to fill statutory gaps. The better rule is to hold judicial interpretations contained in precedents to the same demanding *Chevron* step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.

. . .

. . . Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction.

*Id.* at 982-983, 985 (citations omitted). The Supreme Court reasoned that earlier judicial precedent interpreting the statutory phrase at issue in that case had held, at most, the prior construction was the "*best* reading" of the statute, "not that it was the *only permissible* reading of the statute." *Id.* at 984 (emphasis in original). Stated differently, the Supreme Court recognized that the earlier decision did not hold its construction was "unambiguously required," especially where the earlier decision did not "invoke[] [any] other rule of construction (such as the rule of lenity) requiring it to conclude that the statute was unambiguous to reach its judgment." *Id.* at 985.

Previously, in *Chevron* itself, the Supreme Court explained the first step in the analysis underlying that deferential framework is "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. For "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. Alternatively,

[i]f . . . the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statue is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 843 (footnotes omitted). The Supreme Court further explained as to the initial question regarding whether Congress' intent is clear:

The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. [Collecting cases.] If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Id.* at 843 n.9; *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (holding "the canon against reading conflicts into statutes is a traditional tool of statutory construction and it, along with the other traditional canons we have discussed [including the canon when "a more general term follows more specific terms in a list, the general term is usually understood to 'embrace only objects similar in nature to those objects enumerated by the preceding specific words'"], is more than up to the job of solving today's interpretive puzzle. Where, as here, the canons supply an answer, '*Chevron* leaves the stage.'") (citations omitted); *North Dakota v. United States EPA*, 730 F.3d 750, 763 (8th Cir. 2013) ("Under the first step of the *Chevron* analysis, we employ the traditional tools of statutory interpretation to determine whether the statute makes clear the intent of Congress as to the meaning of the phrase," including by looking to the ordinary meaning of the language used).

In *Brown*, the Eighth Circuit held that the otherwise undefined "other instruments" clause of § 1024(b)(4) means "formal documents that establish or govern the plan," based upon the "ordinary meaning" of the term "instrument" in conjunction with the phrase "under which," and that the terms "should also be read consistently with the more specific terms that precede it." 190 F.3d at 861 (citing *Eilbert v. Pelican*, 162 F.3d 523, 527 (8th Cir. 1998)). In *Eilbert*, on which the *Brown* court explicitly cited in interpreting § 1024(b)(4), the Eighth Circuit employed the "interpretive canons *noscitur a sociis* (a term is known from its associates) and *ejusdem generis* (general words in an enumeration are construed as similar to more specific words in the enumeration" in interpreting a state statute. 162 F.3d at 527 (citation omitted). Additionally, the *Brown* court cited a number of earlier decisions from its sister circuit courts of appeal similarly interpreting § 1024(b)(4)'s "other instruments" clause narrowly with the same familiar canons of statutory interpretation. *See* 190 F.3d at 861.[24]

---

[24] Specifically, the *Brown* court cited the following cases: *Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 142-44 (2d Cir. 1997) (similarly defining "instrument" as limited to "governing documents" based on the plain language, the "principle of statutory construction that words grouped in a list should be given related meaning," other uses of the term "instrument" through ERISA, and the legislative history); *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 653 (4th Cir. 1996) (finding the statutory language is "clear and unambiguous" based on the plain meaning of the terms and means "only formal or legal documents under which a plan is set up or managed"); *Hughes Salaried Retirees Action Committee v. Administrator of Hughes Non-Bargaining Retirement Plan*, 72 F.3d 686, 689-91 (9th Cir. 1995) (employing the canon that "words grouped in a list should be given related meaning," the ordinary meaning of the statutory language, and legislative history to hold that the phrase "is limited to documents that are similar in nature to the documents specifically listed in § [1024](b)(4)"). The *Brown* court also cited with the signal "*cf.*" *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 84 (1995),

41

Contrary to Plaintiff's suggestion otherwise, *Brown* has not been displaced by the 2013 Regulation. And Plaintiff's amended complaint includes no allegations of fact that suggest the comparative analyses she requested from JHA fall within the realm of "formal documents that establish or govern the plan" to satisfy § 1024(b)(4)'s "other instruments" clause as interpreted by the Eighth Circuit in *Brown* (and which remains the majority rule across federal courts today). For this reason, to the extent Count Five asserts a claim under § 1132(c)(1)(B) concerning Plaintiff's request from Defendant for the comparative analyses it is required to perform and document under § 1185a(a)(8)(A), Count Five fails to state a claim.

Additionally, the Court notes, to the extent Plaintiff points to FAQ 45 in support of her claim under § 1132(c)(1)(B), the informal agency action can itself provide no basis to impose the statutory penalty she seeks.[25] Section 1132(c)(1) imposes civil liability in the form of a statutory penalty only as to requests to provide information the plan administrator is required to provide upon request "by this subchapter." § 1132(c)(1). Violations of federal regulations do not provide a basis to impose the statutory penalty otherwise authorized by § 1132(c)(1). *Williamson*, 953 F.3d at 1296 (citing *Groves v. Modified Ret. Plan for Hourly Paid Emps. of Johns Manville Corp. & Subsidiaries*, 803 F.2d 109, 111 (3d Cir. 1986)); *see Brown*, 586 F.3d at 1088-89 (holding § 1132(c) does not permit statutory penalty for violation of regulations promulgated under § 1133 and 1135 of ERISA).

Defendant JHA's motion to dismiss Count Five for failure to state a claim for statutory penalty under § 1132(c)(1)(B) is **GRANTED**.[26]

___

describing § 1024(b)(4) as requiring disclosure of "governing plan documents."

[25] Plaintiff does not argue FAQ 45 holds deferential value under *Chevron*. Because it is an informal agency action, at most it would be entitled to *Skidmore* deference based on its persuasive value. *See York v. Wellmark, Inc.*, No. 4:16-cv-00627-RGE-CFB, 2017 WL 11261026, at *11-12 (S.D. Iowa Sept. 6, 2017) (recognizing FAQs published by the Department of Labor regarding ERISA not entitled to *Chevron* deference but only entitled to *Skidmore* deference, considering the persuasiveness of the agency's interpretation) (citing *Hemminghaus v. Missouri*, 756 F.3d 1100, 1109 (8th Cir. 2014)), *aff'd*, 965 F.3d 633 (8th Cir. 2020). Whatever the persuasive value of FAQ 45, it would make little sense for this informal agency action to displace *Brown* (and the other federal cases cited above stating the majority rule consistent with *Brown*) when the 2013 Regulation, itself otherwise entitled to *Chevron* deference, does not do so. For the same reasons as explained in the text above, FAQ 45 as an agency action does not displace *Brown* regarding the interpretation of § 1024(b)(4)'s "other instruments" clause.

[26] The Court recognizes in the most recent amendment to the Parity Act through the CAA, Congress delegated authority to the Departments of Labor, Health and Human Services, and the Treasury to "issue guidance . . . to assist [group health] plans and issuers in satisfying the requirements of this section[.]" CAA, Sec. 203(a)(2), 134 Stat. 1182, 2912, codified at § 1185a(a)(7)(A). Congress specified, however, "[p]rior to issuing any final guidance under this paragraph, the Secretary [of Labor] shall provide a public

42

## B. Plaintiff's ADA Claim against JHA – Count Seven

Finally, JHA argues Plaintiff fails to state a disability discrimination claim under the ADA in Count Seven because Plaintiff's disability as alleged in her amended complaint – her gender dysphoria diagnosis – is not a disability under the ADA as a matter of law.[27] In Count Seven, Plaintiff alleges the Plan violates the ADA by discriminating against Plaintiff based on her disability (i.e., her diagnosis of gender dysphoria) to the extent the Plan does not "cover the cost of her prescribed gender dysphoria treatment." (Doc. 65 at 67; *see* Doc. 46 at ¶ 172.) Plaintiff alleges JHA's administration of the discriminatory Plan therefore violates the ADA. (Doc. 46 at ¶ 172.)

The ADA generally protects employees from discrimination by their employer based on an employee's disability. *See* 42 U.S.C. § 12112(a). As relevant here, the ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). The statute further explains that the term "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." § 12102(2)(A).

In addition, however, Congress has specifically enumerated several exclusions to the ADA's definition of covered disabilities, including that:

Under this chapter, the term "disability" shall not include –

(1) transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders;

(2) compulsive gambling, kleptomania, or pyromania; or

(3) psychoactive substance use disorders resulting from current illegal use of drugs.

42 U.S.C. § 12211(b)(1)-(3).

---

comment period of not less than 60 days[.]" CAA, Sec. 203(a)(2), 134 Stat. 1182, 2914, codified at § 1185a(a)(7)(D). To date, it does not appear any such final agency action has occurred in this regard.

[27] JHA also argues Plaintiff fails to state a reasonable accommodation claim under the ADA because Plaintiff failed to plead facts that she properly exhausted administrative remedies. (Doc. 55 at 17-18.) In her response, Plaintiff states that the only ADA claim she asserts in Count Seven is a disparate-treatment discrimination claim, not a separate reasonable-accommodation claim. (Doc. 65 at 66-67.) Based on Plaintiff's representation that Count Seven does not assert a reasonable-accommodation ADA claim, the Court does not consider this argument further.

In 2008, Congress amended the ADA through the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. 110-325, 122 Stat. 3553 (Sept. 25, 2008). By enacting the ADAAA, Congress added to ADA's statutory scheme § 12102(4)(A), providing that the definition of "disability" under § 12102(1) "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."

In its motion to dismiss, JHA argues Plaintiff fails to state a claim under the ADA because gender dysphoria is not a disability under the ADA. Specifically, JHA argues Plaintiff's gender dysphoria is *excluded* as an ADA-disability under § 12211(b)(1), excluding "gender identity disorders not resulting from physical impairment[]" from the ADA statutory framework. Plaintiff argues as a matter of law gender dysphoria does not fall within the meaning of "gender identity disorders" otherwise excluded as a disability under the ADA.

To start, the parties appear to disagree whether the issue placed before the Court raises an issue of fact, thus inappropriate to decide at this early motion to dismiss stage. Plaintiff maintains that the distinction, if any, between the two terms (gender dysphoria and gender identity disorders as used in § 12211(b)(1)) is a question of fact rather than a question of law, and therefore should not be resolved at this stage. (Doc. 65 at 62.)

In *Doe v. Massachusetts Department of Corrections*, No. 17-12255-RGS, 2018 WL 2994403 (D. Mass. June 14, 2018) ("MDOC"), for example, a case cited by Plaintiff, the district court denied a Rule 12(b)(6) motion to dismiss because it found a dispute of fact (as to *the cause* of plaintiff's gender dysphoria) would be inappropriate to resolve at the early motion-to-dismiss stage. *MDOC*, 2018 WL 2994403, at *6. Specifically, the district court found that the plaintiff "has raised a dispute of fact that her [gender dysphoria] may result from physical causes," including a physical etiology of her gender dysphoria and the DSM-V's diagnostic criteria of gender dysphoria that "requires attendant disabling physical symptoms, in addition to manifestations of clinically significant emotional distress." *Id.*

Here, however, in her amended complaint, Plaintiff alleges her gender dysphoria diagnosis "is a mental health condition characterized by psychological distress arising from an incongruence between one's sex assigned at birth and one's gender identity." (Doc. 46 at 1, ¶ 1.) Plaintiff alleges she was "assigned male at birth based on external physical sex characteristics" but that she "is female" and that she "continues to experience severe distress relating to her remaining male sex characteristics." (*Id.* at 15-16, ¶ 66, ¶ 73.) Moreover, Plaintiff alleges she "has experienced

44

clinically significant distress and impairment . . . manifesting in all six of the conditions[28] listed in the DSM-V diagnostic criteria" for gender dysphoria. (*Id.* at 16, ¶ 67.) Plaintiff alleges she suffers "significant anxiety and depression as a result of the incongruence between her masculine facial features and her female gender identity." (*Id.* at ¶ 72.) Finally, Plaintiff's pleadings and her argument in response to JHA's motion to dismiss, make clear she neither alleges nor argues her gender dysphoria is caused by any physical impairment.[29] At the most, Plaintiff alleges her gender dysphoria results from her male sex characteristics including her masculine facial features, for which she only alleges "[t]o the outside world . . . are the most obvious indicators of the incongruence between [Plaintiff's] gender identity and the sex was assigned at birth." Moreover,

---

[28] The six criteria for gender dysphoria under the DSM-V as alleged in Plaintiff's amended complaint are as follows:

   (1) A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics;
   (2) A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender;
   (3) A strong desire for the primary and/or secondary sex characteristics of the other gender;
   (4) A strong desire to be of the other gender;
   (5) A strong desire to be treated as the other gender; and
   (6) A strong conviction that one has the typical feelings and reactions of the other gender
(Doc. 46 at ¶ 44.)

[29] Of particular note, federal regulations elsewhere define "physical or mental impairment" as related to the ADA's definition of disability, as:

   (i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

   (ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability.

28 C.F.R. § 36.105(b)(1). Moreover, federal regulations provide that physical or mental impairments include:

   Orthopedic, visual, speech and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, emotional illness, dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder, Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism,

but do not include "homosexuality or bisexuality." § 36.105(b)(2)-(3).

in her response, Plaintiff states unequivocally: "gender dysphoria causes psychological distress that can be physically impairing, not the other way around." (Doc. 65 at 66.) In sum, there is no outstanding question of fact in this case whether Plaintiff's gender dysphoria (even to the extent it is a "gender identity disorder" as that term is used in § 12211(b)(1)) is caused by or results from physical impairment that would make dismissal on this basis inappropriate at this early stage. *Cf. Lange v. Houston Cty.*, 499 F. Supp. 3d 1258, 1270 (M.D. Ga. 2020) (denying Rule 12(b)(6) motion to dismiss ADA claim because the plaintiff specifically alleged facts her gender dysphoria "results from physical impairments").

As presented and framed by the parties, then, the stage in this case is set as follows. *If*, as Plaintiff argues, gender dysphoria is not a "gender identity disorder" as that term is used in the ADA's exclusionary provision, *then* JHA's motion to dismiss Count Seven for failure to state a claim must be denied. Plaintiff's amended complaint plainly alleges facts – and JHA does not argue in its motion to dismiss to the contrary – that she has a disability under the ADA as generally defined by § 12102(a)(1). *See* Doc. 46 at ¶¶ 67, 71-72 (alleging she has experienced "clinically significant distress and impairment . . . manifesting in all six of the conditions listed in the DSM-V diagnostic criteria" for gender dysphoria, also set out in her amended complaint; that she suffers severe distress, anxiety, and depression from the incongruence and existence of her remaining male sex characteristics including from severe distress around being photographed or recorded on video that prevents her from fully and actively participating in videoconference meetings, for example). On the other hand, *if*, as Defendant argues, gender dysphoria is a "gender identity disorder" as that term is used in the ADA's exclusionary provision, *then* Defendant's motion to dismiss Count Seven for failure to state a claim must be granted. As explained above, Plaintiff neither alleges facts nor argues that her gender dysphoria diagnosis "result[s] from [a] physical impairment[]." § 12211(b)(1). Therefore, to the extent Plaintiff's "gender dysphoria" diagnosis falls within the ADA's exclusion for "gender identity disorders," Count Seven would necessarily fail to state a claim. *See also Williams v. Kincaid*, No. 1:20-cv-1397, 2021 WL 2324162 (E.D. Va. June 7, 2021) (granting motion to dismiss for failure to state a claim where plaintiff failed to allege some physical impairment resulted in her gender dysphoria); *Doe v. Northrop Grumman Sys. Corp.*, 418 F. Supp. 3d 921 (N.D. Ala. 2019) (same); *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 754 (S.D. Ohio 2018) (same); *see also Lange v. Houston Cty.*, __ F. Supp. 3d __, 2022 WL 1812306, at *15-16 (M.D. Ga. June 2, 2022) (slip op.) (granting defendant's motion for

summary judgment as to plaintiff's ADA claim for gender dysphoria because plaintiff failed to prove her gender dysphoria results from a physical impairment).

Thus, what controls is the statutory interpretation of the term "gender identity disorders" as used within § 12211(b)(1)'s exclusionary provision, a question of law rather than fact.[30] As with any question of statutory interpretation, the Court must start with the statute's words and look to the "'ordinary meaning . . . at the time Congress enacted the statute.'" *Sanzone v. Mercy Health*, 954 F.3d 1031, 1040 (8th Cir. 2020) (quoting *Wis. Cent. Ltd. v. United States*, __ U.S. __, 138 S. Ct. 2067, 2070 (2018)); *accord Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."). To ascertain the meaning of an otherwise undefined statutory term or phrase courts may look to the corresponding dictionary definition. *Iverson v. United States*, 973 F.3d 843, 847 (8th Cir. 2020). The Court is mindful, at the same time, statutory language must be interpreted in the context of the whole text, including its purpose and context. *Sanzone*, 954 F.3d at 1040.

Plaintiff's argument supposes the statutory term "gender identity disorders" refers only to the diagnosable condition "gender identity disorder" rather than a category of disorders[31] (*See,*

---

[30] Federal courts routinely consider questions of law, including matters of statutory interpretation, even at the motion to dismiss stage. *See, e.g.*, *Granite Re, Inc. v. Nat'l Credit Union Admin. Bd.*, 956 F.3d 1041, 1045 (8th Cir. 2020) (considering whether "any contract" under 12 U.S.C. § 1787(c)(1) "includes the letter of credit issued" in that case, a matter of statutory interpretation, in addressing appeal following grant of the defendant's Rule 12(b)(6) motion to dismiss); *City of Ashdown v. Netflix, Inc.*, __ F. Supp. 3d __, 2021 WL 4497855 (W.D. Ark. Sept. 30, 2021); *Mayfield v. Mo. House of Representatives*, No. 2:21-cv-4059-MDH, 2021 WL 2228061 (W.D. Mo. June 2, 2021); *etrailer Corp. v. TexTrail, Inc.*, No. 4:19-CV-2490-NAB, 2019 WL 6716369 (E.D. Mo. Dec. 10, 2019) (deciding whether 17 U.S.C. § 1202's definition of copyright management information includes the "stickers" Plaintiff placed on photographs); *HEMCO Corp. v. ADP, Inc.*, No. 12-00407-CV-W-BP, 2012 WL 13027553 (W.D. Mo. Sept. 25, 2012); *Am. Cent. Transp., Inc. v. Strickland*, No. 09-00649-CV-W-DGK, 2009 WL 10704945 (W.D. Mo. Nov. 24, 2009); *see also Carter v. United States*, 123 F. App'x 253, 257 (8th Cir. 2005) (deciding question of law on motion to dismiss). Moreover, as the Supreme Court has explained, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citations omitted). Stated differently, dismissal is appropriate "if it appears beyond doubt that [the plaintiff] cannot prove any set of facts in support of [her] claim which would entitle [her] to relief." *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 464 (8th Cir. 2002) (citation and quotation marks omitted); *accord Nietzke*, 490 U.S. at 327 ("[I]f as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one.") (citation and quotation marks omitted).

[31] For instance, Plaintiff's argument seems to focus primarily on comparing "gender dysphoria" as a diagnosable condition under the current DSM to "gender identity disorder" which was a diagnosable

*e.g.*, Doc. 65 at 60 ("JHA's argument . . . fails because it ignores the difference between gender dysphoria, a mental health condition characterized by significant psychological distress, and gender identity disorder . . . an outdated diagnosis that effectively included all transgender individuals, because psychological distress was not a necessary diagnostic criterion.").) The plain language of § 12211(b)(1) indicates this is not so, however.

By enacting § 12211(b)(1), Congress excluded from the ADA's definition of "disabilities" three categories: (1) "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism"; (2) "gender identity disorders not resulting from physical impairments"; and (3) "other sexual behavior disorders." At the time the ADA was enacted, as today, with the exception of transsexualism,[32] the first category enumerated specific diagnosable "paraphilias," or "disorders . . . [with the essential feature of] recurrent intense sexual urges and sexually arousing fantasies" on which a person has acted or is "markedly distressed by." *Compare* DSM-III-R at 279, 282 (exhibitionism), 284 (pedophilia), 289 (transvestic fetishism), 290 (voyeurism) *with* DSM-V at 685 (5th ed. 2013) (noting that "paraphilic disorders," understood as "a paraphilia ["or intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, physically mature, consenting human partners"] that is currently causing distress or impairment," as including "voyeuristic disorder, . . . exhibitionistic disorder, . . . pedophilic disorder, . . . and transvestic disorder").

At the time Congress enacted the ADA, the DSM-III-R referred to "gender identity disorders" as a "subclass" of disorders having an "essential feature" of "an incongruence between assigned sex . . . and gender identity." Under this "subclass" of disorders, the DSM-III-R included as specifically diagnosable conditions: "Gender Identity Disorder of Childhood," "Transsexualism," "Gender Identity Disorder of Adolescence or Adulthood, Nontranssexual

---

condition in earlier versions of the DSM. (*See* Doc. 65 at 60-61.)

[32] Although it is no longer a specifically diagnosable condition as contained within the DSM, transsexualism was historically understood as "a gender identity disorder, the suffers of which believe that they are 'cruelly imprisoned within a body incompatible with their real gender identity.'" *Farmer v. Moritsugu*, 163 F.3d 610, 611 (D.C. Cir. 1998) (quoting THE MERCK MANUAL OF MEDICAL INFORMATION 418 (1997)); *accord* THE MERCK MANUAL OF MEDICAL INFORMATION 1497 (15th ed. 1987) (same); THE MERCK MANUAL OF MEDICAL INFORMATION 1569 (16th ed. 1992) (same); THE MERCK MANUAL OF MEDICAL INFORMATION 1732 (18th ed. 2006) (noting "[t]hose with the most extreme form of gender identity disorder are called transsexuals"). Additionally, the DSM in effect when the ADA was enacted included "transsexualism" as a specifically diagnosable condition under the "subclass" of gender identity disorders. DSM-III-R at 71 (3d ed. rev. 1987).

type," and "Gender Identity Disorder Not Otherwise Specified." DSM-III-R at 71-77.[33] Even to the extent the text, evolution, and development of the DSM is instructive to discern the legal or statutory meaning of the term "gender identity disorders" as used within the ADA, Plaintiff's argument that her gender dysphoria diagnosis is categorically not included within the "gender identity disorders" otherwise excluded from coverage under the ADA is not persuasive.

The "general-terms canon" of statutory interpretation suggests "[w]ithout some indication to the contrary, general words . . . are to be accorded their full and fair scope . . . [and] are not to be arbitrarily limited." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (Thompson/West 2012). This canon of statutory interpretation recognizes "it is possible and useful to formulate categories . . . without knowing all the items that may fit – or may later, once invented, come to fit – within those categories." *Id.* Rather than the specific diagnosable condition "gender identity disorder," the context and plain language indicates Congress chose to exclude from the ADA's definition of covered disabilities the broad or more general category of "gender identity disorders," and more specifically those "gender identity disorders not resulting from physical impairment."

Under the plain language, § 12211(b)(1) excludes from ADA coverage a "gender identity disorder" in the categorical sense (rather than as a specific diagnosable condition). The plain language of the statute indicates Congress did not merely exclude as a disability under the ADA the *diagnosis* of "gender identity disorder" as previously set forth in the DSM. If Congress had done so, Plaintiff's argument that her specific diagnosis of gender dysphoria under the current DSM may well have had merit. Rather than exclude a specific diagnosis, however, the plain language indicates Congress intended to exclude from ADA-covered disabilities gender identity disorders not resulting from physical impairment as a general category. *See also Northrup*, 418 F. Supp. 3d at 929 (recognizing § 12211(b)(1) as "utilize[ing] the descriptive term . . . 'gender identity disorders,'" and that "the terms 'gender identity disorder' and 'gender dysphoria' are legally

---

[33] The following iterations of the DSM promulgated in 1994 and 2000 similarly referred to both "Gender Identity Disorders" and "Gender Identity Disorder," the latter as a specifically diagnosable condition of "Gender Identity Disorder in Children," "Gender Identity Disorder in Adolescents or Adults," or "Gender Identity Disorder Not Otherwise Specified." DSM-IV at 532-38 (4th ed. 1994); *see* DSM-IV-TR at 576-82 (4th ed. text rev. 2000). Subsequently, however, the DSM-V replaced "gender identity disorder" with the "more descriptive [term]": "gender dysphoria." *See* DSM-V at 451. Regardless of the specific diagnostic criteria in DSM-V, the DSM-V noted that the term "gender dysphoria" is continued to generally be understood as "the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." *Id.*

synonymous" for purposes of ruling on the motion to dismiss) (collecting cases); *see also Michaels v. Akal Sec., Inc.*, No. 09-cv-01300-ZLW-CBS, 2010 WL 2573988, at *6 (D. Colo. June 24, 2010) (concluding gender dysphoria is a "gender identity disorder" specifically exempted as a disability under the Rehabilitation Act).[34]

Congress could, of course, amend § 12211(b)(1) or the ADA more broadly to specifically encompass gender identity disorders like gender dysphoria. It has not yet chosen to do so, however.[35] The Court is bound to apply statutes as enacted by Congress. Because § 12211(b)(1) excludes from the ADA gender identity disorders as a category – a category that encompasses Plaintiff's diagnosis of gender dysphoria – and because Plaintiff neither alleges facts nor argues in this case her gender dysphoria is the result of a "physical impairment," the Court must conclude in this case that Plaintiff fails to state a discrimination claim under the ADA. Defendant JHA's motion to dismiss Count Seven for failure to state a claim is **GRANTED**.

## IV. Conclusion

For the reasons explained above, Defendants' motions to dismiss for failure to state a claim under Rule 12(b)(6) (Docs. 52, 54, 57) are **GRANTED in part** and **DENIED in part**, as follows:

(1) Defendants' motions to dismiss Count One seeking relief under ERISA, § 1132(a)(1)(B), are **DENIED**;

---

[34] In support of her argument, Plaintiff primarily relies on a recent decision from a district court in Pennsylvania in *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-04822, 2017 WL 2178123 (E.D. Pa. May 18, 2017). There, the district court applied a narrow interpretation to § 12211(b)(1)'s exclusion for "gender identity disorders not resulting from physical impairments" as "refer[ing] to only the condition of identifying with a different gender, not . . . a condition like [plaintiff]'s gender dysphoria, which goes beyond merely identifying with a different gender and is characterized by clinically significant stress and other impairments that may be disabling." *Id.* at *2. Critically, however, the district court was – as it explicitly recognized – duty-bound to apply the narrow interpretation under the constitutional-avoidance canon of statutory interpretation, given that the plaintiff in *Blatt* had also argued that interpreting § 12211(b) to exclude "gender identity disorders," (the plaintiff in *Blatt* specifically alleged she had been "diagnosed with 'Gender Dysphoria, also known as Gender Identity Disorder'") would violate the plaintiff's equal protection rights. *Id.* at *2 and *4 (recognizing "it is the Court's duty to adopt" the narrow interpretation because it "allows the Court to avoid the constitutional questions raised in this case"). Here, in contrast, Plaintiff does not raise any constitutional argument or claim.

[35] Similarly, Plaintiff's argument that the statutory term excluding "gender identity disorders" must be read narrowly after the ADAAA is not persuasive. The ADAAA states "[t]he definition of disability in this chapter shall be construed in favor of broad coverage . . . to the maximum extent permitted by the terms of this chapter." § 12102(4)(A). The ADAAA did not address, and left untouched, § 12211(b)'s exclusions, and nothing in the text or legislative history of the ADAAA suggests otherwise. *See, e.g.*, 154 Cong. Rec. H8286-03, H8288 (referring to the "catch-22 that Congress will change with the passage of this bill" in the context of court rulings finding persons not protected under the ADA when they have effectively "successfully managed their disability").

Case 6:21-cv-03280-RK    Document 95    Filed 07/27/22    Page 50 of 51

(2) Defendants' motions to dismiss Count Two seeking relief under ERISA, § 1132(a)(3)(A), are **DENIED**;

(3) Defendants' motions to dismiss Count Three seeking relief under ERISA, § 1132(a)(3)(B), are **DENIED**;

(4) Defendants' motions to dismiss Count Four brought under ERISA, § 1185a and seeking § 1132(a)(3) are **DENIED**;

(5) Defendant JHA's motion to dismiss Count Five seeking relief under ERISA, § 1132(c)(1)(B), is **GRANTED**; and finally,

(6) Defendant JHA's motion to dismiss Count Seven seeking relief under the ADA is **GRANTED**.

As a result, only Counts One, Two, Three, Four, and Six (as to which Defendant JHA did not include in its motion to dismiss) remain.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: July 27, 2022.

51